IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| THE SEGERDAHL CORP. d/b/a SG360°,<br><br>    Plaintiff,<br><br>v.<br><br>ANTHONY FERRUZZA; MICHAEL FERRUZZA; DANIELLA TUCCI; CHRISTOPHER KNOLL; ERICA KNOLL; EUGENE "CORKY" CZECH; VINCE DANTE; AMERICAN LITHO, INC. and WORLD VISUAL GROUP, LLC,<br><br>    Defendants. | No. 1:17-cv-03015<br><br>Judge Sharon Johnson Coleman<br>Magistrate Judge Sheila Finnegan |

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

For its Amended Complaint for Injunctive Relief and Damages against Defendants Anthony Ferruzza, Michael Ferruzza, Daniella Tucci, Christopher Knoll, Erica Knoll, Eugene "Corky" Czech (collectively, the "Individual Defendants"), Vince Dante, American Litho, Inc. ("American Litho") and World Visual Group, LLC ("World Visual Group" and, collectively with American Litho, "American Litho") (collectively, the "Defendants"), Plaintiff, The Segerdahl Corp. d/b/a SG360° ("Segerdahl"), states as follows:

**NATURE OF THE ACTION**

1.      Defendants Anthony Ferruzza, Michael Ferruzza (i.e., Anthony Ferruzza's son), Daniella Tucci, Christopher Knoll, Erica Knoll (i.e., Christopher Knoll's daughter) and Eugene "Corky" Czech are former employees of Segerdahl who recently left en masse—resigning between January 31, 2017 and February 2, 2017—to become employed by American Litho (including its alter ego and/or joint employer, World Visual Group), one of Segerdahl's

competitors in the commercial printing and direct mail/direct marketing industries. On March 20, 2017, American Litho issued an article on its blog titled, "We're adding serious talent to grow our sheet-fed and digital operations," which featured numerous marketing photos and descriptions of American Litho's "new team members"—i.e., the Individual Defendants. (A copy of American Litho's blog posted dated March 20, 2017 is attached as **Exhibit A**.)

2.     For the 2016 fiscal year, Segerdahl reported $303 million in total sales, ranking number 17 on the 2016 *Printing Impressions* 400 list of the largest printers in the U.S. and Canada based on annual sales volume. American Litho ranked number 43 on the 2016 *Printing Impressions* 400 list, reporting revenues of $108.61 million. (A copy of the 2016 and 2017 *Printing Impressions* 400 list is attached as **Exhibits B** and **C**, respectively.)

3.     Beginning around June 2016 and continuing for about eight months until the Individual Defendants and Vince Dante resigned from Segerdahl in late January/early February 2017, Anthony Ferruzza and Michael Fontana, American Litho's President, devised a secret plan—in conspiracy with the other Individual Defendants and Vince Dante (among others)—to hire Segerdahl's employees and steal Segerdahl's customers. Anthony Ferruzza continually marketed his "team" to Michael Fontana and American Litho, which team included the Individual Defendants, Vince Dante and a few other Segerdahl employees. Anthony Ferruzza and Michael Fontana expressly planned to (a) turn American Litho from a $100 million company to a $300 million dollar company "in no time"; and (b) steal away from Segerdahl "all" the work for numerous Segerdahl customers, including R. J. Reynolds Tobacco Company ("R. J. Reynolds" or "RJR"), Leo Burnett, American Express and Men's Wearhouse.

4.     Forensic analysis shows that in the days and weeks immediately prior to their departure from Segerdahl, the Individual Defendants used their Segerdahl-issued computers to

(a) connect USB storage devices and copy Segerdahl documents and files thereto; (b) email numerous Segerdahl documents and files to personal email addresses; (c) access and use third-party cloud storage services Google Drive, Dropbox and Box.com; (d) print numerous Segerdahl documents and files, in an abnormal spike of printing activity; and (e) delete numerous Segerdahl documents and files. The Segerdahl documents and files that they took and deleted include confidential information and trade secrets pertaining to Segerdahl's business, including financial statements, current and historical sales data (by customer), customer information, billing reconciliation, facility- and customer-specific operating procedures, job workflows, operational initiatives, customer quotes, vendor information, work schedules and employee compensation information.

5. Approximately six months before the Individual Defendants left Segerdahl, Anthony Ferruzza, while employed as Senior Vice President and General Manager of Segerdahl's Gilman sheetfed and digital operation, solicited sales, production and support staff to join American Litho. In those conversations, Anthony Ferruzza urged a number of key employees to move to American Litho. Approximately six months after soliciting Segerdahl's employees, Anthony Ferruzza left Segerdahl to join American Litho, taking with him the Individual Defendants and a trove of Segerdahl's confidential information and trade secrets. Segerdahl phone records show that certain of the Individual Defendants made multiple phone calls to the cell phone of Michael Fontana, President of American Litho, dating back to June 2016. The timing of this was no accident. Anthony Ferruzza deferred and concealed his plans to leave and his solicitation of the other Individual Defendants to join him and American Litho, as did the other Individual Defendants, in order that Anthony Ferruzza might cash in on nearly $2 million in stock appreciation rights awards ("SARs") that he reaped on December 7, 2016 as the

result of the acquisition of Segerdahl by ICV Partners. As a member of senior management, Anthony Ferruzza signed a Confidentiality Agreement and received confidential information related to the sale process and its timing. Resigning post-sale also benefited the other Individual Defendants (and Vince Dante) as they participated in the company's Employee Stock Ownership Plan ("ESOP"). Per the terms of the ESOP, upon sale of the Company, ESOP shares were immediately vested and converted to cash within 60 to 90 days. Under regular ESOP vesting provisions, individuals leaving the Company before age 59½ would be subject to a five-year payout schedule. Each Individual Defendant is less than 59½ years of age.

6.      Anthony Ferruzza and the other Individual Defendants (and Vince Dante), therefore, continued in their Segerdahl employment and continued receiving the substantial compensation that employment entailed while they were planning their departures to American Litho and timing those departures to maximize the benefit to themselves and to American Litho, and to maximize the harm to Segerdahl. These benefits to the Individual Defendants included nearly $2 million in SARs awards to Anthony Ferruzza. In addition, the Individual Defendants (and Vince Dante) each received accelerated vesting of all ESOP shares held in the company as a result of the sale of the company on December 7, 2016. These ESOP shares were valued at $221,264 for Anthony Ferruzza, $4,044 for Michael Ferruzza, $28,596 for Daniella Tucci, $278,424 for Christopher Knoll, $1,076 for Erica Knoll; $1.4 million for Eugene "Corky" Czech and $811,726.67 for Vince Dante.

7.      During this time, Defendant Vince Dante, Segerdahl's former Director, Infrastructure and Networking, most probably at Anthony Ferruzza's direction and in conspiracy with the other Defendants, was using his position (and his access to Segerdahl employee passwords) to illegally and surreptitiously (1) use a personal computing device/iPad to access the

Segerdahl email accounts of Segerdahl's CEO, Mary Lee Schneider, and its Chairman of the Board and former CEO, Rick Joutras; (2) copy confidential information from those Segerdahl email accounts pertaining to Segerdahl's business and the sale thereof; and (3) paste the purloined information into emails directed from Vince Dante's personal email account, Vdante1@me.com, to Anthony Ferruzza's personal email account, Aferruzza@att.net. Vince Dante allegedly deleted from his personal email account each of the emails that he sent to Anthony Ferruzza's email account. Likewise, Anthony Ferruzza deactivated (and deleted data from) his aferruzza@att.net email account, thus destroying evidence of this unlawful activity. Anthony Ferruzza never notified anyone at Segerdahl about the fact that Vince Dante was illegally and surreptitiously sending hacked emails to Anthony Ferruzza containing confidential information mined from the Segerdahl email accounts of Segerdahl's CEO and former CEO.

8.     Vince Dante interviewed for a position with American Litho in or around November 2016. Although Vince Dante claims that he turned down the position for monetary reasons, he actually resigned from Segerdahl in January 2017 before subsequently revoking his resignation days later. Segerdahl terminated Vince Dante on June 26, 2017 when Segerdahl discovered the full extent of his wrongful and illegal activity in conspiracy with the other Individual Defendants.

9.     The Individual Defendants have violated the Defend Trade Secrets Act, the Computer Fraud and Abuse Act and the Illinois Trade Secrets Act; breached their fiduciary duties; tortiously interfered with Segerdahl's prospective economic advantage; aided and abetted each other's breaches of fiduciary duties; converted Segerdahl's documents, files and other materials; unfairly competed; unjustly enriched themselves and spoliated evidence. Likewise, Vince Dante has violated the Defend Trade Secrets Act, the Computer Fraud and Abuse Act and

the Illinois Trade Secrets Act; breached his fiduciary duties; aided and abetted the Individual Defendants' breaches of fiduciary duties; unfairly competed and spoliated evidence. The Individual Defendants and Vince Dante did this to benefit American Litho well before resigning their Segerdahl employment and, therefore, while they each owed Segerdahl fiduciary duties, including duties to act at all times with the utmost good faith, loyalty, honesty and fair dealing towards Segerdahl. In addition, American Litho has tortiously interfered with Segerdahl's prospective economic advantage; aided and abetted the Individual Defendants' breaches of fiduciary duties; unfairly competed; unjustly enriched itself and spoliated evidence.

10. Segerdahl asserts the following claims against Defendants: (a) violation of the Defend Trade Secrets Act; (b) violation of the Computer Fraud and Abuse Act; (c) violation of the Illinois Trade Secrets Act; (d) breach of fiduciary duty; (e) tortious interference with prospective economic advantage; (f) aiding and abetting breach of fiduciary duty; (g) conversion; (h) unfair competition; (i) civil conspiracy; (j) unjust enrichment and (k) negligent spoliation of evidence.

11. Prior to filing this action, Segerdahl attempted to secure the Individual Defendants' compliance with their continuing obligations, including by sending them several demand letters.

12. Segerdahl thus seeks temporary, preliminary and permanent injunctive relief to stop Defendants from engaging in additional wrongful conduct. Segerdahl also seeks damages for the losses it has sustained as a result of Defendants' wrongful conduct to date; imposition of a constructive trust and the disgorgement of salaries and benefits (including any SARs awards to Anthony Ferruzza) received by Defendants; and punitive damages, attorneys' fees and costs as warranted by Defendants' egregious conduct.

## PARTIES

13.     Segerdahl is an Illinois corporation with its principal place of business in Wheeling, Illinois.  Segerdahl is a citizen of Illinois.

14.     Anthony Ferruzza is an individual residing in Carol Stream, Illinois.  Anthony Ferruzza is a citizen of Illinois.

15.     Michael Ferruzza is an individual residing in Lombard, Illinois.  Michael Ferruzza is a citizen of Illinois.

16.     Daniella Tucci is an individual residing in Northbrook, Illinois.  Daniella Tucci is a citizen of Illinois.

17.     Christopher Knoll is an individual residing in Bloomingdale, Illinois.  Christopher Knoll is a citizen of Illinois.

18.     Erica Knoll is an individual residing in Tinley Park, Illinois.  Erica Knoll is a citizen of Illinois.

19.     Eugene "Corky" Czech is an individual residing in Tinley Park, Illinois.  Eugene "Corky" Czech is a citizen of Illinois.

20.     Vince Dante is an individual residing in Mount Prospect, Illinois.  Vince Dante is a citizen of Illinois.

21.     American Litho is a Illinois corporation with its principal place of business in Carol Stream, Illinois.  American Litho is a citizen of Illinois.

22.     World Visual Group is a Delaware limited liability company with its principal place of business in Carol Stream, Illinois.  World Visual Group is a citizen of Illinois and Delaware.

## JURISDICTION AND VENUE

23.     Subject matter jurisdiction is proper under 28 U.S.C. §§ 1331 and 1367 because this Court has original jurisdiction over Segerdahl's causes of action under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b), and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Segerdahl's other causes of action arising under state law.

24.     Personal jurisdiction is proper under 735 ILCS 5/2-209(a)(1), 2-209(a)(2), 2-209(a)(11), 2-209(b)(2), 2-209(b)(3) and 2-209(c) because (a) Segerdahl's causes of action arise from the transaction of business in Illinois, the commission of tortious acts in Illinois and the breach of fiduciary duties in Illinois; (b) Anthony Ferruzza, Michael Ferruzza, Daniella Tucci, Christopher Knoll, Erica Knoll, Eugene "Corky" Czech and Vince Dante are domiciled and reside in Illinois; (c) American Litho is an Illinois corporation; (d) WVG is the alter ego of American Litho (and/or the joint employer of the Individual Defendants), and it is a Delaware LLC with its principal place of business in Carol Stream, Illinois; and (e) the Court's exercise of jurisdiction over Defendants would not violate due process.

25.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because (a) Defendants reside in this judicial district and (b) a substantial part of the events or omissions giving rise to Segerdahl's causes of action against Defendants occurred in this judicial district.

## BACKGROUND FACTS

### —Segerdahl's Business—

26.     Founded in 1956, Segerdahl is an industry-leading commercial printing and multichannel direct marketing solutions provider.  Segerdahl offers multichannel marketing solutions and services that range from research and strategy to concept and execution, including data programming, commercial printing, direct-mail production, data analytics, lettership, and

distribution and fulfillment, among other services. Headquartered in Wheeling, Illinois, with manufacturing operations in Wheeling and Broadview, Illinois, Segerdahl has sales locations elsewhere in Illinois and also in California, Michigan, Minnesota, New Jersey, New York and Texas.

## —Segerdahl's Customer Relationships—

27.     Segerdahl's continued business success depends on its customer relationships. Segerdahl has expended considerable time, effort and money in initiating, developing and maintaining its customer relationships in order to preserve its competitive advantage. In 2016, Segerdahl provided printing and marketing solutions to approximately 400 customers, and the majority of the top 20 of those customers have been with Segerdahl for 10 years or more. For a printing and marketing services business such as Segerdahl's to succeed, it is necessary to have established customer relationships and production agreements in place. Segerdahl continually invests in its equipment, systems and processes in order to meet its customers' needs. Indeed, it spends between $10 million and $17 million a year in capital investments to maintain its customer relationships.

28.     Through all these efforts, Segerdahl has developed a strongly positive reputation for value, efficiency and quality in the marketplace and has engendered substantial goodwill with its customers. These continuing efforts and this goodwill are critical to Segerdahl's success, and they result in Segerdahl gaining repeat business from its established customer relationships.

## —Segerdahl's Confidential Information—

29.     In order to conduct its printing and marketing services business and to meet its customers' needs, Segerdahl has developed and relies upon certain confidential information ("Confidential Information"), including, but not limited to, the following:

(a)      information relating to Segerdahl's business methods and practices, such as market research data; competitor information and data; consumer studies; product initiatives and strategies; sales projections; gross margin and revenue information; profit and loss information; marketing and business plans; business strategies; branding strategies; mergers and acquisitions information; and operating information and other non-published pricing, financial and sales data;

(b)      information relating to Segerdahl's customers, such as customer names, addresses, telephone numbers, emails and key contacts; customer contracts; customer orders; financial information pertaining to customer accounts, including billing statements and historic revenues; and customer production materials, including proofs, working files, works in progress, final or waste product, and any other part of a production job in whole or in part;

(c)      information pertaining to Segerdahl's suppliers, vendors and subcontractors, such as names, addresses, telephone numbers, emails and key contacts; proposals, presentations, bids and quotes; contracts; performance histories and capabilities; and financial information pertaining to the supplier, vendor or subcontractor, including billing statements and payments; and

(d)      information pertaining to Segerdahl's employees, such as contact information; personnel files; employment agreements; performance evaluations; tax forms; financial information pertaining to salaries, bonuses and benefits and special training qualifications.

**—Segerdahl's Trade Secrets—**

30.      Segerdahl also has developed certain trade secrets ("Trade Secrets"), upon which Segerdahl relies to conduct its printing and marketing services business and to meet its customers' needs, including, but not limited to, the following:

(a)      compilations of information relating to Segerdahl's business methods and practices, such as compilations of industry data; compilations of standard operating procedures and process maps, and proprietary quality management system documentation; and compilations of the various legal requirements in areas where Segerdahl performs printing and marketing work;

(b)      compilations of information pertaining to Segerdahl's customers, such as compilations of customer contracts and the terms and conditions thereof; compilations of current and historic pricing terms, formulas and strategies; compilation lists of former, existing and prospective customers; compilations of customer purchase habits, orders, preferences and requirements; compilations of current and past proposals, presentations, bids and quotes; and compilations of key contact persons of former, existing and prospective customers; compilations of customer production materials, including proofs, working files, works in progress, final or waste product, and any other part of a production job in whole or in part;

      (c)    compilations of information relating to current or prospective suppliers, vendors and subcontractors, such as compilations of contracts and the terms and conditions thereof; compilations of current and past proposals, presentations, bids, quotes and cost calculators; compilation lists of former, existing and prospective suppliers, vendors and subcontractors; compilations of billing statements and payments; compilations of work performed; and compilations of key contact persons; and

      (d)    compilations of employee information, such as a compilation roster of former and current employees, including personal and work contact information; compilations of employment agreements and the terms and conditions thereof; and compilations of salaries, bonuses, benefits and other offers/terms of employment.

**—Segerdahl's Efforts to Protect Its Confidential Information and Trade Secrets—**

31.    Segerdahl's Confidential Information and Trade Secrets are sufficiently secret to derive economic value because they are not generally known to the industry or publicly available, and they are a by-product of countless hours and expense on the part of Segerdahl spanning more than sixty-one (61) years. As a result, Segerdahl's Confidential Information and Trade Secrets afford Segerdahl an advantage over its competitors.

32.    Segerdahl has taken reasonable measures to maintain the secrecy and confidentiality of its Confidential Information and Trade Secrets. These measures include the following:

      (a)    implementing policies and training employees annually on the importance and requirements of maintaining the confidentiality of Segerdahl's Confidential Information and Trade Secrets. Annual Security Training requires every employee to sign a document stating that he or she agrees to abide by the security guidelines regarding the confidentiality of company and customer information;

      (b)    disclosing Segerdahl's Confidential Information and Trade Secrets only to those persons who need to know them in order to perform their work for Segerdahl and mandating that such information be used only for Segerdahl's benefit;

      (c)    controlling access to Segerdahl's facilities, which remain locked and secured during nonbusiness hours, as well as locking secure areas, restricting access to designated employees through the use of keys issued by Segerdahl, and maintaining 24-hour video surveillance of the facilities;

(d)     maintaining Segerdahl's Confidential Information and Trade Secrets on password-protected computer systems with login procedures that restrict access to Segerdahl personnel on a strictly need-to-know basis;

(e)     conducting exit interviews (when possible) and reminding departing employees of their obligations to return all of Segerdahl's Confidential Information and Trade Secrets and to abide by their nondisclosure covenants;

(f)     investigating and taking prompt action whenever Segerdahl learns that someone is wrongly using Segerdahl's Confidential Information and/or Trade Secrets, in order to attempt to stop such use;

(g)     participating in client-mandated annual audits of enforcement of data security policies; and

(h)     investigating and taking prompt action in accordance with applicable data privacy laws, regulations and best practices whenever Segerdahl learns that a data breach or incident potentially has (or may have) occurred, including by providing the requisite notice to the appropriate parties and government entities.

33.     Segerdahl's Confidential Information and Trade Secrets could not be discovered, developed or compiled by a competitor without the investment of substantial sums of money over a period of years.  If Segerdahl's Confidential Information or Trade Secrets were to be disclosed to and/or used by a competitor, that competitor would be able to compete unfairly against Segerdahl in the printing and marketing industry.  Among other things, such disclosure and/or use would enable a competitor to more effectively provide competing products and services, and to solicit Segerdahl's customers and employees, without having to spend the time, effort, expense and resources that Segerdahl has expended over the years.  Under these circumstances, the economic value of Segerdahl's Confidential Information and Trade Secrets would be severely and irreparably damaged, if not completely lost, as would Segerdahl's advantage over its competitors in the industry.

**—The Individual Defendants' and Vince Dante's Employment with Segerdahl—**

34.     In April 2005, Segerdahl hired Anthony Ferruzza as its Prepress Manager.  In January 2014, Segerdahl promoted Anthony Ferruzza to Senior Vice President and General

Manager of Segerdahl's Gilman, Illinois facility. In that role, Anthony Ferruzza had responsibility for the sheetfed and digital operations of Segerdahl. Additionally, Anthony Ferruzza had full access to Segerdahl's financial information, customer data, content, production schedules and billing information, standard operating procedures, vendor contracts and employee personnel records. As a member of the Segerdahl Executive Team, he also had access to information related to future business activities, including a transaction to sell the company. (A copy of Anthony Ferruzza's LinkedIn profile is attached as **Exhibit D**.)

35. Anthony Ferruzza's son, Michael Ferruzza, graduated from Glenbard North High School in 2007. In September 2008, Segerdahl hired Michael Ferruzza as a Prepress Operator; in that role, Michael Ferruzza's dad, Anthony Ferruzza, was also his boss. In January of 2015, Segerdahl promoted Michael Ferruzza to his dad's old role—i.e., Director of Prepress at the Gilman, Illinois facility. In that role, Michael Ferruzza supervised the receipt, preparation, optimization and archiving of customer-supplied digital content for print, and Michael Ferruzza's dad, Anthony Ferruzza, remained his boss. Since graduating high school in 2007, Michael Ferruzza's only employment has been at printing companies where his dad, Anthony Ferruzza, also worked and was Michael Ferruzza's boss. (A copy of Michael Ferruzza's LinkedIn profile is attached as **Exhibit E**.)

36. Daniella Tucci graduated from the University of Iowa in 2010. In October 2010, Segerdahl hired Daniella Tucci as a Receptionist / Sales and Marketing Coordinator. In November 2014, Segerdahl promoted Ms. Tucci to Digital Project Manager at its Gilman, Illinois facility. In that role, Daniella Tucci interfaced with Segerdahl's customers to plan and project manage print programs, and Anthony Ferruzza was Ms. Tucci's boss. Since graduating college school in 2010, Ms. Tucci's only employment has been at printing companies where

Anthony Ferruzza also worked and was her boss. (A copy of Daniella Tucci's LinkedIn profile is attached as **Exhibit F**.)

37. In September 1996, Segerdahl hired Christopher Knoll in an operational role. In June 2002, Segerdahl promoted Christopher Knoll to Segerdahl's Director of Project Management at its Gilman, Illinois facility. In that role, Christopher Knoll worked directly with Segerdahl's customers to plan all aspects of printing jobs. He had responsibility for all the Project Managers for both print and mailing operations. (A copy of Christopher Knoll's LinkedIn profile is attached as **Exhibit G**.)

38. In August 2012, Segerdahl hired Erica Knoll, Christopher Knoll's daughter, as a Receptionist. Segerdahl eventually promoted her to Sheet Fed and Digital Project Manager. In that role, Erica Knoll interfaced with customers to plan and project manage print programs. Erica Knoll's only employment has been at printing companies where her father, Christopher Knoll, also worked and where Anthony Ferruzza was her boss. (A copy of Erica Knoll's LinkedIn profile is attached as **Exhibit H**.)

39. In September 1981, Segerdahl hired Eugene "Corky" Czech as a Supervisor. It eventually promoted him to the Director of Manufacturing role, where he had responsibility for the manufacturing operations of Segerdahl's Gilman facility. (A copy of Eugene Czech's LinkedIn profile is attached as **Exhibit I**.)

40. In April 2000, Segerdahl hired Vince Dante as a color/scanning operator. It eventually promoted him to Director, Infrastructure and Networking. In that role, Vince Dante oversaw the IT Help Desk, security and the Segerdahl network. (A copy of Vince Dante's LinkedIn profile is attached as **Exhibit J**.)

**—The Individual Defendants' and Vince Dante's Agreement to Abide by
Segerdahl's Confidentiality and Nondisclosure Policies Set Forth in
the Confidentiality and Nondisclosure Policy and the Employment Handbook—**

41.    In 2016, the Individual Defendants and Vince Dante each acknowledged their respective receipt of and understanding and willingness to abide by the policies set forth in the Segerdahl Confidentiality and Nondisclosure policy ("Nondisclosure Policy") and the Segerdahl Employment Handbook ("Handbook"), which set forth confidentiality, nondisclosure and other policies to which all employees must adhere.  (Copies of the Nondisclosure Policy and the Handbook are attached as **Exhibits K** and **L**, respectively.)  For example, the Segerdahl Nondisclosure Policy provides, in relevant part:

> Confidentiality and Nondisclosure
>
> In the course of your association with Segerdahl, you may become privy to confidential information concerning Segerdahl. Such confidential information includes information about our business or customers that is not considered public. The following are some, but not the only examples of confidential information:
>
> 1.    Company or customer financial information.
> 2.    Company or customer marketing strategies.
> 3.    Company or customer computer processes.
> 4.    Company compensation data.
> 5.    Company or customer computer programs or codes.
> 6.    Company or customer proprietary production processes.
> 7.    Customer lists.
> 8.    Research on new materials.
> 9.    Pending projects and proposals.
> 10.    Technological data.
>
> Segerdahl requires that you keep all such information confidential both during and after your employment with Segerdahl. Unauthorized use or disclosure of any such information to any person or entity, or allowing any person to examine or make copies of reports or documents containing confidential information, is strictly prohibited and will result in discipline, up to and including termination. If you have any questions about these matters, ask your manager for guidance.

(Ex. K.)

42.     Likewise, in accordance with the express provisions of the Handbook, and as a further condition of their employment with Segerdahl, the Individual Defendants agreed that they were not engaged in any "[u]se or disclosure of proprietary or confidentiality information regarding Segerdahl or a fellow employee." (Ex. L at 24–25.)

### —The Individual Defendants' and Vince Dante's Agreement to Abide By the Segerdahl Company Property Acknowledgment—

43.     The Individual Defendants each signed a Segerdahl Company Property Acknowledgment, pursuant to which they each acknowledged and agreed that "all production materials including all proofs, working files, work in progress, final or waste product or any other part of a production job in whole or in part, cannot be used for personal purposes or taken out of the company premises." (A copy of the Company Property Acknowledgments signed by Anthony Ferruzza, Michael Ferruzza, Daniella Tucci, Christopher Knoll, Erica Knoll, Eugene "Corky" Czech and Vince Dante are attached as **Group Exhibit M**.)

### —The Individual Defendants' Access to Segerdahl's Confidential Information and Trade Secrets—

44.     During their tenure at Segerdahl, the Individual Defendants each had access to and became familiar with Segerdahl's Confidential Information and Trade Secrets. This information was stored in paper form as well as electronically on Segerdahl's network drives and on the Individual Defendants' Segerdahl-issued computing devices.

45.     In addition, Anthony Ferruzza participated in numerous periodic strategy meetings during which he was exposed to, and provided input and support with respect to, Segerdahl's Confidential Information and Trade Secrets. As a member of Segerdahl's Executive Team, Anthony Ferruzza participated in frequent, confidential discussions with Segerdahl's upper management regarding Segerdahl's future business plans, including the potential sale of the company.

46.     During their tenure with Segerdahl, the Individual Defendants also developed close working relationships with Segerdahl's existing customers and helped spearhead new business development efforts.  Segerdahl paid the Individual Defendants as its agents to maintain and develop these relationships and work on these efforts exclusively on Segerdahl's behalf.

**—Anthony Ferruzza's Solicitation of Segerdahl Employees on Behalf of American Litho—**

47.     Approximately six months before he left Segerdahl, Anthony Ferruzza solicited Segerdahl's sales production and support personnel to join American Litho.  Anthony Ferruzza urged these individuals to consider a move to American Litho.  Anthony Ferruzza solicited offer of employment from American Litho for himself and the other Individual Defendants (and Vince Dante), including by promoting the Individual Defendants' collective value as a team and by claiming that Anthony Ferruzza and the Individual Defendants could help secure business from certain of Segerdahl's customers.

**—Anthony Ferruzza's (and American Litho's President, Michael Fontana's) Secret Plan, in Conspiracy with the Other Individual Defendants and Vince Dante Among Others, to Hire Segerdahl's Employees and Steal Segerdahl's Customers—**

48.     Based on the available (i.e., not spoliated) evidence and discovery materials produced in this litigation—including certain text messages exchanged between Michael Fontana, Anthony Ferruzza, the Individual Defendants, Vince Dante and others—it is now indisputable that, beginning at least more than six months before the Individual Defendants' left Segerdahl en masse to work for American Litho, Anthony Ferruzza and Michael Fontana concocted (and executed) a secret plan—in conspiracy with each other, the Individual Defendants, Vince Dante and others—to hire away Segerdahl's employees and acquire Segerdahl's customers.  (A copy of a compilation chart listing, in chronological order, all text messages produced by the Defendants in this litigation is attached as **Exhibit N**.)

*—Anthony Ferruzza's Recruitment of "Team Ferruzza" for American Litho—*

49.    **On Thursday, June 16, 2016**, Anthony Ferruzza and Michael Fontana exchanged text messages about (i) "Chris"—i.e., Christopher Knoll—and "the person we talked about last night" being on "team Ferruzza," (ii) Michael Fontana "looking forward to moving forward," (iii) Anthony Ferruzza "doing [his] homework . . . with the right people to grow," (iv) the need for "this . . . to be 100 percent confidential" and (v) the amount of money American Litho pays its "sheetfed pressman":

> T. Ferruzza:  I was told by the person we talked about tonight— exact words—she is on team Ferruzza. . . lmao— Chris don't need to try anymore—done

> M. Fontana:  Awesome, look forward to moving forward

> T. Ferruzza:  —doing my homework tonight with the right people to grow exciting this has to be 100 percent confidential

> M. Fontana:  Yes

> T. Ferruzza:  talk tomorrow . . . how much you pay sheetfed pressman? top guy?

(Ex. N at 1.)

*—Vince Dante's Insider Hacking Activity on Behalf of Himself and Anthony Ferruzza—*

50.    While Anthony Ferruzza and Michael Fontana were planning the mass defection of Segerdahl's employees, and **from at least approximately October through December 2016**, Vince Dante—i.e., Segerdahl's Director, Infrastructure and Networking—was using his position (and his access to Segerdahl employee passwords) to illegally and surreptitiously (i) use a personal iPad to access the Segerdahl email accounts of Segerdahl's CEO, Mary Lee Schneider, and its Chairman of the Board and former CEO, Rick Joutras; (ii) copy confidential information from those Segerdahl email accounts pertaining to Segerdahl's business and the sale thereof; and

(iii) paste the purloined information into emails directed from Vince Dante's personal email account, Vdante1@me.com, to Anthony Ferruzza's personal email account, Aferruzza@att.net.

51.     Vince Dante admitted to his illegal inside hacking conduct, both to Segerdahl's CEO on May 5, 2017 and during Vince Dante's sworn statement taken under oath by Segerdahl's counsel on May 9, 2017.  (A copy of Vince Dante's sworn statement is attached as **Exhibit O**.)  (*See* Ex. O Dante Statement at 33:11–50:14.)

52.     In his discovery responses, Vince Dante stated that accessed and copied information from the following categories of emails contained in the email accounts of Segerdahl's CEO and its Chairman of the Board and former CEO: emails regarding (i) Dan Taylor's qualifications for the Segerdahl CTO position, (ii) Segerdahl's hiring of a person from Follet, (iii) ways to enhance Segerdahl's monthly sales results that were lower than forecasted amounts, (iv) touring the facilities of Segerdahl's new potential buyers, (v) Segerdahl's leaseback of buildings and (vi) the process of ICV Partner's acquisition of Segerdahl and the date/timing of that acquisition.  (A copy of Vince Dante's Second Supp. Resps. to Pl.'s First Set of Interrogs. is attached as **Exhibit P**.)  (*See* Ex. P at Interrog. No. 1.)

*—Anthony Ferruzza's and Michael Fontana's Meeting on October 24, 2016—*

53.     **On Sunday, October 23, 2016**, Anthony Ferruzza and Michael Fontana exchanged text messages about reviewing "the logo," and they scheduled (and held) a dinner meeting on the next day, Monday, October 24, 2016:

> M. Fontana:  Should we review the logo this week?
>
> T. Ferruzza:  Yup—venutis dinner any night—u let me know
>
> * * *
>
> M. Fontana:  Monday?
>
> * * *

> T. Ferruzza: ok- how bout we have a early dinner 4 pm --so i can be home for my fantasy football—im in 3 close matches and have players playing 2morrow
>
> M. Fontana: see ya at 4
>
> * * *
>
> T. Ferruzza: Running 10 late
>
> M. Fontana: K
>
> T. Ferruzza: Are u here yet?
>
> M. Fontana: Pulling in
>
> T. Ferruzza: Are u here yet?

(Ex. N at 1–2.)

*—Anthony Ferruzza's Text Messages with Michael Fontana to Schedule a Dinner Meeting With Their Wives so That Anthony Ferruzza's Wife Could "Understand Whats Going On"—*

54. **On Wednesday, November 16, 2018**, Anthony Ferruzza and Michael Fontana exchanged text messages about (i) "getting 2017 projects rolling," (ii) getting together for dinner with their wives, and (iii) Anthony Ferruzza wanting his wife to "understand whats going on":

> T. Ferruzza: send me to vacation for 1 week before i start—very stressful last few weeks—getting 2017 projects rolling lol . . . actually would be great to go to dinner—my wife can meet you and your wife—then we get the party started
>
> M. Fontana: Whenever your [sic] ready, we are. Where do you want to go??
>
> T. Ferruzza: anywhere just want my wife to meet and understand whats going on

(Ex. N at 2.)

*—Anthony Ferruzza's Aggressive Refusal to Provide Segerdahl's IT Staff with the Back-Up "Clone" Drive of His Segerdahl-Issued Computer—*

55.     **On Tuesday, November 29, 2016**, a member of Segerdahl's IT staff, John Cleary, ran an overnight back up of Anthony Ferruzza's Segerdahl-issued computer to an external "clone" drive in the ordinary course of his work in preserving Segerdahl's business information.  (A copy of the Declaration of John Cleary is attached as **Exhibit Q**.)  (*See* Ex. Q ¶ 8.)

56.     The next day, **on November 30, 2016**, John Cleary requested that Anthony Ferruzza return the "clone" drive to him for safekeeping, per routine Segerdahl IT practices. Anthony Ferruzza aggressively refused; angrily announced that he did not want anyone "looking at his sh*t;" and directed John Cleary that he, Anthony Ferruzza, would be keeping the back-up "clone" drive in his office desk drawer.  Anthony Ferruzza had never previously insisted on this exception to Segerdahl IT practice, and indeed no other Segerdahl employee had similarly insisted that he/she, not Segerdahl IT, maintain possession of the back-up "clone" drive of their Segerdahl-issued computer.

57.     The day of, or day following, Anthony Ferruzza's abrupt resignation from Segerdahl on January 31, 2017, John Cleary searched Anthony Ferruzza's office for the back-up "clone" drive, to no avail.  Despite an extensive search, Segerdahl has been unable to locate the back-up "clone" drive, and that "clone" drive  has been missing since Anthony Ferruzza's abrupt departure from Segerdahl.  (*See* Ex. Q Clear Decl. ¶¶ 9–13 Ex. A (referencing and attaching Segerdahl's clone drive inventory logs, including the log that specifically includes Mr. Cleary's work with the Anthony Ferruzza iMac clone on November 29–30, 2016, which documents Anthony Ferruzza insisting to John Cleary on November 30, 2016 that Anthony Ferruzza keep physical possession of the Anthony Ferruzza iMac clone).)

58.     Vince Dante executed a declaration stating, "At no time, either before Anthony Ferruzza's January 31, 2017 separation from Segerdahl employment or subsequent to that date, did Anthony Ferruzza [or "anyone else for, or on Anthony Ferruzza's behalf"] give me the Tony Ferruzza iMac Clone."   (A copy of Vince Dante's Supplemental Declaration is attached as **Exhibit R**.)  (*See* Ex. R. ¶¶ 4–5.)

59.     Segerdahl believes the backup "clone" of Anthony Ferruzza's computer to include, at a minimum, a complete duplicate of the files on that computer as of November 29, 2016, including but not limited to confidential and proprietary Segerdahl business information and files previously entrusted to Anthony Ferruzza.

*—Anthony Ferruzza's Text Messages with Michael Ferruzza About a "Start Date" for Anthony Ferruzza's "Team" and the Plan to Steal Business From Segerdahl's Customers and Take American Litho From a $100 Million Company to a $300 Million Company—*

60.     **On Wednesday, November 30, 2016**, Anthony Ferruzza and Michael Fontana exchanged text messages about (i) Anthony Ferruzza being "ready to chat" on Thursday, November 31; (ii) Anthony Ferruzza's "money"—from the accelerated vesting of his ESOP shares held in Segerdahl as a result of the acquisition of Segerdahl by ICV Partners  on December 7, 2016—transferring to his account on Tuesday, December 6, 2016; (iii) Michael Fontana Interviewing Segerdahl's Director of Estimating on Thursday, November 31; (iv) Anthony Ferruzza wanting to "sprint right out of the box"; (v) getting the buyer from Segerdahl customer R. J. Reynolds "in and to a game"; (vi) how every job for Segerdahl customers RJR and Leo Burnett are worth "millions"; very RJR job and Leo Burnett  the need for American Litho to purchase additional printing equipment; (vii) getting "all the discover work" from Segerdahl customer, Discover financial services; (viii) American Litho going from a $100 million company to a $300 million dollar company "in no time"; (ix) Anthony Ferruzza's "team" being "chomping" ready and "checked out already"; (x) American Litho providing health

insurance for the Segerdahl employees on Anthony Ferruzza's "team"; (xi) the "start date" for the Segerdahl employees on Anthony Ferruzza's "team"; and (xii) the "need to put packages together with incentives for the core group":

T. Ferruzza: lmfao — I'm ready to chat tomorrow — money transfers tues in my account I'm told

M. Fontana: Great, what time?

T. Ferruzza: you let me know

M. Fontana: Day time? Lunch? Night?

T. Ferruzza: after work

M. Fontana: I have an interview with [Segerdahl's Director of Estimating] at 5. After that?

T. Ferruzza: kk . . . I wanna get the buyer from rjr asap in and to a game . . . i wanna sprint right out of the box . . . we need some equipment tho—UV press or convert . . . digital press . . . I just sold 3 million piece job on indigo 10000

M. Fontana: We have a 7 color UV Mitzi

T. Ferruzza: gunna be from 100 mill to 300 mill in no time . . . we need 2 . . . every rjr job and leo job are millions

M. Fontana: I will get the HP12000 ASAP I already met with them . . . We already have 3 digital Ricoh's

T. Ferruzza: get the 10000 for a steal— game time man— are you ready to grow

M. Fontana: We could and then upgrade . . . They offered that deal

T. Ferruzza: 12000 is for s[ecial [sic] stocks —no need

M. Fontana: We are ready to strap it on and rook [sic]

T. Ferruzza: my team is chomping—they checked out already— lmfao . . . how long before we can get insurance . . . how many people? . . . how many sales people . . . lots of questions . . . my hr lady went to abs—they

> call me every other day—she told them what I did to gilman —they beg please come here - I said naw

M. Fontana: We can get insurance lined up ASAP. Until in the plan we will cover cobra.  I think I have 90 days wait

T. Ferruzza: lets get all the discover work—my sales girl is in really good –

M. Fontana: I agree

T. Ferruzza: u gunna need to buy 2 more buildings lmfao

M. Fontana: Fun

\* \* \*

M. Fontana: NP I'm excited and focused to make this great

T. Ferruzza: when you want start date for all the peeps?

M. Fontana: Sooner better, we are ready

T. Ferruzza: We need to put packages together with incentives for the core group

M. Fontana:  Okay let's start working on it . . . Okay, let's get down to business tomorrow night

T. Ferruzza: all business— then fun

M. Fontana: The only way

T. Ferruzza:  kk—talk tomorrow text me when you want to meet and where

(Ex. N at 3–4.)

—*Anthony Ferruzza's and Michael Fontana's Meeting on December 1, 2016*—

61.     **On Thursday, December 1, 2016**, Anthony Ferruzza and Michael Fontana met as planned at Jameson's Charhouse at around 7:30 PM to "start working on it" and to "get down to business":

M. Fontana: Jameson's?

T. Ferruzza: I'm leaving work now

24

> M. Fontana:  I will meet you there
>
> T. Ferruzza:  20 min
>
> M. Fontana:  K
>
> T. Ferruzza:  Here
>
> M. Fontana:  Bar

(Ex. N at 4.)

*—ICV Partners' Acquisition of Segerdahl and*
*the Accelerating Vesting of the Individual Defendants' (and Vince Dante's) ESOP Shares—*

62.    **On Wednesday, December 7, 2016**, ICV Partners acquired Segerdahl.  Prior to the acquisition, Segerdahl had been majority-owned by the company's ESOP.  Per the terms of the ESOP, upon sale of the Company, ESOP shares were immediately vested and converted to cash within 60 to 90 days.

63.    **On Tuesday, December 27, 2016**, Anthony Ferruzza text messaged Michael Fontana, "Just waiting to find out when we are getting our doe [sic] . . . Then i will call you." Michael Fontana responded, "Sounds good."  (Ex. N at 5.)

64.    **On Thursday, December 29, 2016**, at around 2 PM, Anthony Ferruzza sent a text message to Christopher Knoll asking Mr. Knoll to "Please tell everyone":

> T. Ferruzza:  Yes . . . Please tell everyone . . . I'm in with all the
>                 temps . . . Lmfao

(Ex. N at 5.)

*—Anthony Ferruzza's Text Messages with Michael Ferruzza About Anthony Ferruzza's*
*Application for Employment with American Litho, Anthony Ferruzza Needing to "Wait a Little*
*Longer" and Their Plan to Steal the Costco Account From Segerdahl—*

65.    **On Thursday, December 29, 2016**, between about 7 and 8 PM, Anthony Ferruzza and Michael Fontana exchanged text messages about (i) Michael Fontana receiving Anthony Ferruzza's application for employment with American Litho; (ii) Anthony Ferruzza

forgetting to attach his resume; (iii) needing "to further discuss the good and bad"; (iv) Michael Fontana knowing that Anthony Ferruzza needed "to wait a little longer" and asking whether they could "start next week"; (v) Anthony Ferruzza needing—and being close to receiving—his "doe"—i.e., the money he was expecting to receive from the accelerated vesting of his ESOP shares held in Segerdahl as a result of the acquisition of Segerdahl by ICV Partners on December 7, 2016—and Michael Fontana "doing [his] best to not mess with that"; (vi) Anthony Ferruzza's "other ideas" to make American Litho the next Segerdahl; (vii) Michael Fontana "looking forward to working together"; (viii) Anthony Ferruzza's belief that they could steal away from Segerdahl work for Segerdahl's customer, Costco, if American Litho could hire away Segerdahl employees "John" and/or "Bruce" (i.e., mostly likely Bruce Rush, Segerdahl's Senior VP of Manufacturing); (ix) Michael Fontana wanting to meet up with "John" and "hear his speal [sic]"; and (x) scheduling a lunch meeting for Monday, January 2, 2017:

> M. Fontana: Got it
>
> T. Ferruzza: lol . . . let me know if i qualify —lmfao . . . I forgot to attach my resume
>
> M. Fontana: Only 33 years young . . . We would need to further discuss the good and bad I'm ready....... as soon as you are. I know you need to wait a little longer. Can we start next week?
>
> T. Ferruzza: I just need my doe—we are close to getting it— . . . thats why talks are heating up—
>
> M. Fontana: Perfect I'm doing my best to not mess with that
>
> T. Ferruzza: i have had some other ideas as well- to take your company to the next SG . . . u are fine—just a lot of stress with being overbooked with work—i have 4 outside printers overbooked as well—
>
> M. Fontana: I'm looking forward to working together
>
> T. Ferruzza: i care because they are my customers . . . I'm excited man— . . . i think if we get john and or bruce we can take the costco account away from sg in-line . . . do you sort mail on press?

M. Fontana: Sometimes, mostly offline

T. Ferruzza: kool—thats the new thing we are doing —sorting on press saves $$$$

M. Fontana: That's cool I saw a videos on that

T. Ferruzza: wanna meet up with me and john to hear his speal?

M. Fontana: Yes

T. Ferruzza: dinner? . . . Lunch?

M. Fontana: What day?

T. Ferruzza: Sunday?

M. Fontana: Sunday is tough is tough [sic] for me. How about Monday? I'm off that day

T. Ferruzza: kk monday—I forgot thats new years day

M. Fontana: Lunch

T. Ferruzza: perfect—where and time?

M. Fontana: 12 at Venuti

T. Ferruzza: see ya monday . . . have a great new year and be safe

M. Fontana: You too see you Monday

(Ex. N at 5.)

*—Anthony Ferruzza's Meeting on January 2, 2017*
*with Michael Fontana and Chris Joyaux, American Litho's Vice President and Co-Founder—*

66.    **On Monday, January 2, 2017**, Anthony Ferruzza and Michael Fontana met as planned for a lunch meeting at around 12 PM  along with Chris Joyaux, American Litho's Vice President and co-founder:

M. Fontana: Tony, Venuti at noon today

T. Ferruzza: yup

M. Fontana: Great, I might be a few mins after, like 12:10

27

> T. Ferruzza: k
>
> M. Fontana (to C. Joyaux):  12 at Venuti . . . V is closed go to roosters
>
> T. Ferruzza:  Im in the parking lot . . . I will wait for you in the lot . . . East side parking lot.
>
> M. Fontana:  1 min
>
> T. Ferruzza:  K
>
> C. Joyaux (to M. Fontana): K
>
> M. Fontana:  1 min

(Ex. N at 6.)

67. Later that same day, after the lunch meeting, at around 3 PM **on Monday, January 2, 2017**, Anthony Ferruzza text messaged Michael Fontana, stating "I'm chomping . . . excited." Michael Fontana responded, "Great meeting, a lot of exciting ideas."

68. A few hours later, just after 5 PM, Anthony Ferruzza and Michael Fontana exchanged text messages about (i) Anthony Ferruzza's "serious talk" with his wife; (ii) Anthony Ferruzza's wife wanting to make sure that he has "security to leave a big paying job" and benefits and that Anthony Ferruzza's job with American Litho wouldn't be "short term"; (iii) Anthony Ferruzza's request for an "offer letter with the benefit info"; (iv) American Litho providing Anthony Ferruzza and his wife with Blue Cross Blue Shield health insurance; (v) American Litho providing Anthony Ferruzza's wife with a Neiman Marcus card; and (vi) their plans to "set up dinner soon" with Anthony Ferruzza's wife so that she could know "what the deal is":

> T. Ferruzza:  so i had a serious talk with the wife—again-lol she just wants to make sure i have security to leave a big paying job—and needs the benefits---anyway you can send me a[n] offer letter with the benefit info?
>
> M. Fontana:  We offer BCBS and a Neumann Marcus card for your wife

28

> T. Ferruzza: dat would be nice—
>
> M. Fontana: Lol, seriously, I will draft it up
>
> T. Ferruzza: kk—its more about security—she knows anywhere I go its long term and wants to make sure this isn't short term . . . i said no
>
> M. Fontana:  Absolutely, we are all on the same page. At this point in each of our carriers it has to be that way
>
> T. Ferruzza: lets set up dinner soon so she knows what the deal is—lol
>
> M. Fontana: Perfect

(Ex. N at 6.)

*—Vince Dante's Text Messages with Michael Fontana*
*to Schedule Vince Dante's Interview for Employment with American Litho—*

69.     **On Monday, January 9, 2017**, Vince Dante text messaged Michael Fontana about (i) Vince Dante wanting to "meet again" to discuss him working for American Litho; (ii) Vince being "close to receiving [his] money" (i.e., the money Vince was expecting to receive from the accelerated vesting of his ESOP shares held in Segerdahl as a result of the acquisition of Segerdahl by ICV Partners on December 7, 2016); (iii) Vince wanting "the opportunity to help" Mr. Fontana "grow the business":

> V. Dante:   Mike . . . This is Vince Dante, I would like meet again . . . to discuss coming to work for you. I can meet you anywhere or your choice. I'm close to receiving my money but I'm not concerned about that. I would like the opportunity to help you grow the business in any way I can. My number is 847-815-2529

(Ex. N at 6.)

70.     A few days later, **on Sunday, January 15, 2017**, just after 5 PM, Michael Fontana and Vince Dante exchanged text messages about (i) Vince interviewing at American Litho with Don Schoen, American Litho's Chief Technology Officer:

> M. Fontana:   Vince sorry for the delay. Would you have time to come interview with Don S our CTO Thanks, Mike

<u>V. Dante</u>:    Sure. . . No problem. Just let me know what works for you.

<u>M. Fontana</u>:    Okay I will have Don S text you back some times tomorrow. Thanks

(Ex. N at 7.)

*—Anthony Ferruzza's Text Messages with Michael Fontana About*
*American Litho's "Offer Letter" and "Benefit Plan," and Their Meeting on January 14, 2017—*

71.    **On Thursday, January 12, 2016**, at around 9:30 PM Anthony Ferruzza and Michael Fontana exchanged text messages about American Litho's offer letter to Ferruzza, and they scheduled a breakfast meeting for over the weekend to "discuss":

<u>T. Ferruzza</u>:    did u ever do offer letter for me with benefits?

<u>M. Fontana</u>:    Yes but dont have benefit plan complete. Let's meet to discuss

<u>T. Ferruzza</u>:    ready to meet when you are

<u>M. Fontana</u>:    I will text you this weekend? Same place. Lunch/ breakfast

<u>T. Ferruzza</u>:    breakfast sounds good

(Ex. N at 6.)

72.    **On Friday, January 13, 2017**, Anthony Ferruzza and Michael Fontana exchanged text messages and agreed to meet the following day, Saturday, January 14, 2017, at around 11 AM at Rooster's Bar and Grill. (Ex. N at 6–7.)

*—Anthony Ferruzza's and Michael Fontana's*
*Final Preparations to Hire Segerdahl's Employees and Steal Segerdahl's Customers—*

73.    **On Sunday, January 15, 2017**, just before 9 PM, Anthony Ferruzza and Michael Fontana exchanged text messages about Defendants Christopher Knoll, Michael Ferruzza and Eugene Czech "signing up" on American Litho's website, which most likely referred to their submitting applications for employment through American Litho's website:

> T. Ferruzza: corky and mikey signed up on your website . . . chris also did
>
> M. Fontana: I saw Mikey and Chris I didn't see corky, what is his full name
>
> T. Ferruzza: eugene czech
>
> M. Fontana: Got them
>
> T. Ferruzza: eugene to [sic]?
>
> M. Fontana: Yes
>
> T. Ferruzza: are you sending us to mexico the week before we start so we can have a retreat and bond?

(Ex. N at 7.)

74.     **On Tuesday, January 17, 2017**, Anthony Ferruzza text messaged Christopher Knoll at around 4:30 PM stating, "Mikey texted me – he is done man . . . Between me and you." (Ex. N at 7.) A couple hours later, at around 6:20 PM, Anthony Ferruzza text messaged Daniella Tucci, stating "Relax . . . We have a plan sis . . . Just sayin." (Ex. N at 7.)

75.     **On Thursday, January 19, 2017**, Anthony Ferruzza text messaged Daniella Tucci, stating "Lmfao . . . I know Carolyn [Sutton] is mad . . . I texted her and said boarding now . . . Her response was (k) . . . Lmfao." (Ex. N at 7.) Carolyn Sutton is the Project Manager of Direct Mail at Southern Graphics Systems, which is a broker entity that touts itself as "critical link between brand owners, their creative partners and printers & converters." In her role with Southern Graphics Systems, Ms. Sutton manages and coordinates direct mail and marketing pieces for Segerdahl customer R. J. Reynolds.

76.     **On Monday, January 23, 2017**, between about 3 PM and 5:30 PM, Anthony Ferruzza and Michael Fontana exchanged text messages to schedule a time for Christopher Knoll

to examine American Litho's "finishing area" to make sure American Litho had the necessary equipment to service Segerdahl's customers:

> T. Ferruzza:  I wanted my chris to come look at your finishing area to make sure u have all that's needed . . . I want to send him tomorrow . . . at 5:00 . . . Who can I have him see to give him a peek at that area?
>
> M. Fontana:  Truman [Pope] or myself
>
> T. Ferruzza:  U gunna be in? . . . I thought [sic] you were out . . . I will have him call you when he is on his way . . . I would rather not have my chris go there until after 5 pm tomorrow . . . Who should I have him call to set it up? . . . Tell pope chris gunna call him to set up time
>
> M. Fontana:  Will do

(Ex. N at 7.)

77.     Later that same day, at around 10 PM **on Monday, January 23, 2017**, Michael Fontana text messaged Truman Pope, American Litho's Lettershop Manager, to let him know that Christopher Knoll would be calling Mr. Pope to schedule a time for Mr. Knoll to examine American Ltiho's finishing area and equipment and make sure American Litho had the necessary equipment to service Segerdahl's customers:

> M. Fontana:  Hi Truman, Chris from Sg360 will be calling your cell. He would like to come in to see the finishing. He needs to make sure we have all that is needed if work is moved to ALITHO . . . See you tomorrow

(Ex. N at 8.)

78.     **On Tuesday, January 24, 2017**, Anthony Ferruzza and Michael Fontana (and Truman Pope) exchanged text messages about (i) Christopher Knoll meeting Truman Pope at American Litho on Wednesday, January 25 after 5 PM; (ii) their plan to steal away from

32

Segerdahl work for Segerdahl customer, Discover Financial Services; and (iii) the approximate start date for Ferruzza's "team" so he could let them know when to be ready:

> T. Ferruzza:  My chris meeting truman tommorrow [sic] at 5
>
> M. Fontana:  Yes
>
> T. Pope (to M. Fontana): Chris from SG 360 will be here tomorrow after 5.
>
> M. Fontana (to T. Pope):  K, perfect
>
> T. Ferruzza:  we gotta get all this discover work to man they love our sheetfed work—been getting a boat load lately
>
> M. Fontana:  Yes, perfect
>
> T. Ferruzza:  Approx date for [REDACTED BY AMERICAN LITHO] So i can let my team know when . . . To be ready
>
> M. Fontana:  I get an update from the Atty tomorrow.  It won't be long

(Ex. N at 8.)

### —Anthony Ferruzza's and Michael Fontana's Text Messages About Their Plan to Steal Away from Segerdahl "All" the Work for Segerdahl Customers R. J. Reynolds, Leo Burnett, American Express and Men's Wearhouse—

79.    **On Friday, January 27, 2017**, between about 8 and 9 PM, Anthony Ferruzza and Michael Fontana exchanged text messages about (i) Anthony Ferruzza's team being "excited"; (ii) Anthony Ferruzza potentially being "salesman of the year" for American Litho; (iii) Michael Fontana thinking that Christopher Knoll was "awesome"; (iv) Joel Boysen, Director Strategic Vendor Management at Leo Burnett, having toured American Litho's facilities earlier in the day; (v) the need for American Litho to steal away from Segerdahl all of the work for multiple Segerdahl customers, including Leo Burnett, American Express, R. J. Reynolds and  Men's Wearhouse; (vi) American Litho purchasing new equipment; (vii) Anthony Ferruzza's "team"

showing American Litho how to "grow a company form little leagues to big leagues"; and (viii)

Anthony Ferruzza's son, Michael Ferruzza, being "ready to report to duty monday":

> T. Ferruzza: My team is excited . . . I may be salesman of the year for AL . . . LMFAO . . . your thoughts with chris?
>
> M. Fontana: He is awesome
>
> T. Ferruzza: i only allow awesome people on my team . . . he said lets go now—lmfao—i said timing is everything
>
> M. Fontana: nice
>
> T. Ferruzza: I don't think you can handle us man—we are go getters and move fast—jus sayin—early bird gets the worm
>
> M. Fontana: Joe was in this am for a tour
>
> T. Ferruzza: ?? . . . LEO?
>
> M. Fontana: Yes
>
> T. Ferruzza: Joel Boysen
>
> M. Fontana: Yes
>
> T. Ferruzza: I have 2 buyers there also—chris has 2 —one time need to get him to hawks game—and we get all the work—he uses all our work seats . . . we need to get all the discover work too- . . . all of it . . . amex . . . rjr . . . leo . . . menswarehouse [sic] . . . and so on
>
> M. Fontana: Hp12000
>
> T. Ferruzza: u get all the pricing for the 12000? . . . then next a 2nd UV press then a roll to roll 1200 dpi screened digital press— . . . 1.2 for the 12000
>
> M. Fontana: Yes
>
> T. Ferruzza: u have my office built yet? . . . u ready for a Team full of energy to pump the volumee [sic] up . . . we gunna raise da roof man— . . . lmfao—ok enuff for tonight—talk soon have a good weekend . . . we gunna energize everyone-

M. Fontana: I'm around all weekend. Start getting a lot of sleep, your gonna need it ….

T. Ferruzza: lmfao—we will show your peeps how to grow a company from little leagues to big leagues . . . my son told me —he is ready to report to duty monday—lmfao

M. Fontana: Tell him we are very close I have big meeting on [REDACTED BY AMERICAN LITHO] this week to push it through

(Ex. N at 8–9.)

**—The Individual Defendants' (and Vince Dante's) Resignations from Segerdahl—**

80.     Segerdahl would have immediately fired Anthony Ferruzza in June 2016, or earlier, if Segerdahl had known that he (a) had concocted (and was executing) a secret plan with Michael Fontana—and in conspiracy with the other Individual Defendants and Vince Dante—to hire away Segerdahl's employees and steal Segerdahl's customers for American Litho, (b) was actively soliciting Segerdahl's employees for employment with American Litho, and (c) planned to misappropriate Segerdahl's Confidential Information and Trade Secrets in complicity, as their leader, with the other Individual Defendants and Vince Dante, for their own benefit and that of American Litho.

81.     Instead, Anthony Ferruzza hid his competitive activity and waited to quit until after the nearly $2 million in SARs he received as the result of the acquisition of Segerdahl by ICV Partners vested on December 7, 2016, as well as accelerated vesting of his ESOP shares. Moreover, Anthony Ferruzza planned and directed the Individual Defendants' (and Vince Dante's) respective resignations from Segerdahl, as well as his own resignation from Segerdahl.

*—Michael Ferruzza's Resignation from Segerdahl—*

82.     **On Monday, January 30, 2017**, Michael Ferruzza resigned his employment with Segerdahl.   His last day of employment with Segerdahl was February 10, 2017.   Michael

35

Ferruzza hid his competitive activity and waited to quit until after accelerated vesting of his ESOP shares. On the same day that he resigned his employment with Segerdahl, Michael Ferruzza exchanged text messages with Daniella Tucci, between 5:59 PM and 6:25 PM, about his resignation from Segerdahl:

> M. Ferruzza: I quit and Mary lee asked me to stay I said no n then nikko asked me to do a two week transition n that it's the right thing to do so I said ok I'll finish this week n then next week will be my last day

> D. Tucci: Jesus ok!!

(Ex. N at 9.)

83. At 6:27 p.m. on **Monday, January 30, 2017**, Anthony Ferruzza sent a text message to Christopher Knoll (who, at the time, was on vacation with his wife in Mexico) about Michael Ferruzza's resignation from Segerdahl:

> T. Ferruzza: Was gunna be today . . . But said finish the week

(Ex. N at 9.)

84. During expedited discovery in this case, Michael Ferruzza admitted that, **on or around January 30, 2017**—i.e., the same day he resigned his employment with Segerdahl—he connected an external Western Digital My Passport USB hard drive (Serial No. 575848314539334A434A3731) (the "Michael Ferruzza External Hard Drive") to his Segerdahl computer and copied approximately 1,350 documents from his computer to the USB drive. Subsequently, Michael Ferruzza transferred those Segerdahl documents to his American Litho computer and, on information and belief, to the American Litho network/servers. (A copy of Michael Ferruzza's Supp. Resp. to Pl.'s First Set of Exped. Interrogs. is attached as **Exhibit S**.) (*See* Ex. S at Interrog. No. 1.)

*—Eugene "Corky" Czech's Resignation from Segerdahl—*

85.     That same day, **on Monday, January 30, 2017**, Eugene "Corky" Czech also resigned his employment with Segerdahl.  His last day of employment was February 10, 2017.  Eugene "Corky" Czech hid his competitive activity and waited to quit until after accelerated vesting of his ESOP shares.

86.     Hours after he resigned his employment, Eugene Czech sent several text messages to Christopher Knoll  (who, at the time, was on vacation with his wife in Mexico) about Eugene Czech's resignation from Segerdahl:

> E. Czech (to C. Knoll):   I'm resigning today I have 4 weeks vacation from bank so I will see you later. . . . It's done I quit.  On to better horizons. . . . No. Fridays last day. I'm retiring. . . Retiring from SG 360

(Ex. N at 9.)

*—Anthony Ferruzza's Text Messages with Michael Fontana About the Resignations—*

87.     That same day, **on Monday, January 30, 2017**, at around 3 PM, Anthony Ferruzza and Michael Fontana exchanged text messages about the resignations of Michael Ferruzza and Eugene Czech from Segerdahl, the three other resignations planned to occur on the next day and Anthony Ferruzza's planned resignation on Wednesday of that week:

> T. Ferruzza:   Mikey and corky quit today . . . 3 more tomorrow . . . Then me weds
>
> M. Fontana:  Can u call
>
> T. Ferruzza:  After work
>
> M. Fontana:  K

(Ex. N at 9.)

*—Anthony Ferruzza's Resignation from Segerdahl—*

88. **On Tuesday, January 31, 2017**, Anthony Ferruzza resigned his employment with Segerdahl without prior notice, and his last day of employment was the very same day. Anthony Ferruzza hid his competitive activity and waited to quit until accelerated vesting of his ESOP shares.

89. The ongoing forensic analysis of Anthony Ferruzza's Segerdahl-issued iMac computer has revealed that his printing activity spiked dramatically **in January 2017**, immediately prior to his departure from Segerdahl. In his last weeks with Segerdahl, Anthony Ferruzza used this computer to access and print numerous documents and files, none of which he restored to Segerdahl before his abrupt departure, including files related to the 2017 Segerdahl budget (including sales information by customer), full-year press schedules, operating procedures, operational initiatives and specific customer job estimates.

90. Moreover, on his last day of employment, **January 31, 2017**, Anthony Ferruzza deleted from his Segerdahl-issued iMac computer all user-created documents associated with his user profile. Anthony Ferruzza also accessed and modified his Segerdahl-issued computer's "Trash" folder on January 31, 2017, emptying all files contained therein, which effectively deleted all file-system metadata for the corresponding files.

*—Daniella Tucci's Resignation from Segerdahl—*

91. Daniella Tucci also resigned her employment with Segerdahl **on Tuesday, January 31, 2017**. Daniella Tucci's last day of employment was February 10, 2017. Daniella Tucci hid her competitive activity and waited to quit until after accelerated vesting of her ESOP shares.

*—Vince Dante's Resignation from Segerdahl—*

92.     Vince Dante also resigned his employment **on Tuesday, January 31, 2017**.  Days later, however, Vince Dante revoked his resignation from Segerdahl.

93.     Although Vince Dante interviewed for a position with American Litho and resigned his employment with Segerdahl on January 31 (before revoking it several days later), Vince Dante claims that he turned down an offered position with American Litho for monetary reasons.

94.     In any event, Segerdahl terminated Vince Dante in June 2017 when Segerdahl discovered the full extent of his wrongful and illegal activity in conspiracy with the other Individual Defendants.  His last day of employment was June 26, 2017.

*—Anthony Ferruzza's Text Messages with Michael Fontana About*
*the Resignations, Daniella Tucci's and Erica Knoll's Salaries and Saturday's Meeting—*

95.     Later that same day, **on Tuesday, January 31, 2017**, Anthony Ferruzza and Michael Fontana exchanged text messages about (i) Daniella Tucci's and Erica Knoll's salaries at Segerdahl; (ii) the resignations of Vince Dante and Daniella Tucci; (iii) Daniella Tucci being Anthony Ferruzza's "lil rjr top dog"; (iv) a planned meeting on Saturday; (v) Anthony Ferruzza's resignation from Segerdahl; and (vi) Anthony Ferruzza being eager to change his Facebook profile to indicate his employment with American Litho:

> T. Ferruzza:  Fyi . . . Daniella is 70k . . . Ericka [sic] is 60k . . .  I
>                  had them both at 65K . . . 2 more quit today
>
> M. Fontana:  Those two?
>
> T. Ferruzza:  Dante and top daniella . . . She is my lil rjr top dawg
>
> M. Fontana:  I need to call Daniella?
>
> T. Ferruzza:  No . . . We all gunna meet saturday.
>
> M. Fontana:  K

> T. Ferruzza:  I just quit
>
> M. Fontana:  Omg, great surprise.

(Ex. N at 9–10.)

*—Christopher Knoll's Text Messages with*
*Eugene Czech, Erica Knoll and Anthony Ferruzza About the Resignations—*

96.     Also **on Tuesday, January 31, 2017**, Christopher Knoll exchanged text messages with Eugene Czech and with Anthony Ferruzza about (i) Anthony Ferruzza's resignation; (ii) whether Anthony Ferruzza had talked to Mr. Czech (prior to Mr. Czech's resignation) about what Mr. Czech's salary and benefits would be at American Litho; (iii) Chris Knoll's planned resignation; and (iv) the team meeting planned for Saturday:

> C. Knoll:     It crazy there? . . . Tony said he quit today and went home.
>
> E. Czech:     2 weeks
>
> C. Knoll:     Did he talk to you about salary and anything else at AL before you did it
>
> E. Czech:     Salary same picking up COBRA
>
> C. Knoll:     Sweet. Will u be there Monday when I give my notice
>
> E. Czech:     Yep

(Ex. N at 10.)

97.     Later that same day, **on Tuesday, January 31, 2017**, at around 9:30 PM, Chris Knoll exchanged text messages with his daughter, Erica Knoll, and with Anthony Ferruzza about the timing of Erica Knoll's resignation from Segerdahl:

> T. Ferruzza (to C. Knoll):  yup— lmfao-
>
> C. Knoll:     Tony said you should give your notice tomorrow. Say next Friday last day. 2/10.

| E. Knoll: | Ok should I do it in the morning |
| C. Knoll: | Ok, good night |

(Ex. N at 10.)

*—Erica Knoll's Resignation from Segerdahl—*

98.     **On Wednesday, February 1, 2017**, Erica Knoll resigned her employment with Segerdahl.  Her last day of employment was February 10, 2017.  Erica Knoll hid her competitive activity and waited to quit until after accelerated vesting of her ESOP shares.

99.     Immediately following her resignation, on February 1, 2017, Erica Knoll and her dad, Christopher Knoll, exchanged text messages about her resignation from Segerdahl that morning:

| E. Knoll: | I just did it. I feel bad for Nikko, she already knew when I asked if she had a minute.. I told her I was putting in my notice and that next Friday would be my last day. Told her I found a job closer to home and then she asked if  that was the only reason or if what she heard from other people about the direction the company was going had a little do do [sic] with my leaving too. I said yes when we were told that the company wouldn't sell and it did just don't like the direction of the company |
| C. Knoll: | Good girl!  Proud of you. |
| E. Knoll: | Thanks Dad |

(Ex. N at 10.)

*—Daniella Tucci's Connection of*
*USB Storage Devices to Her Segerdahl-Issued Computer—*

100.     **On February 1, 2017**, which was the day after Daniella Tucci resigned from Segerdahl (and nine days before her separation date on February 10, 2017), Daniella Tucci connected at least two USB storage devices to her Segerdahl-issued desktop computer, with no

authority from Segerdahl to do so.  Neither of these USB storage devices had been attached to her computer previously.

101.    After connecting the first USB storage device to her computer—i.e., SanDisk Cruzer Blade USB Device Serial No. 4C530101651127114151)—Daniella Tucci interacted with the files related to production data and customer specific content just prior to inserting the USB device into the computer.

102.    After connecting the second USB storage device to her computer—i.e., the Michael Ferruzza External Hard Drive, which is the same USB storage device that Michael Ferruzza connected to his Segerdahl computer on January 30, 2017 and copied approximately 1,350 documents from his computer to the USB drive—Daniella Tucci accessed files relating to customer high-resolution images, print-ready files and billing information.

*—Christopher Knoll's Resignation from Segerdahl—*

103.    **On Thursday, February 2, 2017**, Chris Knoll resigned his employment with Segerdahl.  His last day of employment was February 10, 2017.  Christopher Knoll hid his competitive activity and waited to quit until after accelerated vesting of his ESOP shares.

*—Erica Knoll's Text Message to Christopher Knoll about American Litho's Equipment Needs—*

104.    Also **on Thursday, February 2, 2017**, Erica Knoll text messages her father, Christopher Knoll, stating "he wants to go over any equipment needed—got some doe [sic]—to spend."  (Ex. N at 11.)

*—The Saturday, February 4, 2017 Meeting Between Anthony Ferruzza, Michael Fontana, Certain of The Individual Defendants and Carolyn Sutton in Furtherance of Their Plan to Steal R. J. Reynolds Work Away From Segerdahl—*

105.    **On Friday, February 3, 2017**, Anthony Ferruzza text messaged Christopher Knoll about (i) a planned meeting on Saturday, February 3; (ii) Carolyn Sutton's knowledge of

(and desire to participate in) the planned meeting on Saturday; and (iii) Michael Fontana wanting

Anthony Ferruzza and Cristopher Knoll to "get people to work like you do":

> T. Ferruzza: SHE WANTS TO CAL [sic] INTO OUR MEETING
> TOMORROW ON THE PHONE—SHE KNOWS
> ABOUT OUR MEETING

> \* \* \*

> T. Ferruzza: he said I want you and him to get people to work like
> you guys do—I said no problem

(Ex. N at 11.)

106.　Also **on Friday, February 3, 2017**, Anthony Ferruzza exchanged text messages

with Michael Fontana about (i) Anthony Ferruzza being excited and for the meeting on Saturday,

February 4; (ii) the "special guest"—i.e., Carolyn Sutton of Southern Graphics Systems—

participating in the meeting on Saturday; (iii) Carolyn Sutton being a loyal "customer" to

"#teamtony" who has previously assigned/directed to Segerdahl significant sheetfed and

finishing work pertaining to Segerdahl customer, R. J. Reynolds that is worth about $15-18

million annually; and (iv) Anthony Ferruzza, Michael Ferruzza, Christopher Knoll and Michael

Fontana being "ready and so fuckin [sic] exited":

> T. Ferruzza: excited for meeting tomorrow - lets see if we can get
> some of these guys to join american litho . . . i think i
> can convince these guys to join the team-lmafo . . .
> now that i don't work at sg—i can ask them . . . I am
> ready and so fuckin excited—lmfao chris and mikey
> sent the same to me tonight—

> M. Fontana: We are too!!

> T. Ferruzza: we have a surprise guest that wants to be on a call in
> our meeting tomorrow— . . . we will put on
> speakerphone . . . hint: special guest is a customer
> that does around 15-18 mill a year in sheetfed work
> and finishing— . . . and is a loyal customer to
> #teamtony

> M. Fontana: #sweet
>
> T. Ferruzza: I get more excited every day—but I really need a break—I been exhausted last 2 months— . . . #freshstart

(Ex. N at 11.)

107.    **On Saturday, February 4, 2017**, Anthony Ferruzza, Michael Fontana, Carolyn Sutton, Eugene Czech, Daniella Tucci and others (including, on information and belief, the other Individual Defendants and Vince Dante) held their meeting as planned from about 12 PM to 3 PM.

108.    Just prior to that meeting, at 11:26 AM, Daniella Tucci sent a text message to Anthony Ferruzza, stating:

> D. Tucci: I trust you  . You know it's not about the money for me, yeah it's a plus lol. But we're a team, wouldn't want it any other way/

(Ex. N at 11.)

109.    At 11:37 AM, Michael Fontana text messaged Anthony Ferruzza, stating "I'm early."  (Ex. N at 11.)

110.    At 3:29 PM, Michael Fontana text messaged Chris Joyaux, American Litho's Vice President and co-founder, stating "I just finished a 3 hour meeting with SG and conf call with RJR." (Ex. N at 12.)

111.    Between 3:24 PM and 8:04 PM, Anthony Ferruzza and Michael Fontana exchanged text messages about (i) the "great meeting"; (ii) Michael Fontana being "wired to get moving now"; and (iii) the salaries and incentives that American Litho would provide to Christopher Knoll, Michael Ferruzza, Daniella Tucci, Erica Knoll and Eugene Czech:

> T. Ferruzza:  Great meeting <3

M. Fontana:   Great meeting, very nice people I'm a little wired to get moving now

T. Ferruzza:   please double check with these guy's their salaries—i know daniella is 70 erica is 60 mikey is 115 corky and chris i have a good idea but I raised them mid last year—chris told you yesterday his corky was 135 last i remember———don't want to insult them———when u have your one on ones . . . u can ask them— . . . its nothing crazy tho . . . but incentives will be a nice gig for all— . . . i checked with mikey my son—his salary is 119,000 . . . you guys work out the stuff when yu [sic] meet one on one . . . i will have everyone bring a pay stub

(Ex. N at 12.)

*—Anthony Ferruzza's Super Bowl Party on Sunday, February 5, 2017, and Vince Dante's and Anthony Ferruzza's Destruction of a Segerdahl-Purchased Computer Hard Drive—*

112.    **On, Sunday, February 5, 2017**, Anthony Ferruzza hosted a Super Bowl party at his house.  At 12:39 PM, Anthony Ferruzza text messaged Christopher Knoll, stating "It's a [sic] awesome party . . . U and wife would love . . . Open stop shelf bar . . . Food."  (Ex. N at 12.)

113.    That same day, while Vince Dante was helping Anthony Ferruzza set up the Super Bowl party, Anthony Ferruzza brought Vince Dante an Apple MacBook Pro purchased with Segerdahl funds.  Anthony Ferruzza asked Vince Dante about getting rid of Segerdahl information on this device.  Vince Dante, still a Segerdahl employee at the time, told Anthony Ferruzza that replacing the internal hard drive would be the best way to get rid of all information on the computer.  Vince Dante then removed the internal hard drive, handed it to Anthony Ferruzza and watched as Anthony Ferruzza snapped the hard drive in two with his hands and threw the pieces in the trash.  (A copy of Vince Dante's Declaration dated May 30, 2017 is attached as **Exhibit T**.)  (*See* Ex. T ¶ 4.)

*—Christopher Knoll's Connection of a USB Storage Device to His Segerdahl Computer—*

114.   **On Monday, Tuesday, Wednesday, Thursday and Friday, February 6–10, 2017**, Christopher Knoll connected at least one 16 GB USB storage device (Serial No. 200519426307BE4053B6) (the "Chris Knoll Thumb Drive") to his Segerdahl-issued desktop computer.  The Chris Knoll Thumb Drive had never been attached to his computer previously.

115.   At those connection times, Christopher Knoll accessed and interacted with numerous files, including the file 2016.xlsm, which contains the contact information (including mobile and home phone numbers) for over 300 Segerdahl employees, and which was later deleted.  The other files that Christopher Knoll accessed and interacted with include nearly all of the Standard Operating Procedures for Segerdahl's Gilman, Illinois facility, contact lists, organizational charts, job workflows, rate cards and billing data, and employee offer letters.

*— Michael Ferruzza, Christopher Knoll's and Daniella Tucci's Secret Plan to Provide Carolyn Sutton with "the Silver/Black Kodaks," and Anthony Ferruzza's Knowledge Thereof—*

116.   **On Tuesday, February 7, 2017**, at 12:37 PM, Michael Ferruzza and Christopher Knoll exchanged text messages about (i) Michael Ferruzza putting "the silver/black kodaks" on Christopher Knoll's desk; (ii) Christopher Knoll making sure that Carolyn Sutton—i.e., the Project Manager of Direct Mail at Southern Graphics Systems, who manages and coordinates direct mail and marketing pieces for Segerdahl customer R. J. Reynolds—"gets [the silver/black kodaks] for 830 delivery"; and (iii) how only Michael Ferruzza, Christopher Knoll and Daniella Tucci were "aware that we are doing this":

M. Ferruzza:   Chris I put the silver/black kodaks on your desk, please make sure Carolyn gets these for 830 delivery n only me you and Daniella are aware that we are doing this

C. Knoll:   10-4.  Thanks

(Ex. N at 12.)

117.     Shortly thereafter, at 12:54 PM **on Tuesday, February 7, 2017**, Anthony Ferruzza text messaged Christopher Knoll, stating "Lmfao."  (Ex. N at 12.)

*—Michael Fontana's and American Litho's*
*Meetings with the Individual Defendants and Other Segerdahl Employees—*

118.     **On Tuesday, February 7, 2017**, at 10:56 AM, Michael Ferruzza text messaged Michael Fontana to schedule a meeting that week:

> M. Ferruzza:   Hey Mike, it's Mike Ferruzza. I am available any day this week after 5pm. Whichever day works best for you, please let me know. Thanks.

(Ex. N at 12.)

119.     Later that evening, **on Tuesday, February 7, 2017**, between 7:02 PM and 7:23 PM, Michael Ferruzza and Michael Fontana exchanged text messages to schedule meetings that week between Michael Fontana and each of Michael Ferruzza, Christopher Knoll, Daniella Tucci and Eugene Czech:

> M. Fontana:    Mikey, how does Tomorrow work?
>
> M. Ferruzza:   Perfect. Time and place?
>
> M. Fontana:    Let's do Alitho, I can walk you around too. Earlier the better
>
> M. Ferruzza:   Ok, I'll text you when I'm on the way. I'll leave work a little early.
>
> M. Fontana:    K, possibly HR will still be in. If not next time . . . Can you check in Daniella, I didn't see an email from her. Corky too, Chris too. Thx
>
> M. Ferruzza:   will do now.
>
> M. Fontana:    Thank you
>
> M. Ferruzza:   They all said they will reach out first thing tomorrow
>
> M. Fontana:    Great, thx

(Ex. N at 12.)

120. Around that same time, **on Tuesday, February 7, 2017**, between 7:01 PM and 7:28 PM, Anthony Ferruzza and Michael Fontana exchanged text messages about Michael Fontana's scheduled meetings with several Segerdahl employees, including (i) Craig Jenkins, Segerdahl's Director of Data Services since 2012; (ii) Andrew Giovanni, Segerdahl's Programmer since 2012; (iii) Erica Knoll and (iv) Michael Ferruzza:

> M. Fontana:  Two meetings are set
>
> T. Ferruzza:  kool Mikey and?
>
> M. Fontana:  Craig breakfast Thursday. Andrew Lunch Monday. Erica 1 pm Tuesday. Mikey tomorrow afternoon.
>
> T. Ferruzza:  tell him that ou[r] team was going to different places but now that everyone quit- the team looks like it may stick together—

(Ex. N at 12–13.)

121. Between 7:28 PM and 7:47 PM that same evening **on Tuesday, February 7, 2017**, Eugene Czech and Michael Fontana exchanged text messages to schedule a meeting:

> E. Czech:  Hi Mike it's Cork, I can set up a time to talk anytime after 5:30 Wednesday or Thursday or anytime your available next week. Thanks
>
> M. Fontana:  Cork, will next Wednesday work.  If so, what time is best for you
>
> E. Czech:  Next Wednesday would be fine and I'm free all day so whatever works for you
>
> M. Fontana:  Okay 9:30 am ?
>
> E. Czech:  That's good and once again thanks for the opportunity.
>
> M. Fontana:  I look forward to working together

(Ex. N at 12–13.)

122.   **On Wednesday, February 8, 2017**, at 1:11 PM, Michael Ferruzza text messaged Michael Fontana, stating "Is it ok to get by you at 215?," and Michael Fontana responded, "Yes." At 2:11 PM, Michael Ferruzza again text messaged Michael Fontana, stating: "Just walked in by reception."  (Ex. N at 13.)

123.   **On Wednesday, February 8, 2017**, at 2:24 PM, Christopher Knoll text messaged Michael Fontana to schedule a meeting, stating "Hi Mike, It's Chris from SG . . . I am open all next week any day or time please let me know what is good . . . I would like to meet with HR when I come in if possible."

*—Michael Ferruzza's Deletion of Data From His Segerdahl Computer —*

124.   O**n Wednesday, February 8, 2017**, Michael Ferruzza deleted all user-created documents associated with his user profile on his Segerdahl-issued computer and, at 12:40 PM— about an hour and a half before his scheduled meeting with Michael Fontana at 2:15 PM—he accessed and modified his computer's "Trash" folder, emptying all files contained therein, which effectively deleted all file-system metadata for the corresponding files.

*—Christopher Knoll's Text Messages with*
*Erica Knoll, Eugene Czech and Daniella Tucci About Carolyn Sutton—*

125.   **On Wednesday, February 8, 2017**, at 5:28 PM, Christopher Knoll text messaged his daughter, Erica Knoll, informing her that Carolyn Sutton of Southern Graphics Systems was going to call Erica Knoll: "Carolyn gonna call you.  Just t[o] see how you are doing."  (Ex. N at 13.)

126.   Two minutes later, at 5:30 PM, Christopher Knoll text messaged Eugene Czech, informing him that Carolyn Sutton of Southern Graphics Systems was going to call him: "Carolyn gonna call you."  (Ex. N at 13.)

127.     **On Thursday, February 9, 2017**, at 5:05 PM, Christopher Knoll text messaged Daniella Tucci, stating "Just talked to Carolyn. She is piiiiiissed at Jim. She said how doe[s] he think he is trying to show off on the call and she said . . . that Kim is such a bitch. Lmao."  (Ex. N at 13.)  Later that night, at 9:10 PM, Daniella Tucci responded, "I know! She said I HATE Jim. Ugh such a mess."  (Ex. N at 13.)

128.     **Friday, February 10, 2017** was Christopher Knoll's, Michael Ferruzza's, Erica Knoll's, Daniella Tucci's and Eugene Czech's last day of employment with Segerdahl.

### —American Litho's Final Preparations to Officially Hire the Individual Defendants and Other Segerdahl Employees—

129.     **On Friday, February 10, 2017**, Anthony Ferruzza and Michael Fontana exchanged text messages about (i) Michael Fontana "getting everything ready" and (ii) Anthony Ferruzza and Michael Fontana being "partners and teammates" who were going to "rock da [sic] world":

> <u>M. Fontana</u>:  I'm back getting everything ready...♥ . . . Meaning, I'm not in vegas
>
> <u>T. Ferruzza</u>:  Oh . . . Lmfao . . . Tired didnt pick up on that . . . Partners and teammates . . . We gunna rock da world
>
> <u>M. Fontana</u>:  Craig breakfast Thursday. Andrew Lunch Monday. Erica 1 pm Tuesday. Mikey tomorrow afternoon.

(Ex. N at 13.)

130.     **On Saturday, February 11, 2017**, Michael Fontana text messaged Sal Swanton, American Litho's independent marketing consultant and President of Swanton Video Media, Inc., that he had six Segerdahl employees beginning their employment with American Litho:

> <u>M. Fontana</u>:  I have six people from SG starting . . . Let's plan on working together this week on various things. I'm trying to finish construction this week so they have somewhere to sit.

S. Swanton: Ok, sounds good. I'll be in Monday, text or call me anytime for anything. If you need to shift some people to my place for a few weeks to make room for the new folks, consider my place available.

(Ex. N at 13.)

131. **On Monday, February 13, 2017**, Anthony Ferruzza and Michael Fontana exchanged text messages about (i) Eugene Czech's name, his prior salary at Segerdahl and his expected compensation at American Litho (including "possible commission split from RJR work"); (ii) Daniella Tucci's and Erica Knoll's prior compensation at Segerdahl; (iii) Anthony Ferruzza and Michael Fontana meeting that week to "discuss others" and to "to finalize" things; (iv) Michael Fontana's meetings that week with Chris Knoll, Andrew Giovanni, Erica Knoll and Daniella Tucci; and (v) Carolyn Sutton coming in to Chicago that Sunday afternoon and meeting with Anthony Ferruzza, Michael Fontana, the other Individual Defendants and others for dinner:

M. Fontana: Can you text me Corky's actual name . . . Is it Eugene Czech

T. Ferruzza: yes

M. Fontana: Corky $2

T. Ferruzza: he was 145ish last i seen—he will bring his check stub

M. Fontana: I have 135 in my notes from last time

T. Ferruzza: i know that was 6 months ago when we did approx—

M. Fontana: 135 + possible commission split from RJR work split determined by you

T. Ferruzza: we will make it up with rjr— . . . that will work— . . . jus [sic] tell him till we get going . . . go 140 If u can- . . . am I suppose [sic] to meet you this week?

| M. Fontana: | Yes, I thought last because we can discuss others and we just need to finalize . . . Nice . . . Chris at 10, Andrew at 12 . . . Erica 2 Daniella 3 tomorrow |
|---|---|
| T. Ferruzza: | wow-busy day- . . . erica 60 daniella 70 — 100percent [sic] positive—just gave them raise a few months ago |
| M. Fontana: | k |
| T. Ferruzza: | yes |
| M. Fontana: | Corky $2 |

(Ex. N at 13–14.)

132. **On Tuesday, February 14, 2017**, Michael Fontana met with Christopher Knoll at American Litho at around 10 AM. (*See* Ex. N at 14 ("Chris Knoll is here for you").) A couple hours later, Anthony Ferruzza text messaged Christopher Knoll, stating "was everything as expected?" and Christopher Knoll responded, "Yes. Everything is good thanks. Insurance a little high but it doesn't matter. I will call you after lunch." (Ex. N at 14.) At around 6 PM, Erica Knoll, who had also met with Michael Fontana that day at American Litho, text messaged her father, Christopher Knoll, stating "Sounds good!" At around 8:20 PM, Eugene Czech text messaged Christopher Knoll, stating "Did you fil out all the paperwork before your meeting with [Michael] Fontana?" (Ex. N at 14.)

133. **On Wednesday, February 15, 2017**, Erica Knoll exchanged text messages with Daniella Tucci about Ms. Knoll's meeting at American Litho the day before and Ms. Tucci's schedule meeting that Friday at American Litho:

| E. Knoll: | Yesterday went good, did a tour and met with HR... was done in an hour. Saw Sigi too lol |
|---|---|
| D. Tucci: | Going for my tour on Friday now, glad it'll be quick! |

(Ex. N at 14.)

134.    **On Wednesday, February 15, 2017**, at around 5:30 PM, Anthony Ferruzza and Michael Ferruzza exchanged text messages about Carolyn Sutton and "the whole team" having dinner at Michael Fontana's house on Sunday:

> M. Fontana:  Can Carolyn come to dinner at my house on Sunday. Maybe the whole team
>
> T. Ferruzza:  I will check with her and the team . . . She calls me in 1 hr
>
> M. Fontana:  I think it would be private enough for her??
>
> T. Ferruzza:  Yup

(Ex. N at 14–15.)

135.    **On Thursday, February 16, 2017**, Anthony Ferruzza text messaged Christopher Knoll, stating "cup of coffee . . . I'm at AL." (Ex. N at 15.)

136.    Later that day, just before 8 PM **on Thursday, February 16, 2017**, Anthony Ferruzza and Michael Fontana exchanged text messages about (i) the meeting on Sunday at Michael Fontana's house with Carolyn Sutton and the "team"; and (ii) internal Segerdahl "rumors" about ICV Partners being "mad" about Anthony Ferruzza not being subject to an employment contract and noncompetition covenant:

> T. Ferruzza:  is your wife really up to having team over Sunday?
>
> M. Fontana:  that'll be a great way to meet Caroline
>
> T. Ferruzza:  ok-I will rally the troops . . . i will bring my wife sunday—her and carolyn are tight . . . rumor has it—new owners are so mad that i didn't have a contract and non compete being a SR VP-imfao-they fucked up-they wanted me to sign it for 6 months
>
> M. Fontana:  I think it would be private enough for her??

T. Ferruzza:  Yup

(Ex. N at 15.)

137.    **On Friday, February 17, 2017**, Daniella Tucci met with Michael Fontana at American Litho at around 11 AM.  (*See* Ex. N 15 ("Hey Mike, Danielle –Neel [sic] is here to see you she's upstairs in the waiting area").)   Daniella Tucci and Erica Knoll exchanged text messages throughout that day about Ms. Tucci's meeting at American Litho:

> D. Tucci:    Omg did u fill out this packet and bring it??
>
> E. Knoll:    lol I filled out some of the paperwork ahead of time but I was told I didn't need to until like next week.
>
> D. Tucci:    Lol ok.. so I guess I'll still bring it
>
> E. Knoll:    How did it go today?
>
> D. Tucci:    Today was good, it was a lot to take in and it's so different than SG but it'll be good . . . I had lunch with Sigi.

(Ex. N at 15.)

138.    At around 6 PM, **on Friday, February 17, 2017**, Anthony Ferruzza and Michael Fontana exchanged text messages about (i) the headcount for the meeting at Michael Fontana's (and his wife's) house on Sunday with Christopher Knoll (and his wife), Mikey Ferruzza (and his guest), Anthony Ferruzza (and his wife) and Carolyn Sutton; (ii) Carolyn Sutton stating that "not a single person can know" about her meeting at Michael Fontana's house on Sunday; and (iii) Michael Fontana's intention to lie to Chris Joyaux, American Litho's Vice President and co-founder, about Carolyn Sutton attending Sunday's meeting:

> M. Fontana:    Do you have a head count ( or close) for Sunday
>
> T. Ferruzza:    Working on it now . . . so if your wife is cool with it - or we can go to restaurant - there will be 7 peeps - Carolyn said not a single person can know- . . . Chris knoll his wife mikey his wife tony his wife carolyn

M. Fontana:   More personal at our home. Chris and Juanita too? What time?

T. Ferruzza:   your call she lands at 1ish then she checking in at hotel then coming to ferruza casa . . . she said absolutely not 1 word can get out-

M. Fontana:   K, what time. I will tell Chris she didn't come.

T. Ferruzza:   Your call . . . 4ish? . . . U sure your wife ok with dis [sic]?

M. Fontana:   Perfect . . . She loves it

\* \* \*

T. Ferruzza:   My wife and your wife will hit it off . . . They seem same

(Ex. N at 15.)

**—Anthony Ferruzza's Facebook Post About Starting a New Job with American Litho—**

139.   **On Friday, February 17, 2017**, Anthony Ferruzza posted to his personal Facebook profile that he had started a new job at American Litho as Sr. V.P. Digital and Shetfed. (A copy of a screen shot of Anthony Ferruzza's February 17, 2017 Facebook post is attached as **Exhibit U**.)

140.   Carolyn Sutton commented on the Facebook Post, stating "So excited for you." (*See* Ex. U.) Christopher Knoll commented on the Facebook post, stating, "Good Luck Tony!" to which Anthony Ferruzza responded, "thanks Chris Knoll- i am anxiously waiting to hear waht [sic] your final decision is going to be ---would love to get the A team back together. (*See* Ex. U.)

**—The Dinner Meeting at Michael Fontana's House on Sunday, February 19, 2017
with the Individual Defendants and Carolyn Sutton—**

141. **On Saturday, February 18, 2017**, Michael Fontana and Anthony Ferruzza finalized plans for the dinner meeting at Michael Fontana's house on Sunday:

> T. Ferruzza:   what time u want us to come tomorrow" [sic]
>
> M. Fontana:   Let's do 5 we are all good
>
> T. Ferruzza:   see ya tomorrow—

(*See* Ex. N at 16.)

142. **On Sunday, February 19, 2017**, at around 4:20 PM, Anthony Ferruzza text messages Michael Fontana "Dressing shorts and flip flops . . . Carolyn is very casual . . . Don't want her to feel uncomfortable." Michael Fontana responded, "I will have jeans on." (Ex. N at 16.)

143. After the dinner meeting was over, Anthony Ferruzza and Michael Fontana exchanged text messages at around 8:45 PM thanking each other:

> T. Ferruzza:   Thanks again to you and your wife
>
> M. Fontana:   Very welcome, thank you

(*See* Ex. N at 16.)

**—Segerdahl's February 20, 2017 Demand/Preservation Letters Directed to
the Individual Defendants and American Litho—**

144. **On Monday, February 20, 2017**, Segerdahl sent demand letters via Federal Express and email to each of the Individual Defendants, except for Eugene "Corky" Czech and Vince Dante, confirming their post-employment obligations to Segerdahl, demanding that they cease and desist their wrongful conduct, demanding the return of certain documents and electronically stored information, requesting assurances that their wrongful conduct had ceased and requesting a written accounting of all specific actions taken to cease their wrongful conduct.

(Copies of the demand letters Segerdahl sent to the Individual Defendants are attached as **Group Exhibit V**.)

145. **On February 20, 2017**, Segerdahl sent a demand letter via Federal Express and email to American Litho informing it of the Individual Defendants' post-employment obligations to Segerdahl and their apparent breaches of their fiduciary and other obligations to Segerdahl; demanding that American Litho cease and desist from using or disclosing Segerdahl's Confidential Information; demanding the return of certain documents and electronically stored information; requesting assurances that American Litho is not in possession of any materials belonging to Segerdahl; and demanding that American Litho take immediate disciplinary measures against the Individual Defendants, including termination of their employment. (A copy of the demand letter Segerdahl sent to American Litho is attached as **Exhibit W**.)

**—Anthony Ferruzza's Deletion of Data From
His aferruzza@att.net Email Account on February 20, 2017 —**

146. At 6:14 PM **on Monday, February 20,** 2017, Segerdahl's counsel sent an email to Anthony Ferruzza's personal email address, aferruzza@att.net, attaching a copy of the demand/preservation letter and stating, "Your immediate attention to the attached is required." (A copy of Segerdahl's counsel's email to Anthony Ferruzza dated February 20, 2017 is attached as **Exhibit X**.)

147. Less than one hour later, Anthony Ferruzza logged in to his AT&T email account (the content of which is controlled by Yahoo!) *fourteen* separate times between 7:02 PM and 9:37 PM from two separate IP addresses. At 10:41 PM that same night, Anthony Ferruzza called AT&T, and the customer account notes for that call state, "Problem: customer calling about their uverse services, just got att email reactivate email att email customer accidentally deleted email."

148.     On information and belief, Anthony Ferruzza deleted data from his email account (including the emails that Vince Dante had sent to Anthony Ferruzza containing information Vince Dante had copied from the email accounts of Segerdahl's CEO and former CEO) and deactivated that account within hours of his receiving Segerdahl's demand/preservation letter.

149.     On May 10, 2017, Anthony Ferruzza's counsel emailed Segerdahl's counsel and falsely stated that Anthony Ferruzza deactivated the aferruzza@att.net account on February 17, 2017:

> Also be advised that Mr. Ferruzza deactivated the aferruzza@att.net account on February 17, 2017, before joining American Litho on February 20, 2017. The reason Mr. Ferruzza took this precautionary measure was to distance himself from Segerdahl before joining American Litho. Deactivation insured Mr. Ferruzza was not in possession of any Segerdahl information, including any Segerdahl confidential information or trade secrets when he joined American Litho.

(A copy of Anthony Ferruzza's counsel's May 10, 2017 email is attached as **Exhibit Y**.)

150.     The applicable AT&T/Yahoo! logs of Anthony Ferruzza's login and call activity for his aferruzza@att.net account do not show any login attempts or calls to customer service on February 17, 2017.

**—Michael Ferruzza's Text Messages with Daniella Tucci About Segerdahl's Demand Letters, Going to Jail "for the Next 30 Years" and Having "#Jumpdrivesfordays"—**

151.     **On Tuesday, February 21, 2017**, Michael Ferruzza and Daniella Tucci exchanged text messages about (i) Segerdahl's demand/preservations letters; (ii) Michael Ferruzza and Daniella Tucci potentially "running shit . . . from the penitentiary" and eating bread and water "for the next 30 years"; and (iii) Michael Ferruzza having "#jumpdrivesfordays":

> M. Ferruzza:  these people have a lot to learn. Pretty soon we'll be
>                    running shit... hopefully
>
> D. Tucci:      Yeah from the penitentiary

> M. Ferruzza: Fml we better eat a big meal for lunch just in case we're eating bread n water for the next 30 years. #wegotlockedupthehwontletusout
>
> D. Tucci: Lmao. Bread n water
>
> M. Ferruzza: **#jumpdrivesfordays**

(Ex. N at 16 (emphasis added).)

### —Anthony Ferruzza's Text Messages with Michael Fontana About Segerdahl's Demand Letters—

152. **On Tuesday, February 21, 2017**, Anthony Ferruzza and Michael Fontana exchanged text messages about Segerdahl's demand letters and, although Anthony Ferruzza had already received Segerdahl's demand letter via email on Monday, February 20, 2017 at 6:14 PM, Anthony Ferruzza lied to M. Fontana and stated that he "just got my letter" at 5:45 PM on February 21:

> T. Ferruzza: Let me know when we can group chat about the lawyer thing so they can calm down lol
>
> M. Fontana: 3 pm
>
> T. Ferruzza: Ok
>
> M. Fontana: Let's do Chicago room
>
> T. Ferruzza: Hope everything is ok with her bullshit scare tactics . . . Meet you at 3 . . . Just got my letter
>
> M. Fontana: Send yours to Kevin [Krantz] Tomorrow
>
> T. Ferruzza: Ok

(*See* Ex. N at 16.)

### —The Individual Defendants' Employment with American Litho/World Visual Group—

153. With the exception of Vince Dante, the Individual Defendants each began formal employment with American Litho (including its alter ego and/or joint employer, World Visual

Group) upon leaving Segerdahl in February 2017.

154. American Litho hired (a) Anthony Ferruzza as Senior Vice President Digital and Sheetfed Division, (b) Michael Ferruzza as Prepress Manager, (c) Daniella Tucci as Project Manager, (d) Christopher Knoll as Director, Sheetfed and Digital Operations, (e) Erica Knoll as Project Manager and (f) Eugene "Corky" Czech as Sheetfed Press Room Manager.

155. The Individual Defendants' (not including Vince Dante) respective positions and responsibilities at American Litho are the same as or substantially similar to the positions they held with Segerdahl. The confidential and proprietary business information to which they had access at Segerdahl is directly relevant to, and has great commercial value in, their duties and responsibilities at American Litho.

156. During the same time period that Anthony Ferruzza, Michael Ferruzza, Daniella Tucci, Christopher Knoll and Erica Knoll resigned, American Litho, through its sales executives and representatives, began aggressively contacting certain of Segerdahl's customers. In certain of these communications, American Litho stated that "there has been a lot of change at your current vendor in the past couple weeks, I wanted to let you know that we will be able to support your business and any of your projects with people that are very familiar with your work, if you need us to." In certain other communications, American Litho specifically named and highlighted each of the Individual Defendants (except for Vince Dante) without mentioning any of the other employees in that division of American Litho's business.

**—The American Litho/World Visual Group Employment Agreements—**

157. Each of the Individual Defendants (except for Vince Dante) executed employment agreements **on Monday, February 20, 2017** in connection with their employment with American Litho (the "American Litho Employment Agreements"). (Copies of the American

Litho Employment Agreements are attached as **Group Exhibit Z**.)  During discovery in this case, American Litho produced to Segerdahl *redacted* copies of the American Litho Employment Agreements, and American Litho specifically redacted the name of the employer in each of the employment agreements.  In producing the *redacted* copies of the American Litho Employment Agreements, American Litho falsely claimed that the redacted employer name was highly confidential, even though the name had already been disclosed in the publicly available records of both the Illinois and Delaware Secretaries of State.  Subsequently, on October 23, 2017, American Litho produced to Segerdahl *unredacted* copies of the American Employment Agreements.  The employer identified in the American Litho Employment Agreements is World Visual Group, *not* American Litho.

158.  World Visual Group is a Delaware limited liability company incorporated on April 5, 2017 under Delaware file No. 6371005, according to the public website of the Delaware Secretary of State.  The Illinois Secretary of State's public records have listed World Visual Group as a domestic limited liability company under file number 06262708 active since April 12, 2017, the same date its publicly listed agent was changed to Kevin R. Krantz (American Litho's General Counsel) of 401 Huehl Rd., Suite 2A, Northbrook, Illinois.  World Visual Group's managers, according to the Illinois Secretary of State's public records, are American Litho officers Michael S. Fontana and Christopher J. Joyaux.  (Copies of publicly available records from the websites of the Delaware and Illinois secretaries of state are attached as **Group Exhibit AA**.)

159.  In response to Segerdahl's motion to compel American Litho to produce *unredacted* copies of the American Litho Employment Agreements, American Litho's general counsel, Kevin Krantz, executed a Declaration dated September 28, 2017, in which he stated that

World Visual Group "is a contemplated new name for the business of American Litho," and that it pertains to the "internal restructuring and rebranding plan of American Litho, which has not been consummated to date." (A copy of the Declaration of Kevin R. Krantz, Esq. is attached as **Exhibit BB**.)

160.   In any event, there is such a unity of interest and ownership between American Litho and World Visual Group that the separate personalities of the two entities no longer exist, and adherence to the fiction of the separate corporate entities would sanction a fraud or promote injustice. World Visual Group and American Litho operate as a single entity (or as alter egos of each other), and each entity should be subject to direct and/or alter-ego liability in connection with Segerdahl's claims against American Litho and World Visual Group.

161.   In addition to their base salary and other benefits, The American Litho Employment Agreements provide each of the Individual Defendants with commission-based compensation tied to "future RJR projects." (*See* Grp. Ex. Z at § II(D) or II(E), respectively. The reference in the employment agreements to "RJR" pertains to a major Segerdahl customer R. J. Reynolds. R. J. Reynolds previously was not a *direct mail* customer of American Litho. Thus, the Individual Defendants' compensation was tied explicitly, in part, to their ability to obtain direct mail RJR work for American Litho. No other customer is named in the American Litho Employment Agreements. Not surprisingly, the Individual Defendants specifically targeted and took Segerdahl's confidential information and trade secrets pertaining to RJR and to Segerdahl's direct mail work for RJR when they left Segerdahl to work for American Litho, and they used this stolen information to attempt to secure RJR's direct mail business for American Litho.

162.   On   February 13, 2017, Anthony Ferruzza sent a text message to Christopher Knoll stating, "more money for us – we don't need him.  Between me-you-mike-corky-daniella-erica—we can hand the account and make the doe [sic]."  (Ex. N at 14.)  On information and belief, the "account" referenced by Anthony Ferruzza is the R. J. Reynolds account and the direct mail work for R. J. Reynolds that the Individual Defendants' were trying to secure for American Litho, which work the Individual Defendants stood to benefit from with the commission-based compensation provided for in the American Litho Employment Agreements.

163.   The American Litho Employment Agreements also contain certain restrictive covenants, including a nondisclosure covenant.  (See Grp. Ex. Z § IV.)  The nondisclosure covenant imposes certain restrictions on the Individual Defendants (except for Vince Dante) with respect to American Litho's "Trade Secrets and confidential information."  The definition of Trade Secrets in the employment agreements includes the following types of information, which is the same type of information that the Individual Defendants specifically targeted and took from Segerdahl when they left to work for American Litho:

> [C]ustomer lists; pricing policies and techniques; costs; marketing policies and techniques; the business affairs of [American Litho's] customers (including, without limitation, customers' service policies, service records and specific product needs and requirements); certain financial books, records, and reports; plans, techniques and methods of production, marketing, purchasing, selling and distributing [American Litho's products and services; the identity of [American Litho's] suppliers and the prices they charge [American Litho], as well as their shipping schedules; all improvements, designs and processes of [American Litho].

(Grp. Ex. Z § IV.)

164.   For example, the Segerdahl confidential information and trade secrets pertaining to R. J. Reynolds that the Individual Defendants targeted and took when they left to work for American Litho constitutes "the business affairs of [Segerdahl's] customers (including, without

limitation, customers' service policies, service records and specific product needs and requirements)."  (Grp. Ex. Z § IV.)

### —American Litho's February 23, 2017 Response Letter to Segerdahl—

165.    **On Thursday, February 23, 2017**, American Litho's outside general counsel sent a response letter to Segerdahl on behalf of American Litho and the Individual Defendants, although it was not clear from the response letter whether American Litho's outside general counsel also represented the Individual Defendants.  Therein, American Litho's outside general counsel falsely stated that (1) the Individual Defendants and American Litho "do not possess any tangible or electronically kept information containing any trade secrets, and therefore there is nothing to return"; (2) "[n]o wrongful conduct has taken place and no use of [Segerdahl] forms or documents has or will occur" ; (3) "[n]o specific actions are necessary" ; and (4) " [n]o cease and desist is necessary."   (A copy of the response letter is attached as **Exhibit CC**.)

### —Segerdahl's March 10, 2017 Response Letters to American Litho, Daniella Tucci and Christopher Knoll—

166.    On March 10, 2017, Segerdahl sent a response letter to American Litho's outside general counsel and letters to Daniella Tucci and Christopher Knoll.  In the letter to American Litho, Segerdahl requested confirmation from counsel as to which, if any, among the Individual Defendants and American Litho he represents.  Segerdahl also provided a summary of the results of the ongoing forensic investigation of the Individual Defendants' Segerdahl-issued computers, including Daniella Tucci's and Christopher Knoll's attachment of certain USB storage devices to their Segerdahl computers and other wrongful conduct.   In addition, Segerdahl reiterated its request that Defendants return any all of Segerdahl's documents, files and materials, including any such materials that may have been saved on any USB storage device.  (Copies of these letters are attached as **Exhibit DD**.)

**—American Litho's March 15, 2017 Letter to Segerdahl—**

167.     On March 15, 2017, American Litho's outside general counsel sent another letter to Segerdahl, stating therein that he represents American Litho "as its general counsel" and that he has interviewed certain of the Individual Defendants relating to this matter. American Litho's outside general counsel also made certain admissions regarding the Individual Defendants' wrongful conduct, including that (1) Christopher Knoll "downloaded his desktop drive onto a thumb drive . . . prior to leaving" Segerdahl; and (2) Daniella Tucci, while employed at Segerdahl, regularly "copied files and either emailed them to herself in a zip file or copied files to a thumb drive so that she could perform her work at home." Finally, American Litho enclosed Christopher Knoll's thumb drive with this letter. (A copy of this letter is attached as **Exhibit EE**.)

168.     This representation is patently false, as forensic examination reveals that Daniella Tucci's USB devices were attached only once to her Segerdahl-issued computer and after she resigned her employment. Additionally, although the response letter claims that Daniella Tucci, while employed at Segerdahl, "routinely p[er]formed additional work from home one or two days per week," that is simply not true. Moreover, her claim is expressly at odds with the Company Property Acknowledgment that Segerdahl required her to sign and abide by. (*See* Group Ex. M.)

**—Segerdahl's March 28, 2017 Additional Letters to**
**American Litho, Daniella Tucci and Christopher Knoll—**

169.     Segerdahl sent additional letters to American Litho, Christopher Knoll and Daniella Tucci on March 28, 2017, urging them to turn over the outstanding devices Daniella Tucci used in her misappropriation of confidential information. (Copies of these letters are attached as **Exhibit FF**.)

**—The Individual Defendants' and American Litho's Continued Pursuit of Segerdahl Customer R. J. Reynolds Using Segerdahl Information—**

170. **On Wednesday, February 22, 2017**, Michael Ferruzza text messaged Christopher Knoll stating, "We really gotta get moving n setup for rjr. They are struggling badly at SG and this is our opportunity to jump in n get one job perfect. The other 2 printers they have can't handle the workload so SG is continuing to get the work." (Ex. N at 17.)

171. **On Monday, February 27, 2017**, Michael Ferruzza text messaged Daniella Tucci stating, "On phone with Carolyn [Sutton].. she's like when I get off with you I need to talk to daniELLA [sic]." (Ex. N at 18.)

172. Later that same day, Anthony Ferruzza text messaged Michael Fontana stating, "Me and you in 2 weeks need to fly to rjr and meet them . . . I will set up the meeting week after next if it works . . . They are pulling a lot of work . . . The brands are already asking where is tony and when is he coming . . . I told her I'm coming with the owner –top dog . . . Lol." (Ex. N at 18–19.)

173. **On Monday, February 27, 2017**, Anthony Ferruzza, Michael Fontana, Christopher Knoll (and likely certain other of the Individual Defendants) met with Carolyn Sutton at around 7:30 PM:

|  |  |
|---|---|
| <u>D. Tucci (to M. Ferruzza)</u>: | R u meeting Carloyn? |
| <u>T. Ferruzza (to D. Tucci)</u>: | u gunna join us sis? |
| <u>T. Ferruzza (to M. Fontana)</u>: | u here yet? |
| <u>M. Fontana (to T. Ferruzza)</u>: | 15 mins |
| <u>T. Ferruzza (to M. Fontana)</u>: | K |
| <u>C. Knoll (to T. Ferruzza)</u>: | 4minutes [sic] |
| <u>T. Ferruzza (to C. Knoll)</u>: | K |

66

(Ex. N at 19.)

174. **On Monday, March 6, 2017**, Anthony Ferruzza text messaged Michael Fontana stating, "A little birdie told me that RJR is gunna call me tomorrow . . . No fingers crossed needed . . . All the planners went to top and said we need to reach out to Tony . . . they are all unhappy with the service and quality at SG . . . And it's time to look at new printer .."   (Ex. N at 19.)

175. **On Tuesday, March 7, 2017**, Michael Fontana text messaged Anthony Ferruzza stating, "How did the call go today," and Anthony Ferruzza responded, "jason will prolyl [sic] call me after the meeting 2Morrow [sic] . . . on phone now with carolyn—meeting tomorrow with buyers—they pulling programs from SG."  (Ex. N at 19.)

176. **On Wednesday, March 8, 2017**, between about 5 PM and 7:30 PM, Anthony Ferruzza and Michael Fontana exchanged text messages about (i) their continuing pursuit of work from Segerdahl customer R. J. Reynolds and (ii) R. J. Reynolds taking work away from Segerdahl and giving it to American Litho:

> T. Ferruzza: Just pulled 16 million Newport impressions …. Gunny talk to her when I leave . . . Update you later
>
> M. Fontana: Wow
>
> T. Ferruzza: And took all the grizzly work
>
> M. Fontana: What's the plan
>
> T. Ferruzza: Jason may reach out to me tomorrow latest Monday . . . Then me and you gonna set up meeting here or there . . . All the brands met with upper mgt today and said time to reach out . . . ITS GAME TIME MAN

(Ex. N at 19.)

177.     About an hour later, at 8:35 PM **on Wednesday, March 8, 2017**, Michael Fontana text messaged Chris Joyaux, American Litho's Vice President and Co-Founder, stating "Good news, going to RJR next week . . . The work is coming . . . They pulled all out of SG today." (Ex. N at 19.)

178.     **On Monday, March 13, 2017**, Christopher Knoll text messaged Anthony Ferruzza stating, "Let me know when u are done with Jason.  Then we call Ann about security audit." (Ex. N at 19.)  Christopher Knoll then text messaged Daniella Tucci stating, "I told Tony to let me know when he is off with Jason and then we will call."  (Ex. N at 20.)  Shortly thereafter, Daniella Tucci text messaged Christopher Knoll stating, "With tony on RJR call." (Ex. N at 20.)

179.     **On Wednesday, March 15, 2017**, Christopher Knoll text messaged Michael Fontana stating, "Let me know when you want me to come up and discuss [the RJR] security checklist." (Ex. N at 20.)  A few hours later, Daniella Tucci text messaged Michael Ferruzza stating, "Carolyn [Sutton] said to let her know when and where tonight." (Ex. N at 20.)

180.     **On Monday, March 20, 2017**, Anthony Ferruzza exchanged text messages with Michael Fontana about (i) their continued pursuit of work from Segerdahl customer R. J. Reynolds, and (ii) an April 10, 2017 meeting schedule with American Litho and R. J. Reynolds:

> T. Ferruzza:   Letter and equipment list sent . . . I will let you know the date they choose to visit . . . He responded . . . He is going to be out next week . . . And the week after he is busy . . . Looks like April 10th . . . But may be sooner
>
> M. Fontana:   4/10 is . . . Great, let's do it

(Ex. N at 20.)

181.    **On Tuesday, March 21, 2017**, Anthony Ferruzza text messaged Michael Fontana stating, "Jason just called me . . . He asked mete put agenda together for him and Carolyn for April 10th . . . I would like you to review the plan with me someone today Then I vwill [sic] send it to him."  (Ex. N at 20.)

182.    **On Friday, March 24, 2017**, Anthony Ferruzza text messaged Michael Fontana stating, "Call in number for RJR."  (Ex. N at 20.)

183.    **On Sunday, March 26, 2017**, Anthony Ferruzza text messaged Michael Fontana stating, "from carolyn [Sutton]: Tuesday I will break things up on call as follows for open discussion: Intros . . . Partnership . . . Expectations . . . Facilities . . . Quality."  (Ex. N at 20.)

184.    **On Tuesday, March 28, 2017**, at 10:48 AM, Anthony Ferruzza text messaged Michael Fontana stating, "Carolyn feedback: They said American litho seemed like we were well prepared…  ABS did a lot of stuttering 101."  (Ex. N at 21.)

185.    A couple hours later, at 12:34 PM **on Tuesday, March 28, 2017**, Erica Knoll text messaged Christopher Knoll stating, "I'm on phone with Jason and Carolyn," and Anthony Ferruzza text messaged Christopher Knoll stating, "I got the word . . . <u>We got the work</u>."  (Ex. N at 21 (emphasis added).)

**—Michael Ferruzza's March 28, 2017 Bulk Copy (to His American Litho Computer) of Segerdahl's Customer Files Pertaining to R. J. Reynolds, Including Standard Operating Procedures, Security Findings and Remediation Plans—**

186.    Between 1:05 and 1:08 PM **on Tuesday, March 28, 2017**—i.e., about 30 minutes after Anthony Ferruzza announced that American Litho "got the work" from R. J. Reynolds—Michael Ferruzza copied 1,350 Segerdahl files onto his American Litho computer in a bulk copy operation.

187.    Many of those 1,350 Segerdahl files pertain solely to R. J. Reynolds, including (a) 177 current, official standard operating procedures files (e.g., for document control and retention,

calibration, color ok, pressroom maintenance, shipping, digital, material handling and make-ready for the sheetfed press), (b) security audit findings and (c) remediation plans.

188.    Tellingly, Christopher Knoll also targeted and took from Segerdahl 114 standard operating procedure files from the same set of 177 standard operating procedure files that Michael Ferruzza targeted and took from Segerdahl, all of which pertain to the same Segerdahl customer R. J. Reynolds.  The overlapping targeting and taking of these standard operating procedures indicates the intrinsic competitive value that both Michael Ferruzza and Christopher Knoll recognized in these documents.

189.    R. J. Reynolds is the Segerdahl customer for which each and every one of the individual Defendants, would, according to their American Litho employment agreements, reap special commission income upon moving its business to American Litho.  (*See* Grp. Ex. Z.)

### —The Individual Defendants' and American Litho's Continued Pursuit of Segerdahl Customer R. J. Reynolds Using Segerdahl Information—

190.    **On Thursday, March 30, 2017**, Anthony Ferruzza text messaged Michael Fontana stating, "got the RJR files in today –we gunna prep them and meet tomorrow with the plan." (Ex. N at 21.)

191.    **On Monday, April 3, 2017**, Christopher Knoll text messaged Anthony Ferruzza stating, "Photo ID system is being installed today. Once it works we will need to set up the lockdown of the building. Should I send out a meeting request for tomorrow morning? RJR team, Mike, Chris, Truman?" Anthony Ferruzza responded, "yes-" (Ex. N at 21.)

192.    **On Wednesday, April 5, 2017**, Anthony Ferruzza and Michael Fontana exchanged text messages about the status of their pursuit of work from Segerdahl customer R. J. Reynolds:

> T. Ferruzza:   We may have gotten a free pass . . . Jason text me
>                and said security guy will Jan us on a call . . . That

> meens [sic] he ain't coming but will do if over phone
> . . . Jason wants to play Monday nite . . . He text me .
> . . He coming in 6:30 . . . We will have private time
> with him . . . Tues will be Carolyn and Jason

M. Fontana:  Sun is dinner with Carolyn?

T. Ferruzza:  Yes and plant tour

(Ex. N at 21.)

193.     **On Thursday, April 6, 2017**, Anthony Ferruzza texted Christopher Knoll stating, "Curious to see speed on the RJR estimate." Later that same day, Anthony Ferruzza text messaged Michael Fontana and Chris Joyaux, American Litho's Vince President and Co-Founder, stating "I told her wait until she sees camel and pall mall and grizzly . . . They look awesome .. FYI Carolyn got her Newport samples today . . . And really liked them . . . She told Jason American litho sheet looks great and they can print the Newport work… She very excited." (Ex. N at 21.)

194.     **On Friday, April 7, 2017**, Michael Ferruzza text messaged Christopher Knoll stating, "Told us our drobos servers aren't recommended either . . . Definitely shows our IT department getting exposed." (Ex. N at 21.)

195.     **On Friday, April 7, 2017**, Anthony Ferruzza text messaged Michael Fontana stating, "What time is good for the tour with Carolyn on Sunday? She coming to my house around 11:30." Wanna do 2:00 . . . Then we can go eat at villagios?" Michael Fontana responded, "K." (Ex. N at 21.)

196.     **On Friday, April 7, 2017**, Anthony Ferruzza exchanged text messages with Christopher Knoll regarding their pursuit of work from Segerdahl Customer R. J. Reynolds, including by using their inside knowledge about Segerdahl's pricing terms:

| T. Ferruzza: | Let's see what Carolyn says . . . Ready when u are . . . Want me to call u then add Carolyn in? |
|---|---|
| C. Knoll: | Yes |
| T. Ferruzza: | Are we gunna be able to get close? |
| C. Knoll: | If SG could get to that price so should we. I'm gonna put an email together and send to the estimator and Fontana asking for some information so we can dig into this. . . . Presstime alone was an additional 79 hours |
| T. Ferruzza: | I just text her and said are you sure Newport price was that low . . . Press sped is a big factor to . . . And paper should be same . . . As SG . . . I got paper pricing at SG same as meridith . . . I'm working with Carolyn on price now . . . Don't get to crazy yet . . . She has to be wrong . . . I'm beatin on her now . . . I told her that was 6/c price . . . Here's my info . . . But that is 6/c correct |

(Ex. N at 22.)

197. **On Friday, April 7, 2017**, Anthony Ferruzza exchanged text messages with Michael Fontana and others about (i) their continued pursuit of work from Segerdahl Customer R. J. Reynolds, (ii) pricing terms for such work, and (iii) Carolyn Sutton coming to visit on Sunday for a meeting at American Litho:

| T. Ferruzza: | Everyone please hold on . . . With [t]he RJR price . . . I called her and I think she gave us wrong price per piece . . . She had price from SG and it was 6/c . . . She said hold off on any digging until she comes Sunday . . . I told her that price per piece was way to[o] low as a 7/c . . . She said hold of[f] until Sunday on the pricing . . . Please check paper price for now tho . . . She is digging up paper work and bringing Sunday |
|---|---|

(Ex. N at 22.)

198.    **On Sunday, April 9, 2017**, Anthony Ferruzza text messaged Michael Fontana about (i) meeting with Carolyn Sutton in Chicago, and (ii) the "big tour day" on Tuesday "when Jason is here":

> T. Ferruzza:    We will meet at the office at 2:30? . . . Sounds good . . . She is staying hotel out here . . . We can stay local if you want . . . U da boss . . . But somewhere really casual . . . So she can relax . . . Big tour day is Tuesday . . . When Jason is here

(Ex. N at 22.)

199.    **On Monday, April 10, 2017**, Anthony Ferruzza text messaged Daniella Tucci stating, "Call fontana after lunch . . . Tell him Jason and Carolyn wanna do drinks then perrys . . . Tomorrow . . . Drinks at 4 . . . Dinner at 5 or 5:30" (Ex. N at 22.)

**—Segerdahl Customer R. J. Reynolds' (and Carolyn Sutton's) Tour of
the American Litho Facility on April 11, 2017—**

200.    **On Tuesday, April 11, 2017**, Carolyn Sutton and Jason Burnette, a buyer for Reynolds American (and its subsidiary, R. J. Reynolds), visiting the American Litho facility to witness a so-called press test and facility tour.  That morning, Anthony Ferruzza text messaged Michael Fontana stating, "They on the way now," to which Michael Fontana responded, "At front signing in."  (Ex. N at 23.)  Anthony Ferruzza replied, "I'm with them.  (Ex. N at 23.)  At 9:33 AM, Anthony Ferruzza text messaged Christopher Knoll stating, "In RJR MEETING."  (Ex. N at 23.)

201.    **On Wednesday, April 12, 2017**, Anthony Ferruzza text messaged Christopher Knoll around 10 AM stating, "alesha text me at 3am and asked if i was with mikey she had not heard from him----lmfao . . . jason just text me and said thx for hospitality — i said you just get back to hotel? . . . is Daniella in today?  (Ex. N at 23.)

202.    At around 10:30 AM, **on Wednesday, April 12, 2017**, Anthony Ferruzza text messaged Daniella Tucci stating, "Tomorrow we will work on RJR procedures? To send for Danny.." (Ex. N at 23.)

203.    That night, at around 5:30 PM **on Wednesday, April 12, 2017**, Anthony Ferruzza exchanged text messages with Michael Fontana and Michael Ferruzza about a call from Carolyn Sutton and feedback regarding her and Jason Burnette's tour of the American Litho facility:

> T. Ferruzza:    Carolyn just called . . . Was at ABS all day . . . We blew them away wen [sic] equipment . . . We blew thorn [sic] away vat [sic] our color . . . They blew us away vAth [sic] security audit . . . They were not even close with color to her proofs
>
> M. Fontana:    Let's work our ass off to get the security questions answered So we shine them too
>
> T. Ferruzza:    consider it done by friday—I'm almost done and will finalize with daniella

(Ex. N at 23.)

204.    **On Wednesday, April 19, 2017**, Anthony Ferruzza and Michael Fontana exchanged text messages about the status of their pursuit of work form Segerdahl customer R. J. Reynolds and American Litho's "camel test" blowing Segerdahl away:

> T. Ferruzza:    I am on phone with RJR . . . discussing audit stuff . . . Carolyn said first job gunna be camel and it will be 2 million plus per element . . . Envelope. Carrier coupons . . . 6 million . . . She still going . . . We on phone in my office . . . Tuesday is big day next week . . . All the brands saying American litho best . . . And start letting them quote . . . They ask Carolyn her recommendations . . . Lmfafo. Rigged canted [sic] . . . They said our camel test blew SG away...... SG ran same files . . . Friday . . . We waxed their ass
>
> M. Fontana:    Nice, I must have just missed you . . . Great news

> T. Ferruzza:  ♥ good feedback after meeting . . . They feeling
> loved and like what going on . . . They said finally

(Ex. N at 23.)

**—Segerdahl's Complaint for Injunctive Relief and Damages (Filed April 21, 2017)—**

205.  **On Friday, April 21, 2017**, Segerdahl filed its Complaint for injunctive Relief and Damages.  (Dkt. 1.)

**—R. J. Reynolds' Decision**
**Not to Hire American Litho for Its Direct Mail Printing Needs—**

206.  **On Tuesday, April 25, 2017**, Christopher Knoll text messaged Anthony Ferruzza stating, "Just got home. Carolyn text me while I was at the show and asked if we could talk. Told her I couldn't. Said we will talk tomorrow."

207.  **On Wednesday, April 26, 2017**—i.e., just five days after Segerdahl filed its Complaint in this litigation—Tim Steelman, Sr. Manager Procurement Marketing Materials & Services for R. J. Reynolds, emailed Anthony Ferruzza to inform him that R. J. Reynolds would not be using American Litho for its direct mail and printing needs:

> Tony:
>
> Recently, Jason Burnette had correspondence on behalf of R.J. Reynolds Tobacco Company regarding the direct mail printing capabilities from American Litho.  For example, Jason visited the American Litho facility to witness a so-called press test and facility tour on Tuesday, April 11th 2017.  <u>R. J. Reynolds has elected to pursue other avenues for its direct mail printing needs, and for this reason, it will not be considering using American Litho for its needs</u>.

(A copy of Mr. Steelman's April 26, 2017 email to Anthony Ferruzza is attached as **Exhibit GG**.)  (Ex. GG (emphasis added).)  Anthony Ferruzza forwarded Mr. Steelman's April 26 to American Michael Fontana, who responded, "That hurts."   (Ex. GG.)

**—Anthony Ferruzza's Threat Directed to Segerdahl's CEO—**

208.     On or about April 27, 2017, Anthony Ferruzza initiated a telephone conversation with Rick Joutras, Segerdahl's Chairman of the Board and former CEO.   During that call, Anthony Ferruzza told Rick Joutras that Segerdahl's CEO, Mary Lee Schneider, had better back off from pursuing Segerdahl's lawsuit against Defendants and that, if she did not back off, Anthony Ferruzza would disclose allegedly damaging information relating unspecified bad conduct by Segerdahl, of which he allegedly had knowledge by virtue of his Segerdahl employment.

**—Defendants' False Representations to the Court—**

209.     On May 2, 2017, Defendants filed their Response in Opposition to Plaintiff's Emergency Motion for a Temporary Restraining Order.   (*See* Dkt. 38.)   In that response, Defendants falsely stated, "No Segerdahl information of any kind was transferred to American Litho."   (Dkt. 38 at 1.)   The Court denied Segerdahl's Emergency Motion for a Temporary Restraining Order in partial reliance on Defendants' false representations.   (*See* Dkt. 40 ("It appears from the record so far, that at least one of the individual employees took some Segerdahl information (Christopher Knoll), the thumb drive that he had was returned. . . . Defendants aver through a declaration that they have not disclosed any confidential information of Segerdahl's to American Litho.")   Three weeks later, on May 24, 2017, American Litho admitted in its discovery responses that (a) "Michael Ferruzza copied files from the desktop computer that he used while he was employed by Segerdahl to an external USB hard drive and . . . attached that external USB hard drive and uploaded files contained on that drive to his American Litho Mac Computer"; and (b) "Christopher Knoll . . . attached a thumb drive to his American Litho-issued computer, which files Mr. Knoll had copied off of the desktop of his Segerdahl-issued

computer." (A copy of American Litho's Objections and Responses to Plaintiff's First Set of Expedited Interrogatories is attached as **Exhibit HH**.) (*See* Ex. HH at Interrog. No. 2.)

210. On May 3, 2017, Michael Ferruzza executed a Declaration in support of Defendants' Response in Opposition to Plaintiff's Emergency Motion for a Temporary Restraining Order. (*See* Dkt. 38-1, Michael Ferruzza Decl.) In that Declaration, Michael Ferruzza falsely stated, "When I left, I did not take with me any production materials. I did not take any proofs, working files, work in progress, final or waste product or any other part of a production job in whole or in part." (*See id.* ¶ 12.) Three weeks later, on May 24, 2017, Michael Ferruzza admitted in his discovery responses that, on or about January 30, 2017, he connected an external USB hard drive to his Segerdahl computer and copied approximately 1,350 documents from his computer to the USB drive. (*See* Ex. S at Interrog. No. 1.) Michael Ferruzza transferred those Segerdahl documents to his American Litho computer and, on information and belief, to the American Litho network/servers. The 1,350 documents that Michael Ferruzza misappropriated from Segerdahl are listed in a spreadsheet that he produced in expedited discovery. The overwhelming majority of the 1,350 documents listed in the spreadsheet have titles showing that they are Segerdahl's business information and/or information of Segerdahl customers—including R. J. Reynolds—entrusted to Segerdahl. The confidential Segerdahl business information listed in the Michael Ferruzza spreadsheet includes customer production materials, including proofs, working files, works in progress, final or waste product and other parts of production jobs (and compilations thereof).

**—American Litho's Continued Pursuit of Work for Segerdahl Customer R. J. Reynolds—**

211. **On Wednesday, May 24, 2017**—more than one month after Segerdahl filed its original Complaint for Injunctive Relief and Damages—Michael Fontana personally emailed the

Sr. Manager Procurement Marking Materials & Services for R. J. Reynolds. (A copy of Michael Fontana's May 24, 2017 email is attached as **Exhibit II**.)

212.    In that email, Michael Fontana (a) acknowledged RJR's decision to pursue other avenues for its direct mail printing needs; (b) admitted his disappointment in RJR's decision; (c) stated his belief that American Litho would have been an ideal provider for RJR, given its personnel, equipment and process capabilities; (d) expressly solicited RJR's business and requested a reconsideration of RJR's prior decision not to use American Litho for its direct mail printing needs; (e) acknowledged this lawsuit and attempted to minimize its significance by denying any impropriety, indicating his intent to vigorously defend against the lawsuit and citing Judge Coleman's decision to deny Segerdahl's Motion for Temporary Restraining Order, which decision was premised, in part, on Defendants' false representations to the Court. (*See* Ex. II.)

**—The Computer Forensic Analysis Protocol Agreement—**

213.    On August 15, 2017, during expedited discovery in this case, the parties (except for Vince Dante) entered into a computer Forensic Analysis Protocol Agreement (the "Protocol Agreement"), as directed by the appointed Special Master in this case, Thomas Lidbury. (A copy of the Protocol Agreement is attached as **Exhibit JJ**.)

214.    The Protocol Agreement governs the forensic analysis of (a) the American Litho computers and email accounts used by the Individual Defendants (except for Vince Dante); (b) the American Litho computers and email account used by American Litho's President, Michael Fontana; (c) the personal computers, web-based storage accounts, email accounts and mobile devices of the Individual Defendants (except for Vince Dante); and (d) any computer storage media connected to or on behalf of the Individual Defendants (except for Vince Dante) to any American Litho computer or computer network. The forensic analyses called for by the Protocol

Agreement include USB analysis, MD5 hash value analysis, search term analysis, list of files analysis and data deletion analysis. The parties reserved their respective rights under the Protocol Agreement to seek and contest searches of the unallocated and slack space on each of the computer forensic images.

**—Defendants' Spoliation of Evidence—**

215.    While the implementation of the Protocol Agreement is ongoing, the forensic analysis completed thus far has revealed that, beginning no later than January 2017 and continuing through to at least August 28, 2017 (i.e., two weeks *after* the execution of the Protocol Agreement), Defendants have engaged in coordinated and sustained efforts to (a) take large amounts of Segerdahl's data, (b) use that data to compete unfairly against Segerdahl and (c) cover up evidence of their taking and using Segerdahl's data. As a direct result of Defendants' own actions, extensive spoliation of evidence issues exist that call into question the integrity of the metadata results in the forensic protocol reports, as well as the integrity of the documents to be produced under the Protocol Agreement.

216.    In a letter to the Special Master requesting forensic analysis of the unallocated and slack space on each of the computer forensic images dated October 6, 2017, Segerdahl detailed the substantial spoliation of evidence issues that exist solely as a result of Defendants' own actions. These spoliation issues include, without limitation:

- the failure to turn over multiple USB storage devices that were connected to the American Litho Computers;

- the mass defragging of the American Litho computers immediately prior to imaging;

- the communal use of a stolen USB storage device containing stolen Segerdahl data;

- the connection of USB storage devices containing Segerdahl data to transfer Segerdahl data from Segerdahl computers to American Litho computers;

- the installing and running of data-deletion software;

- the deleting of data from Michael Ferruzza's previously undisclosed American Litho iMac computer;

- the taking and deleting of Segerdahl data from Segerdahl computers;

- the failure to return a "clone" drive backup of a Segerdahl computer containing Segerdahl data;

- the deactivation of an email account containing Segerdahl data;

- the deletion of emails containing Segerdahl data; and

- the physical removal and destruction of a hard drive from a Segerdahl computer.

(A copy of Segerdahl's letter to the Special Master dated October 6, 2017, without the exhibits thereto, is attached as **Exhibit KK**.)

### —The Expert Report of David Kalat, Segerdahl's Retained Expert—

217. **On February 15, 2018**, Segerdahl served its Rule 26(a)(2) expert witness disclosure, attaching thereto the Expert Report of David Kalat. (A copy of Segerdahl's Rule 26(a)(2) expert witness disclosure and the Expert Report of David Kalat, without the exhibits thereto, are attached as **Exhibit LL**.)

218. Among the many finding set forth in the Expert Report, David Kalat found:

(a) that the Defendants took affirmative steps in the days and weeks immediately prior to their resignations from Segerdahl that resulted in the copying of Segerdahl company documents onto external storage media that remained in the possession of the Defendants after the termination of their employment with Segerdahl;

(b) that the Defendants' affirmative actions included (i) connecting USB external storage devices to their Segerdahl-issued work computers and copying Segerdahl company documents to those devices; (ii) emailing Segerdahl company documents to personal email address; (iii) printing numerous Segerdahl documents and files; and (iv) copying Segerdahl documents directly to American Litho computers; and

(c) that the Defendants also took affirmative steps to delete, conceal, and otherwise obscure access to electronic evidence related to their misappropriation of Segerdahl company documents and records. (*See* Ex. LL Kalat Rep. at 16.)

### —American Litho's Motion for Leave to Remediate the Segerdahl Materials from American Litho's Devices—

219.   **On February 16, 2017**, American Litho filed a motion for leave to remediate Segerdahl materials from American Litho's (and the Individual Defendants') computing devices. (Dkt. 274.)

220.   American Litho's motion for leave sought to remediate the following Segerdahl materials from American Litho's (and the Individual Defendants') computing devices: (a) files contained on Christopher Knoll's thumb drive that he copied from his Segerdahl computer; (b) approximately 1,350 files that Michael Ferruzza copied from his Segerdahl computer and later uploaded to his American Litho-issued Mac Pro computer; (c) approximately 115 files that Christopher Knoll copied from his Segerdahl computer and later uploaded to his American Litho-issued HP Pro Desk 400; and (d) approximately 4,456 documents (8,601 pages) consisting of emails and attachments that Christopher Knoll emailed from his Segerdahl email account to his personal email account. (*See* Dkt. 274 at 2.)

221.   In its motion for leave, American Litho did not identify or acknowledge the full array of Segerdahl documents and files that Defendants took from Segerdahl and copied to American Litho's (and the Individual Defendants') computing devices.

### —Summary of Defendants' Misconduct—

222.   The Individual Defendants and American Litho have committed numerous wrongful acts in violation of their respective obligations to Segerdahl, including those set forth below and in Counts I–XI.

*—Anthony Ferruzza—*

223. The ongoing forensic analysis of Anthony Ferruzza's Segerdahl-issued iMac computer has revealed that his printing activity spiked dramatically in January 2017, immediately prior to his departure from Segerdahl. In his last weeks with Segerdahl, Anthony Ferruzza used this computer to access and print numerous documents and files, none of which he restored to Segerdahl before his abrupt departure, including files related to the 2017 Segerdahl budget (including sales information by customer), full-year press schedules, operating procedures, operational initiatives and specific customer job estimates. During his last month at Segerdahl, Anthony Ferruzza printed 132 documents, which was an increase of 43% over his usual monthly average, a 65% increase over the previous month and a high-water mark overall for his entire print history.

224. On his last day of employment, January 31, 2017, Anthony Ferruzza deleted all user-created documents associated with his user profile. Anthony Ferruzza also accessed and modified his Segerdahl-issued computer's "Trash" folder on January 31, 2017, emptying all files contained therein, which effectively deleted all file-system metadata for the corresponding files. The forensic analysis of this computer has thus far recovered four of the deleted files, including Gilman key metrics, phone directories and operational initiative details.

225. In addition, on the evening of November 29, 2016, a member of Segerdahl's IT staff, John Cleary, ran an overnight back up of Anthony Ferruzza's Segerdahl-issued computer to an external "clone" drive in the ordinary course of his work in preserving Segerdahl's business information. The next day, November 30, 2016, John Cleary requested that Anthony Ferruzza return the "clone" drive to him for safekeeping, per routine Segerdahl IT practices. Anthony Ferruzza aggressively refused; angrily announced that he did not want anyone "looking at his

sh*t;" and directed John Cleary that he, Anthony Ferruzza, would be keeping the back-up "clone" drive in his office desk drawer. Anthony Ferruzza had never previously insisted on this exception to Segerdahl IT practice, and indeed no other Segerdahl employee had similarly insisted that he/she, not Segerdahl IT, maintain possession of the back-up "clone" drive of their Segerdahl-issued computer. The day of, or day following Anthony Ferruzza's abrupt resignation from Segerdahl on January 31, 2017, John Cleary searched Anthony Ferruzza's office for the back-up "clone" drive, to no avail. Despite an extensive search, Segerdahl has been unable to locate the back-up "clone" drive, and that "clone" drive has been missing since Anthony Ferruzza's abrupt departure from Segerdahl. Segerdahl believes the backup "clone" of Anthony Ferruzza's computer to include, at a minimum, a complete duplicate of the files on that computer as of November 29, 2016, including but not limited to confidential and proprietary Segerdahl business information and files previously entrusted to Anthony Ferruzza.

*—Anthony Ferruzza and Vince Dante—*

226. Furthermore, while Anthony Ferruzza was organizing the mass defection of Segerdahl's employees, and from at least approximately October through December 2016, Vince Dante—i.e., Segerdahl's Director, Infrastructure and Networking—was using his position (and his access to Segerdahl employee passwords) to illegally and surreptitiously (a) use a personal iPad to access the Segerdahl email accounts of Segerdahl's CEO, Mary Lee Schneider, and its Chairman of the Board and former CEO, Rick Joutras; (b) copy confidential information from those Segerdahl email accounts pertaining to Segerdahl's business and the sale thereof; and (c) paste the purloined information into emails directed from Vince Dante's personal email account, Vdante1@me.com, to Anthony Ferruzza's personal email account, Aferruzza@att.net. Vince Dante allegedly deleted from his personal email account each of the emails that he sent to

Anthony Ferruzza's personal email account. Through counsel, Anthony Ferruzza claims to have deactivated his Aferruzza@att.net email account on February 17, 2017, and he further claims that, by doing so, he deleted all data associated with that email account. Anthony Ferruzza never notified anyone at Segerdahl about the fact that Vince Dante was illegally and surreptitiously sending hacked emails to Anthony Ferruzza containing confidential information mined from the Segerdahl email accounts of Segerdahl's CEO and its Chairman of the Board.

227.    Additionally, on Sunday, February 5, 2017, while Vince Dante was helping to set up a Super Bowl party being hosted by Anthony Ferruzza, Anthony Ferruzza brought Vince Dante an Apple MacBook Pro purchased with Segerdahl funds. According to his counsel, Anthony Ferruzza asked Vince Dante about getting rid of Segerdahl information on this device. Vince Dante, still a Segerdahl employee at the time, told Anthony Ferruzza that replacing the internal hard drive would be the best way to get rid of all information on the computer. Vince Dante then removed the internal hard drive, handed it to Anthony Ferruzza and watched as Anthony Ferruzza snapped the hard drive in two with his hands and threw the pieces in the trash. Segerdahl policies call for the *return* to Segerdahl, not the destruction, of its business information on an employee's separation (*see* Ex. B at 19, "Company Property").

228.    On May 3, 2017, Anthony Ferruzza executed a declaration in support of Defendants' Response in Opposition to Plaintiff's Emergency Motion for a Temporary Restraining Order, in which he falsely stated, "I did not take any information from Segerdahl. I have not misused or disclosed any information from Segerdahl." (*See* Dkt. 38-1.)

—*Michael Ferruzza*—

229.    The ongoing forensic analysis of Michael Ferruzza's Segerdahl-issued MacPro Tower computer has revealed that he used it to access and use, with no authority from Segerdahl,

third-party cloud storage services Google Drive, Dropbox and Box.com in the days and weeks immediately preceding his departure from Segerdahl. In addition, prior to leaving Segerdahl, Michael Ferruzza deleted all user-created documents associated with his user profile, and he accessed and modified his computer's "Trash" folder on February 8, 2017, emptying all files contained therein, which effectively deleted all file-system metadata for the corresponding files. The forensic analysis of this computer has thus far not been able to recover any of the deleted files or file names.

230. In addition, during expedited discovery in this case, Michael Ferruzza admitted that, on or around January 30, 2017—i.e., the day he resigned his employment with Segerdahl— he connected the Michael Ferruzza External Hard Drive (an external Western Digital My Passport USB hard drive (Serial No. 575848314539334A434A3731)) to his Segerdahl computer and copied approximately 1,350 documents from his computer to the USB drive. The Michael Ferruzza External Hard Drive is a large capacity external storage device capable of storing 1 or 2 *terabytes* of information— i.e., the equivalent of 1,428–2,856 CD-ROMs, or between 75 million and 150 million printed pages. Subsequently, Michael Ferruzza transferred those Segerdahl documents to his American Litho computer and, on information and belief, to the American Litho network/servers. The documents that Michael Ferruzza misappropriated from Segerdahl are listed in a spreadsheet that he produced in expedited discovery, which itemizes 1,350 documents. Segerdahl's review of those 1,350 documents has shown that the overwhelming majority contain Segerdahl's business information and/or information of Segerdahl customers entrusted to Segerdahl, including (a) files containing proprietary instructions, best practices, standard operating procedures and production examples for the Gilman sheetfed facility; (b) 177 current, official standard operating procedures files, including for document control and

retention, calibration, color ok, pressroom maintenance, shipping, digital, material handling and make-ready for the sheetfed press; (c) proprietary software scripts developed by Segerdahl to automate various prepress productions steps (to which Michael Ferruzza had access only because he was a privileged user of the prepress department which he managed); (d) prepress PDF customer production files; (e) final, complete and press-ready PDFs containing several thousand names and addresses; (f) customer security audit findings and remediation plans and FTP and SFTP access information and passwords for those customers (which would have given Michael Ferruzza and American Litho the ability to log in to customer FTP and SFTP sites and steal additional confidential information shared between Segerdahl and its customers); (g) files specific to Segerdahl's Gilman facility, including floor plans, prepress schedules, paper ordering, new job logs and pressroom inventory; and (h) Segerdahl-specific vendor contracts containing pricing, terms/conditions and customer-specific billing information. (*See* Ex. S at Interrog. No. 1.)

231. Notably, the confidential Segerdahl business information that Michael Ferruzza took from Segerdahl includes customer production materials, including proofs, working files, works in progress, final or waste product and other parts of production jobs (and compilations thereof). On May 3, 2017, Michael Ferruzza executed a declaration in support of Defendants' Response in Opposition to Plaintiff's Emergency Motion for a Temporary Restraining Order, in which he falsely stated, "When I left, I did not take with me any production materials. I did not take any proofs, working files, work in progress, final or waste product or any other part of a production job in whole or in part." (*See* Dkt. 38-1, Michael Ferruzza Decl. ¶ 12.)

232. Furthermore, the confidential Segerdahl business information that Michael Ferruzza took from Segerdahl includes extensive protected health information ("PHI") relating

potentially to tens of thousands of individual third parties, such PHI having been provided to Segerdahl by a Segerdahl customer, then misappropriated by Michael Ferruzza. With limited exceptions, Defendants continue to refuse to provide Segerdahl with most of the 1,350 Segerdahl files identified in the Michael Ferruzza spreadsheet. As a result of Michael Ferruzza's illegal actions, Segerdahl is engaging in ongoing, extensive work to aid its customer in responding to, and providing necessary notices and reports regarding a significant data compromise incident in accordance with applicable data privacy rules, regulations and contractual obligations. Segerdahl has incurred and will continue to incur significant damages (reputational and financial) to redress Michael Ferruzza's illegal data theft, including the costs to remediate and the potential loss of business from Segerdahl's customers who have been affected by this significant data compromise incident.

233. All of this confidential Segerdahl business information that Michael Ferruzza targeted and took from Segerdahl falls within the definition of "Trade Secrets" provided in the American Litho Employment Agreements. (*See* Grp. Ex. Z § II(D) or II(E).)

234. Forensic analysis shows that Michael Ferruzza connected the Michael Ferruzza External Hard Drive to his American Litho computer as recently as April 10, 2017.

*—Michael Ferruzza and Vince Dante—*

235. According to Vince Dante, Michael Ferruzza turned over a Segerdahl-issued MacBook Pro to Vince Dante on the weekend of February 25–26, 2017; just over two weeks after Michael Ferruzza left Segerdahl on February 10, 2017; at least five days after Segerdahl's February 20, 2017 letter to Michael Ferruzza demanding the return of Segerdahl's business information; and at least two days after American Litho's attorney wrote Segerdahl's counsel denying that any of the Individual Defendants had anything to return to Segerdahl. Vince Dante

allegedly put this device into a drawer in his Segerdahl office, where it remained until May 11, 2017, when he claims to have recalled the existence of this MacBook Pro and Segerdahl turned it over for forensic analysis. The ongoing forensic analysis of this device shows *at least five instances* when this device logged onto a Wi-Fi network called "ALITHOGUEST"—i.e., Defendant American Litho's guest Wi-Fi network—during the workweek of February 20–24, 2017. Each American Litho Wi-Fi log-on was an occasion for Michael Ferruzza (or any American Litho employee with whom he shared custody of the MacBook Pro) to use it to transmit Segerdahl business information to American Litho or use that information on American Litho's behalf. The forensic analysis also shows that this device contained Segerdahl business information that was deleted before this computer could be forensically imaged and examined by BRG. System files dated February 24, 2017 show that the following were the most recently accessed files stored in the Michael Ferruzza MacBook Pro:

- Users/michael-ferruzza-Personal/Desktop/ivelive/TestFilesMike/Mike/MISC/ New Sg360Joblog.pdf

- Users/michael-ferruzza-personal/Desktop/test.indd

- Users/michael-ferruzza-personal/Desktop/ivelive/Mis/yellowsheet.pdf

- Users/michael-ferruzza-personal/Desktop/ivelive/Mike_Ferruzza_Items/BAILEY CHARTS/G7_Testform_Gilman_Q1_iSis_P2P51.pdf

- Users/michael-ferruzza-personal/Desktop/mikesstuff/untitledfolder5/test.indd

- Users/michael-ferruzza-personal/Desktop/ivelive/Mike_Ferruzza_Items/PRESS TESTS/plate makeover.pdf

- Users/michael-ferruzza-personal/Desktop/ivelive/yellowsheet.pdf

- Users/michael-ferruzza-personal/Desktop/ivelive/Mike_Ferruzza_Items/yellow sheet.pdf

- Users/michael-ferruzza-personal/Desktop/ivelive/Mike_Ferruzza_Items/BAILEY CHARTS/G7 Form_v66 11x17.pdf

- Users/michael-ferruzza-personal/Desktop/mikesstuff/untitledfolder5/test/Scree
Shot 2016-02-18 0at 7.31.39 AM.png.

All of these Segerdahl files (and any other items located in these same directories) were deleted from this computer prior to February 25, 2017 at 11:46 a.m.— i.e., they were placed in the Trash and then the Trash was emptied by a user with physical custody of the Michael Ferruzza MacBook Pro at that time, most likely either by Michael Ferruzza and/or by Vince Dante.

*—Daniella Tucci—*

236.    The ongoing forensic analysis of Daniella Tucci's Segerdahl-issued desktop computer has revealed that, with no authority from Segerdahl, she connected at least two USB storage devices to this computer just prior to her departure from Segerdahl on February 1, 2017, which was the day after she resigned from Segerdahl and nine days before her separation date on February 10, 2017.  Moreover, the data shows that neither of these USB storage devices had ever been attached to her computer previously.  The first USB storage device (SanDisk Cruzer Blade USB Device Serial No. 4C530101651127114151) was connected to her computer on February 1, 2017, and Daniella Tucci interacted with the files related to production data and customer specific content just prior to inserting the USB device into the computer.

237.    The second USB storage device was the Michael Ferruzza External Hard Drive— i.e., a Western Digital My Passport USB hard drive (Serial No. 575848314539334A434A3731), which is the same USB storage device that Michael Ferruzza connected to his Segerdahl computer on January 30, 2017 and copied approximately 1,350 documents from his computer to the USB drive.  In Segerdahl's business, these types of large-capacity external storage devices are not typically used to store documents, but rather to back up Mac computers (her desktop computer is not a Mac computer) or to store and transfer high-resolution images such as those required to generate print-ready files to generate plates or pages for the offset or digital printing

process. Segerdahl stores these types of high-resolution images and print-ready files on password-protected, centralized desktop imaging servers, not on individual high-capacity portable USB devices such as the one Daniella Tucci connected to her desktop computer. With no authority from Segerdahl, Daniella Tucci connected this large-capacity storage device to the Segerdahl work computer assigned to her for business purposes only one day after tendering her resignation to Segerdahl on February 1, 2017. Shortly after connecting this Western Digital USB device to her desktop computer, Daniella Tucci accessed files relating to customer high-resolution images, print-ready files and billing information.

238. In addition, Daniella Tucci has admitted to American Litho's outside general counsel that, while employed at Segerdahl, she regularly accessed Segerdahl documents and files and either emailed them to her personal email account in a zip file or copied them to a thumb drive, ostensibly so that Daniella Tucci could work from home using these documents. But Segerdahl never authorized Daniella Tucci to work from home at any time while she was employed by Segerdahl, nor did it authorize her to email Segerdahl business information to a non-Segerdahl, personally owned computer, and her claim, through American Litho's general counsel, that she "routinely performed additional work from home one or two days per week" is false.

239. On May 3, 2017, Daniella Tucci executed a declaration in support of Defendants' Response in Opposition to Plaintiff's Emergency Motion for A Temporary Restraining order, in which she falsely stated, "I did not take any information from Segerdahl. I have not misused or disclosed any information from Segerdahl." (*See* Dkt. 38-1, Tucci Decl. ¶¶ 11–12.)

*—Christopher Knoll—*

240.    The ongoing forensic analysis of Christopher Knoll's Segerdahl-issued desktop computer has revealed that, with no authority from Segerdahl, he connected at least one 16 GB USB storage device (Serial No. 200519426307BE4053B6) (the "Chris Knoll Thumb Drive") to his desktop computer just prior to his departure from Segerdahl on February 6, 7, 8, 9 and 10, 2017, which are all days after his resignation from Segerdahl and before his separation date. Moreover, the data shows that the USB storage device had never been attached to his computer previously.    At those times, Christopher Knoll accessed and interacted with numerous files, including the file 2016.xlsm, which contains the contact information (including mobile and home phone numbers) for over 300 Segerdahl employees, and which was later deleted.    The other files that Christopher Knoll accessed and interacted with include nearly all of the Standard Operating Procedures for Segerdahl's Gilman, Illinois facility, contact lists, organizational charts, job workflows, rate cards and billing data, and employee offer letters.    In addition, Chris Knoll has admitted to American Litho's outside counsel that, immediately prior to his departure from Segerdahl, he downloaded his Segerdahl computer's entire desktop drive to the Chris Knoll Thumb Drive.

241.    Forensic analysis shows that Chris Knoll connected the Chris Knoll Thumb Drive to his American Litho Computer.  The first connection of the Chris Knoll Thumb Drive to this computer occurred on February 22, 2017 and the last connection occurred on March 13, 2017, *just ten days before Chris Knoll and American Litho returned the thumb drive to Segerdahl*. Moreover, Chris Knoll subsequently defragged his American Litho computer on May 15, 2017, *only several hours prior to the forensic imaging of the computer*.

242.     Christopher Knoll and American Litho returned the Chris Knoll Thumb Drive to Segerdahl on or about March 23, 2017 (more than a month after Christopher Knoll's last date of Segerdahl employment).   Forensic examination revealed that Christopher Knoll took contact lists, organizational charts, job workflows, rate cards and billing data, standard operating procedures and employee offer letters.   Additionally, forensic analysis confirms that Christopher Knoll copied all of these files on February 9, 2017, one day prior to leaving Segerdahl, and continued to access these documents through March 2, 2017, nearly three weeks after his last Segerdahl workday.

243.     Tellingly, Chris Knoll targeted and took 114 standard operating procedure files from the same set of 177 standard operating procedure files that Michael Ferruzza targeted and took from Segerdahl, all of which pertain to the same Segerdahl customer, RJR.   RJR is the Segerdahl customer for which each and every one of the individual Defendants, excepting Defendant Dante only, would, according to their American Litho employment agreements, reap special commission income upon moving its business to American Litho.   The overlapping targeting and taking of these standard operating procedures indicates the intrinsic competitive value that both Michael Ferruzza and Chris Knoll recognized in these documents.

244.     Moreover, forensic analysis shows that Chris Knoll connected the Michael Ferruzza Hard Drive to his American Litho computer.   The first connection occurred on February 20, 2017 and the last connection occurred on May 15, 2017 at 10:27:49 a.m. Eastern time, *approximately two and a half hours prior to the defragging of Chris Knoll's computer, and approximately ten hours prior to the imaging of his American Litho computer.*

245.    In addition, Christopher Knoll emailed himself approximately 4,500 documents (8,600 pages) consisting of emails and attachments from his Segerdahl email account to his personal email account.

246.    For a substantial period of time prior to and through their resignations and actual separations from Segerdahl employment, and while all of the Individual Defendants owed Segerdahl fiduciary duties of loyalty, honesty and confidentiality, each and all of them deliberately but surreptitiously worked for American Litho and against the commercial and business interests of Segerdahl.  As a consequence, all of the foregoing acts of misconduct alleged against the Individual Defendants occurred in their capacities as agents and servants of American Litho, such that American Litho is, by and through those alleged acts of misconduct, vicariously, as well as individually, liable to Segerdahl.

**COUNT I**
**VIOLATION OF DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836**
**(Against the Individual Defendants and Vince Dante)**

247.    Segerdahl incorporates its allegations in Paragraphs 1 through 246 as if fully set forth in this Paragraph.

248.    Segerdahl's Trade Secrets are proprietary and confidential to Segerdahl, and they constitute protectable trade secrets under the Defend Trade Secrets Act.  *See* 18 U.S.C. § 1839(3) (defining the term "trade secret").

249.    Segerdahl's products and services (to which its Trade Secrets relate) are used in interstate commerce.

250.    Segerdahl has taken reasonable efforts to protect and maintain the secrecy and confidentiality of its Trade Secrets.

251.    Segerdahl's Trade Secrets are not generally known in the industry or to the general public, and their secrecy confers substantial economic advantage and benefit to Segerdahl.  Knowledge of this information would also confer a substantial economic benefit to Segerdahl's competitors, including American Litho.

252.    The circumstances of the Individual Defendants' and Vince Dante's respective employment with Segerdahl gave rise to fiduciary duties and obligations to maintain the secrecy of Segerdahl's Trade Secrets and to strictly limit the use of such Trade Secrets to Segerdahl business activities and for Segerdahl's exclusive benefit.

253.    The Individual Defendants and Vince Dante, through improper means and without authorization, either directly or indirectly misappropriated, misused and/or disclosed Segerdahl's Trade Secrets to and for the benefit of themselves and American Litho.

254.    In addition, the Individual Defendants and Vince Dante have been systematically targeting and soliciting key Segerdahl employees to work for American Litho, knowing that they possess specific knowledge of Segerdahl Trade Secrets and that such Trade Secrets would provide immediate benefit to American Litho.

255.    As a direct and proximate result of the Individual Defendants' and Vince Dante's deliberate, willful and malicious misappropriation of Segerdahl's Trade Secrets, Segerdahl has sustained and will continue to sustain severe, immediate and irreparable harm, damage and injury to the value of its Trade Secrets and its competitive advantage, which Segerdahl has expended significant time, effort and money to secure.

WHEREFORE, Segerdahl respectfully requests that the Court enter an Order granting judgment in favor of Segerdahl and against the Individual Defendants and Vince Dante on Count I and ordering the following relief:

(a)     the issuance of temporary, preliminary and permanent injunctive relief enjoining the Individual Defendants and Vince Dante, and every person and entity acting in concert with them, including, but not limited to, American Litho, from directly or indirectly misappropriating, disclosing and/or using Segerdahl's Trade Secrets;

(b)     the issuance of a mandatory injunction compelling the Individual Defendants and Vince Dante, and every person and entity acting in concert with them, including, but not limited to, American Litho, to return all documents and other materials containing or constituting Segerdahl's Trade Secrets;

(c)     the award of compensatory damages in an amount to be determined at trial;

(d)     the award of exemplary and other damages pursuant to 18 U.S.C. § 1836(b)(3)(C);

(e)     reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D); and

(f)     such other relief as the Court deems just and proper.

**COUNT II**
**VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030**
**(Against the Individual Defendants and Vince Dante)**

256.    Segerdahl incorporates its allegations in Paragraphs 1 through 246 as if fully set forth in this Paragraph.

257.    The Individual Defendants' and Vince Dante's Segerdahl-issued computing devices were each used in interstate commerce, and they each constitute a "protected computer" under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(e)(2)(b).

258.    Without authorization or by exceeding authorized access, the Individual Defendants and Vince Dante intentionally accessed their respective Segerdahl-issued computing devices and/or the Segerdahl network/email systems with the intent to defraud Segerdahl in violation of Sections 1030(a)(2)(c), (a)(4) and (a)(5) of the CFAA, including by:

(a)     obtaining certain information from the Segerdahl-issued computing devices and/or the Segerdahl network;

(b)      obtaining copies of certain documents and files of value from the Segerdahl-issued computing devices and/or the Segerdahl network;

(c)      deleting electronic files from the Segerdahl-issued computing devices and/or the Segerdahl network; and

(d)      accessing the Segerdahl email accounts of Segerdahl's CEO, Mary Lee Schneider, and Chairman of the Board and former CEO, Rick Joutras; copying confidential information from those Segerdahl email accounts pertaining to Segerdahl's business and the sale thereof; and pasting the purloined information into emails directed from Vince Dante's personal email account, Vdante1@me.com, to Anthony Ferruzza's personal email account, Aferruzza@att.net.

259.     By engaging in the foregoing misconduct for the purpose of misappropriating Segerdahl's Confidential Information and Trade Secrets, the Individual Defendants and Vince Dante breached their fiduciary duties and other obligations owed to Segerdahl. The Individual Defendants and Vince Dante had no authority or authorization for the foregoing misconduct.

260.     The Individual Defendants and Vince Dante intentionally and recklessly caused damage and loss to Segerdahl in excess of $5,000 because their conduct impaired the integrity of Segerdahl's protected computers and required Segerdahl to expend resources in excess of $5,000 to investigate the foregoing misconduct, conduct forensic examination of the devices to ascertain the scope of the Individual Defendants' and Vince Dante's misconduct, and perform certain remedial measures required as a result of such misconduct.

261.     As a further direct and proximate cause of the foregoing misconduct, Segerdahl has been damaged and suffered loss in an amount in excess of $5,000 to the extent the Individual Defendants accessed, deleted, destroyed and copied electronic files containing Confidential Information and Trade Secrets belonging to Segerdahl for their personal use and/or that of American Litho.

WHEREFORE, Segerdahl respectfully requests that the Court enter an Order granting judgment in favor of Segerdahl and against the Individual Defendants and Vince Dante on Count II and ordering the following relief:

(a) the issuance of temporary, preliminary and permanent injunctive relief enjoining the Individual Defendants and Vince Dante, and every person and entity acting in concert with them, from directly or indirectly misappropriating, disclosing and/or using Segerdahl's Confidential Information and Trade Secrets;

(b) the issuance of a mandatory injunction compelling the Individual Defendants and Vince Dante, and every person and entity acting in concert with them, including, but not limited to, American Litho, to return all documents and other materials containing or constituting Segerdahl's Confidential Information and Trade Secrets;

(c) the award of compensatory damages in an amount to be determined at trial pursuant to 18 U.S.C. § 1030(g); and

(d) such other relief as the Court deems just and proper.

## COUNT III
### VIOLATION OF THE ILLINOIS TRADE SECRETS ACT, 765 ILCS 1065/1 *et seq.*
### (Against the Individual Defendants and Vince Dante)

262. Segerdahl incorporates its allegations in Paragraphs 1 through 246 as if fully set forth in this Paragraph.

263. Segerdahl's Trade Secrets are proprietary and confidential to Segerdahl, and they constitute protectable trade secrets under the Illinois Trade Secrets Act. *See* 765 ILCS § 1065/2(d) (defining the term "trade secret").

264. Segerdahl has taken reasonable efforts to protect and maintain the secrecy and confidentiality of its Trade Secrets.

265. Segerdahl's Trade Secrets are not generally known in the industry or to the general public, and their secrecy confers substantial economic advantage and benefit to

Segerdahl. Knowledge of this information would also confer a substantial economic benefit to Segerdahl's competitors, including American Litho.

266. The circumstances of the Individual Defendants' (and Vince Dante's) respective employment with Segerdahl gave rise to fiduciary duties and obligations to maintain the secrecy of Segerdahl's Trade Secrets and to strictly limit the use of such Trade Secrets to Segerdahl business activities and for Segerdahl's exclusive benefit.

267. The Individual Defendants and Vince Dante, through improper means and without authorization, either directly or indirectly misappropriated, misused and/or disclosed Segerdahl's Trade Secrets to and for the benefit of themselves and American Litho.

268. In addition, the Individual Defendants and Vince Dante have been systematically targeting and soliciting key Segerdahl employees to work for American Litho, knowing that such employees possess specific knowledge of Segerdahl Trade Secrets and that such Trade Secrets would provide immediate benefit to American Litho.

269. Moreover, each Individual Defendant is performing and will continue to perform work for American Litho that is so similar to his or her work at Segerdahl that it will not be possible for him or her to discharge those responsibilities without disclosing, using and/or relying upon his or her knowledge of Segerdahl's Trade Secrets for the benefit of American Litho. Thus, not only have the Individual Defendants already taken, disclosed, used and/or relied upon Segerdahl's Trade Secrets for the benefit of themselves and American Litho, it is inevitable that the Individual Defendants will continue to do so unless they are restrained and enjoined from continuing to do so.

270. As a direct and proximate result of the Individual Defendants' and Vince Dante's deliberate, willful and malicious misappropriation of Segerdahl's Trade Secrets, Segerdahl has

sustained and will continue to sustain severe, immediate and irreparable harm, damage and injury to the value of its Trade Secrets and competitive advantage, which Segerdahl has expended significant time, effort and money to secure.

WHEREFORE, Segerdahl respectfully requests that the Court enter an Order granting judgment in favor of Segerdahl and against the Individual Defendants and Vince Dante on Count III and ordering the following relief:

(a)    the issuance of temporary, preliminary and permanent injunctive relief enjoining the Individual Defendants and Vince Dante, and every person and entity acting in concert with them, including, but not limited to, American Litho, from directly or indirectly misappropriating, disclosing and/or using Segerdahl's Trade Secrets;

(b)    the issuance of a mandatory injunction compelling the Individual Defendants and Vince Dante, and every person and entity acting in concert with them, including, but not limited to, American Litho, to return all documents and other materials containing or constituting Segerdahl's Trade Secrets;

(c)    the award of compensatory damages in an amount to be determined at trial;

(d)    exemplary and other damages pursuant to 765 ILCS 1065/4(a);

(e)    reasonable attorneys' fees pursuant to 765 ILCS 1065/5; and

(f)    such other relief as the Court deems just and proper.

## COUNT IV
## BREACH OF FIDUCIARY DUTY
### (Against the Individual Defendants and Vince Dante)

271.    Segerdahl incorporates its allegations in Paragraphs 1 through 246 as if fully set forth in this Paragraph.

272.    As employees of Segerdahl, the Individual Defendants and Vince Dante each owed Segerdahl fiduciary duties, including, but not limited to, a duty to act at all times with the utmost good faith, loyalty, honesty and fair dealing towards Segerdahl, to avoid self-dealing,

conflicts of interest and acting for his or her personal benefit to the exclusion of Segerdahl's interest, and to act in the best interests of Segerdahl in all matters relating to its business.

273.    Segerdahl placed trust and confidence in the Individual Defendants and Vince Dante that they would abide by their fiduciary duties.

274.    On information and belief, while still employed by Segerdahl, the Individual Defendants and Vince Dante each breached their respective fiduciary duties by, among other things, engaging in the following conduct:

(a)    extensively preparing to become engaged with and employed by (and actually becoming engaged with and employed by) American Litho (including its alter ego, World Visual Group), a business that competes directly with Segerdahl;

(b)    extensively preparing to perform work and other services (and actually performing work and other services) on behalf of American Litho in competition with Segerdahl;

(c)    extensively preparing to solicit, induce and/or encourage certain customers of Segerdahl (and actually soliciting, inducing and/or encouraging those customers, including RJR) to purchase, from a source other than Segerdahl, a product or service similar to and competitive with that sold or offered by Segerdahl and which could be supplied by Segerdahl;

(d)    extensively preparing to solicit, induce and/or encourage certain suppliers, licensors, agents, representatives or other persons (and actually soliciting, inducing and/or encouraging them) to terminate or adversely alter its/their business relationship with Segerdahl;

(e)    extensively preparing to solicit for employment or hire (and actually soliciting and hiring) certain employees and representatives of Segerdahl, including but not limited to the Individual Defendants, certain sales production and support staff;

(f)    taking, using, disclosing and/or relying on Segerdahl's Confidential Information and other proprietary business information and property for their own benefit and for the benefit of American Litho to the detriment of Segerdahl;

(g)  misusing Segerdahl property, including computers, telephones and other resources, to perform work on behalf of themselves and American Litho in competition with Segerdahl;

(h)  misusing Segerdahl property and IT administrator credentials, including Segerdahl networks and email systems, to illegally and surreptitiously (i) use a personal iPad to access the Segerdahl email accounts of Segerdahl's CEO, Mary Lee Schneider, and Chairman of the Board and former CEO, Rick Joutras; (ii) copy confidential information from those Segerdahl email accounts pertaining to Segerdahl's business and the sale thereof; and (iii) paste the purloined information into emails directed from Vince Dante's personal email account, Vdante1@me.com, to Anthony Ferruzza's personal email account, Aferruzza@att.net;

(i)  spoliating evidence of their misconduct;

(j)  deleting or otherwise destroying Segerdahl computer data and property; and

(k)  actively exploiting their positions with Segerdahl for personal benefit and hindering Segerdahl's ability to conduct business.

275.  These breaches of fiduciary duty have proximately caused and, unless restrained and enjoined, will continue to cause Segerdahl severe, immediate and irreparable harm, damage and injury for which Segerdahl has no adequate remedy at law.

276.  These breaches of fiduciary duty were part of an overall covert, pre-planned and calculated scheme, were knowing, intentional and reckless, and were of such an aggravated character as to warrant the imposition of punitive damages, attorneys' fees and costs.

WHEREFORE, Segerdahl respectfully requests that the Court enter an Order granting judgment in favor of Segerdahl and against the Individual Defendants and Vince Dante on Count IV and ordering the following relief:

(a)  the issuance of temporary, preliminary and permanent injunctive relief enjoining each Individual Defendant and Vince Dante, and every person and entity acting in concert with him or her, including, but not limited to, American Litho, from directly or indirectly:

(i)  being engaged with or employed by American Litho;

(ii)    soliciting, inducing and/or encouraging any customers of Segerdahl (including RJR) to purchase, from a source other than Segerdahl, a product or service similar to and competitive with that sold or offered by Segerdahl and which could be supplied by Segerdahl;

(iii)    soliciting, inducing and/or encouraging any of Segerdahl's suppliers, licensors, agents, representatives or other persons to terminate or adversely alter its/their business relationship with Segerdahl;

(iv)    soliciting or hiring on behalf of American Litho any employees or representatives of Segerdahl; and

(v)    using, disclosing and/or relying on Segerdahl's Confidential Information and other proprietary business information and property for their own benefit and for the benefit of American Litho to the detriment of Segerdahl;

(b)    the imposition of a constructive trust and the disgorgement of salaries and the value of any other benefits (including, but not limited to, any such benefits relating to SARs awards paid to Anthony Ferruzza) paid or provided to the Individual Defendants and Vince Dante by Segerdahl, American Litho or any other person or entity while the Individual Defendants and Vince Dante were in breach of their respective fiduciary duties to Segerdahl;

(c)    the imposition of a constructive trust and the disgorgement of salaries and the value of any other benefits (including, but not limited to, any such benefits relating to SARs awards paid to Anthony Ferruzza) paid or provided to the Individual Defendants and Vince Dante by Segerdahl, American Litho or any other person or entity following the termination of their employment with Segerdahl, to the extent that the salary and benefits are related to and naturally flow from their prior breaches of fiduciary duty;

(d)    the imposition of a constructive trust and the disgorgement of any payments or profits received by the Individual Defendants, Vince Dante and/or American Litho as a result of the Individual Defendants' and Vince Dante's respective breaches of fiduciary duty;

(e)    the award of compensatory damages in an amount to be determined at trial;

(f)    the award of punitive damages in an amount to be determined at trial; and

(g)     such other relief as the Court deems just and proper.

**COUNT V**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
**(Against All Defendants, Except Vince Dante)**

277.    Segerdahl incorporates its allegations in Paragraphs 1 through 246 as if fully set forth in this Paragraph.

278.    Segerdahl has a protectable interest and valid business expectancy in maintaining a stable workforce through continued relationships with its employees that have been cultivated, obtained and maintained through the investment of substantial time, effort and expense.  As a result of their employment with Segerdahl, the Individual Defendants had knowledge of these employee relationships.  As a result of American Litho's contacts with and employment of the Individual Defendants, American Litho had knowledge of these employee relationships.

279.    Segerdahl also has a protectable interest and valid business expectancy in maintaining its customer relationships, including RJR (and potential customer relationships), through continued relationships with these customers (and potential customers) and their agents, which relationships have been cultivated, obtained and maintained through the investment of substantial time, effort and expense.  As a result of their employment with Segerdahl, the Individual Defendants had knowledge of these customer relationships, including the relationship with RJR (and potential customer relationships).  As a result of American Litho's contacts with and employment of the Individual Defendants, American Litho had knowledge of these customer relationships (and potential customer relationships).

280.    The Individual Defendants and American Litho, willfully, knowingly and without privilege, justification or excuse, tortiously interfered with Segerdahl's employee relationships by improperly soliciting and inducing employees to resign in order to hinder, impair and

appropriate Segerdahl's business, undermine business relationships with Segerdahl's employees and otherwise compete unfairly with Segerdahl.

281.    The Individual Defendants and American Litho, willfully, knowingly, and without privilege, justification or excuse, tortiously interfered with certain of Segerdahl's customer relationships (and potential customer relationships) by improperly soliciting certain customers, including RJR (and potential customers), in order to hinder, impair and appropriate Segerdahl's business, undermine business relationships with Segerdahl's customers (and potential customers) and otherwise compete unfairly with Segerdahl.

282.    Notably, in addition to their base salary and other benefits, The American Litho Employment Agreements provide each of the Individual Defendants with commission-based compensation tied to "future RJR projects."  (*See* Grp. Ex. Z at § II(D) or II(E), respectively.) RJR previously was not a *direct mail* customer of American Litho.  Thus, the Individual Defendants' compensation was tied explicitly, in part, to their ability to obtain direct mail RJR work for American Litho (and to take away such RJR work from Segerdahl).  No other customer is named in the American Litho Employment Agreements.  Not surprisingly, the Individual Defendants specifically targeted and took Segerdahl's confidential information and trade secrets pertaining to RJR and to Segerdahl's direct mail work for RJR when they left Segerdahl to work for American Litho, and they used this stolen information to attempt to secure RJR's direct mail business for American Litho.

283.    The tortious interference by the Individual Defendants and American Litho is outside the scope of mere competition, and it has proximately caused and, unless restrained and enjoined, will continue to cause Segerdahl severe, immediate and irreparable harm, damage and injury for which it has no adequate remedy at law.

284.     Such tortious interference, in disregard of Segerdahl's prospective economic advantage, has been deliberate, willful and malicious, and of such an aggravated character as to warrant the imposition of punitive damages, attorneys' fees and costs in addition to compensatory damages and injunctive relief.

WHEREFORE, Segerdahl respectfully requests that the Court enter an Order granting judgment in favor of Segerdahl and against Defendants (except for Vince Dante) on Count V and ordering the following relief:

(a)     the issuance of temporary, preliminary and permanent injunctive relief enjoining each Individual Defendant and American Litho, and every person and entity acting in concert with them, from directly or indirectly:

(i)     tortiously interfering with Segerdahl's employee relationships by improperly soliciting and inducing Segerdahl's employees to resign in order to hinder, impair and appropriate Segerdahl's business, undermine business relationships with Segerdahl's employees and otherwise compete unfairly with Segerdahl;

(ii)     tortiously interfering with certain of Segerdahl's customer relationships, including RJR (and potential customer relationships), by improperly soliciting certain customers (and potential customers) in order to hinder, impair and appropriate Segerdahl's business, undermine business relationships with Segerdahl's customers, including RJR (and potential customers), and otherwise compete unfairly with Segerdahl;

(iii)     otherwise interfering with Segerdahl's employee relationships or customer relationships (or potential customer relationships);

(b)     the award of compensatory damages in an amount to be determined at trial;

(c)     the award of punitive damages in an amount to be determined at trial; and

(d)     such other relief as the Court deems just and proper.

**COUNT VI**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(Against All Defendants)**

285.    Segerdahl incorporates its allegations in Paragraphs 1 through 246 as if fully set forth in this Paragraph.

286.    As employees of Segerdahl, the Individual Defendants and Vince Dante each owed Segerdahl certain fiduciary duties during their respective employment.

287.    At all relevant times, each of the Individual Defendants, Vince Dante and American Litho were aware of and had reason to know of the fiduciary duties owed to Segerdahl by the Individual Defendants and Vince Dante.

288.    The Individual Defendants, Vince Dante and American Litho knowingly and substantially committed acts that encouraged, aided and abetted, and participated in conduct that caused, the Individual Defendants and Vince Dante to breach their fiduciary duties to Segerdahl.

289.    Among other things, the Individual Defendants, Vince Dante and American Litho purposefully induced the Individual Defendants and Vince Dante, while they were employed by Segerdahl, to:

     (e)    extensively prepare to become engaged with and employed by (and to actually become engaged with and employed by) American Litho (including its alter ego, World Visual Group), a business that competes directly with Segerdahl;

     (f)    extensively prepare to perform work and other services (and to actually perform work and other services) on behalf of American Litho in competition with Segerdahl;

     (g)    extensively prepare to solicit, induce and/or encourage (and to actually solicit, induce and/or encourage) certain customers of Segerdahl, including RJR, to purchase, from a source other than Segerdahl, a product or service similar to and competitive with that sold or offered by Segerdahl and which could be supplied by Segerdahl;

     (h)    extensively prepare to solicit, induce and/or encourage (and to actually solicit, induce and/or encourage) certain suppliers, licensors, agents,

representatives or other persons to terminate or adversely alter its/their business relationship with Segerdahl;

(i)     extensively prepare to solicit for employment or hire (and to actually solicit and hire) certain employees and representatives of Segerdahl, including but not limited to the Individual Defendants and certain sales production and support staff;

(j)     take, use, disclose and/or rely on Segerdahl's Confidential Information and other proprietary business information and property for their own benefit and for the benefit of American Litho to the detriment of Segerdahl;

(k)     misuse Segerdahl property, including computers, telephones and other resources, to perform work on behalf of themselves and American Litho in competition with Segerdahl;

(l)     misuse Segerdahl property and IT administrator credentials, including Segerdahl networks and email systems, to illegally and surreptitiously (i) use a personal iPad to access the Segerdahl email accounts of Segerdahl's CEO, Mary Lee Schneider, and Chairman of the Board/former CEO, Rick Joutras; (ii) copy confidential information from those Segerdahl email accounts pertaining to Segerdahl's business and the sale thereof; and (iii) paste the purloined information into emails directed from Vince Dante's personal email account, Vdante1@me.com, to Anthony Ferruzza's personal email account, Aferruzza@att.net;

(m)     spoliate evidence of their misconduct;

(n)     delete or otherwise destroy Segerdahl computer data and property; and

(o)     actively exploit their positions with Segerdahl for personal benefit (and for the benefit of American Litho) and hinder Segerdahl's ability to conduct business.

290.     Notably, in addition to their base salary and other benefits, The American Litho Employment Agreements provide each of the Individual Defendants with commission-based compensation tied to "future RJR projects." (*See* Grp. Ex. Z at § II(D) or II(E), respectively.) RJR previously was not a *direct mail* customer of American Litho. Thus, the Individual Defendants' compensation was tied explicitly, in part, to their ability to obtain direct mail RJR work for American Litho (and to take away such RJR work from Segerdahl). No other customer is named in the American Litho Employment Agreements. Not surprisingly, the Individual

Defendants specifically targeted and took Segerdahl's confidential information and trade secrets pertaining to RJR and to Segerdahl's direct mail work for RJR when they left Segerdahl to work for American Litho, and they used this stolen information to attempt to secure RJR's direct mail business for American Litho.

291.     Upon information and belief, the Individual Defendants, Vince Dante and American Litho have induced and continue to induce the Individual Defendants, Vince Dante and certain other Segerdahl employees to breach their fiduciary duties to Segerdahl.

292.     The Individual Defendants, Vince Dante and American Litho knowingly and voluntarily accepted the benefits flowing or expected to flow from the breaches of fiduciary duties that they induced, including, without limitation: (a) the Individual Defendants and Vince Dante performing work and other services for American Litho while still employed by Segerdahl; (b) the Individual Defendants' employment with American Litho (including its alter ego, World Visual Group) and corresponding wages and benefits; (c) the ability to quickly and unfairly solicit Segerdahl's employees for employment with American Litho, solicit Segerdahl's customers, including RJR, for business with American Litho, and solicit Segerdahl's suppliers, licensors, agents and representatives to adversely alter their business relationships with Segerdahl; and (d) access to Segerdahl's Confidential Information and other proprietary business information and property.

293.     The breaches of fiduciary duties by the Individual Defendants and Vince Dante, together with the tortious inducement and participation of American Litho and the Individual Defendants and Vince Dante, have proximately caused and, unless restrained and enjoined, will continue to cause Segerdahl severe, immediate and irreparable harm, damage and injury for which Segerdahl has no adequate remedy at law.

294.    This misconduct is part of an overall scheme and conspiracy, was knowing, intentional and reckless, and was of such an aggravated character as to warrant the imposition of punitive damages.

WHEREFORE, Segerdahl respectfully requests that the Court enter an Order granting judgment in favor of Segerdahl and against Defendants on Count VI and ordering the following relief:

(a)    the issuance of temporary, preliminary and permanent injunctive relief enjoining each Individual Defendant, Vince Dante and American Litho, and every person and entity acting in concert with them, from directly or indirectly:

(i)    being engaged with or employed by American Litho (applicable to the Individual Defendants), or employing the Individual Defendants (applicable to American Litho);

(ii)    soliciting, inducing and/or encouraging any customers of Segerdahl, including RJR, to purchase, from a source other than Segerdahl, a product or service similar to and competitive with that sold or offered by Segerdahl and which could be supplied by Segerdahl;

(iii)    soliciting, inducing and/or encouraging any of Segerdahl's suppliers, licensors, agents, representatives or other persons to terminate or adversely alter its/their business relationship with Segerdahl;

(iv)    soliciting or hiring on behalf of American Litho any employees or representatives of Segerdahl; and

(v)    using, disclosing and/or relying on Segerdahl's Confidential Information and other proprietary business information and property for their own benefit and for the benefit of American Litho to the detriment of Segerdahl;

(b)    the imposition of a constructive trust and the disgorgement of salaries and the value of any other benefits (including, but not limited to, any such benefits relating to SARs awards) paid or provided to the Individual Defendants and Vince Dante by Segerdahl, American Litho or any other person or entity while the Individual Defendants and Vince Dante were in breach of their respective fiduciary duties to Segerdahl;

(c)     the imposition of a constructive trust and the disgorgement of salaries and the value of any other benefits (including, but not limited to, any such benefits relating to SARs awards) paid or provided to the Individual Defendants and Vince Dante by Segerdahl, American Litho or any other person or entity following the termination of the Individual Defendants' and Vince Dante's employment with Segerdahl, to the extent that the salary and benefits are related to and naturally flow from their prior breaches of fiduciary duty;

(d)     the imposition of a constructive trust and the disgorgement of any payments or profits received by the Individual Defendants, Vince Dante and/or American Litho as a result of the Individual Defendants' and Vince Dante's respective breaches of fiduciary duty;

(e)     the award of compensatory damages in an amount to be determined at trial;

(f)     the award of punitive damages in an amount to be determined at trial; and

(g)     such other relief as the Court deems just and proper.

## COUNT VII
## CONVERSION
### (Against the Individual Defendants, Except Vince Dante)

295.    Segerdahl incorporates its allegations in Paragraphs 1 through 246 as if fully set forth in this Paragraph.

296.    The Segerdahl documents, files and other materials and property converted by the Individual Defendants constitute Segerdahl's personal and intellectual property, and, at all relevant times, Segerdahl had the legal right and entitlement to the exclusive use, possession, custody and control of such property.

297.    In disregard of Segerdahl's legal right and entitlement, the Individual Defendants converted the Segerdahl documents, files and other materials constituting Segerdahl's Confidential Information and other proprietary business information and property without

Segerdahl's consent and with the intent of depriving Segerdahl of the exclusive use, possession, custody and control of such property.

298.   Segerdahl has demanded in writing that the Individual Defendants return all Segerdahl documents, files and other materials, including any such materials containing Segerdahl's Confidential Information and Trade Secrets, in their possession, custody or control. To date, the Individual Defendants have not accounted for or returned the missing files, documents and other materials belonging to Segerdahl.

299.   As a direct and proximate result of the foregoing misconduct, Segerdahl has sustained and—unless the Individual Defendants are ordered to return all of the missing Segerdahl documents, files and other materials in their possession, custody or control—will continue to sustain severe, immediate and irreparable harm, damage and injury for which Segerdahl has no adequate remedy at law.

300.   The Individual Defendants' wrongful conversion of Segerdahl documents, files and other materials, in disregard of Segerdahl's rights, is part of an overall conspiracy and has been deliberate, willful and malicious.

WHEREFORE, Segerdahl respectfully requests that the Court enter an Order granting judgment in favor of Segerdahl and against the Individual Defendants on Count VII and ordering the following relief:

(a)   the issuance of temporary, preliminary, permanent and mandatory injunctive relief compelling the Individual Defendants to return all documents, files and other materials, including but not limited to any such documents, files and other materials containing and/or comprising Segerdahl's Confidential Information and Trade Secrets (whether stored electronically or in hard copy), without retaining any copies;

(b)   the award of compensatory damages in an amount to be determined at trial;

(c)     the award of punitive damages in an amount to be determined at trial; and

(d)     such other relief as the Court deems just and proper.

## COUNT VIII
## UNFAIR COMPETITION
### (Against All Defendants)

301.     Segerdahl incorporates its allegations in Paragraphs 1 through 246 as if fully set forth in this Paragraph.

302.     The Individual Defendants, Vince Dante and American Litho have each engaged in wrongful conduct and unfair competition, and they have thereby misappropriated Segerdahl's labors and expenditures to benefit themselves and at Segerdahl's expense, by:

(p)     being engaged with or employed by American Litho (applicable to the Individual Defendants), or employing the Individual Defendants (applicable to American Litho);

(q)     soliciting, inducing and/or encouraging certain customers of Segerdahl, including RJR, to purchase, from a source other than Segerdahl, a product or service similar to and competitive with that sold or offered by Segerdahl and which could be supplied by Segerdahl;

(r)     soliciting, inducing and/or encouraging certain of Segerdahl's suppliers, licensors, agents, representatives or other persons to terminate or adversely alter its/their business relationship with Segerdahl;

(s)     soliciting or hiring on behalf of American Litho certain employees or representatives of Segerdahl; and

(t)     using, disclosing and/or relying on Segerdahl's Confidential Information and other proprietary business information and property for the Individual Defendants' own benefit and for the benefit of American Litho to the detriment of Segerdahl.

303.     The wrongful conduct and unfair competition by the Individual Defendants, Vince Dante and American Litho are outside the scope of mere competition, and they have proximately caused and, unless restrained and enjoined, will continue to cause Segerdahl severe,

immediate and irreparable harm, damage and injury for which Segerdahl has no adequate remedy at law.

304.    Such wrongful conduct and unfair competition, in disregard of Segerdahl's protectable business interests, has been deliberate, willful and malicious, and of such an aggravated character as to warrant imposition of punitive damages, attorneys' fees and costs in addition to compensatory damages and injunctive relief.

WHEREFORE, Segerdahl respectfully requests that the Court enter an Order granting judgment in favor of Segerdahl and against Defendants on Count VIII and ordering the following relief:

(a)    the issuance of temporary, preliminary and permanent injunctive relief enjoining each Individual Defendant, Vince Dante and American Litho, and every person and entity acting in concert with them, from directly or indirectly:

(i)    being engaged with or employed by American Litho (applicable to the Individual Defendants), or employing the Individual Defendants (applicable to American Litho);

(ii)    soliciting, inducing and/or encouraging any customers of Segerdahl, including RJR, to purchase, from a source other than Segerdahl, a product or service similar to and competitive with that sold or offered by Segerdahl and which could be supplied by Segerdahl;

(iii)    soliciting, inducing and/or encouraging any of Segerdahl's suppliers, licensors, agents, representatives or other persons to terminate or adversely alter its/their business relationships with Segerdahl;

(iv)    soliciting or hiring on behalf of American Litho any employees or representatives of Segerdahl; and

(v)    using, disclosing and/or relying on Segerdahl's Confidential Information and other proprietary business information and property for the Individual Defendants' and Vince Dante's own benefit and for the benefit of American Litho to the detriment of Segerdahl;

(b)     the award of compensatory damages in an amount to be determined at trial;

(c)     the award of punitive damages in an amount to be determined at trial; and

(d)     such other relief as the Court deems just and proper.

**COUNT IX**
**CIVIL CONSPIRACY**
**(Against All Defendants)**

305.    Segerdahl incorporates its allegations in Paragraphs 1 through 246 as if fully set forth in this Paragraph.

306.    The Individual Defendants, Vince Dante and American Litho knowingly and voluntarily entered into a scheme and agreement to engage in a combination of unlawful acts and misconduct including, without limitation, the following:

(a)     the Individual Defendants and Vince Dante breached their fiduciary duties to Segerdahl, as set forth in Count IV, which breaches were aided and abetted by the Individual Defendants, Vince Dante and American Litho, as set forth in Count VI;

(b)     the Individual Defendants and American Litho tortiously interfered with Segerdahl's prospective economic advantage, as set forth in Count V;

(c)     the Individual Defendants converted Segerdahl's documents, files and other materials, including but not limited to certain documents, files and other materials containing or comprising Segerdahl's Confidential Information and other proprietary business information and property;

(d)     the Individual Defendants, Vince Dante and American Litho competed unfairly against Segerdahl, as set forth in Count VIII;

(e)     the Individual Defendants and Vince Dante violated the CFAA, as set forth in Count II; and

(f)     The Individual Defendants, Vince Dante and American Litho spoliated evidence, as set forth in Count XI.

307.    The intent, purpose and objective of the conspiracy, and the underlying combination of unlawful acts and misconduct committed by the Individual Defendants, Vince

Dante and American Litho, was to undermine Segerdahl and its business by unfairly competing against it as described above, and to spoliate evidence of their misconduct.

308.    The Individual Defendants, Vince Dante and American Litho each understood and accepted the foregoing scheme and agreed to do their respective part, as described herein, to further accomplish the foregoing intent, purpose and objective.  Thus, by entering into the conspiracy, the Individual Defendants, Vince Dante and American Litho have each deliberately, willfully and maliciously permitted, encouraged and/or induced all of the foregoing unlawful acts and misconduct.

309.    As a direct and proximate cause of the unlawful acts and misconduct undertaken by the Individual Defendants, Vince Dante and American Litho in furtherance of the conspiracy, Segerdahl has sustained and, unless the Individual Defendants, Vince Dante and American Litho are restrained and enjoined, will continue to sustain severe, immediate and irreparable harm, damage and injury for which Segerdahl has no adequate remedy at law.

WHEREFORE, Segerdahl respectfully requests that the Court enter an Order granting judgment in favor of Segerdahl and against Defendants on Count IX and ordering the following relief:

(a)    the issuance of temporary, preliminary and permanent injunctive relief enjoining each Individual Defendant, Vince Dante and American Litho, and every person and entity acting in concert with them, from directly or indirectly:

(i)    being engaged with or employed by American Litho (applicable to the Individual Defendants), or employing the Individual Defendants (applicable to American Litho);

(ii)    soliciting, inducing and/or encouraging any customers of Segerdahl, including RJR, to purchase, from a source other than Segerdahl, a product or service similar to and competitive with that sold or offered by Segerdahl and which could be supplied by Segerdahl;

(iii)    soliciting, inducing and/or encouraging any of Segerdahl's suppliers, licensors, agents, representatives or other persons to terminate or adversely alter its/their business relationship with Segerdahl;

(iv)    soliciting or hiring on behalf of American Litho any employees or representatives of Segerdahl;

(v)    using, disclosing and/or relying on Segerdahl's Confidential Information and other proprietary business information and property for their own benefit and for the benefit of American Litho to the detriment of Segerdahl;

(vi)    tortiously interfering with Segerdahl's employee relationships by improperly soliciting and inducing Segerdahl's employees to resign in order to hinder, impair and appropriate Segerdahl's business, undermine business relationships with Segerdahl's employees and otherwise compete unfairly with Segerdahl;

(vii)    tortiously interfering with certain of Segerdahl's customer relationships, including RJR (and potential customer relationships), by improperly soliciting certain customers (and potential customers) in order to hinder, impair and appropriate Segerdahl's business, undermine business relationships with Segerdahl's customers (and potential customers) and otherwise compete unfairly with Segerdahl;

(viii)    otherwise interfering with Segerdahl's employee relationships or customer relationships (or potential customer relationships);

(ix)    competing unfairly against Segerdahl;

(b)    the issuance of temporary, preliminary, permanent and mandatory injunctive relief compelling the Individual Defendants, Vince Dante and American Litho to return all documents, files and other materials, including but not limited to any such documents, files and other materials containing and/or comprising Segerdahl's Confidential Information (whether stored electronically or in hard copy), without retaining any copies;

(c)    the award of compensatory damages in an amount to be determined at trial;

(d)    the award of punitive damages in an amount to be determined at trial; and

(e)      such other relief as the Court deems just and proper.

## COUNT X
## UNJUST ENRICHMENT
### (Against All Defendants, Except Vince Dante)

310.    Segerdahl incorporates its allegations in Paragraphs 1 through 246 as if fully set forth in this Paragraph.

311.    The misconduct of the Individual Defendants and American Litho, as alleged above, has enabled and will continue to enable them to compete unfairly against Segerdahl, and to improperly take advantage of and exploit Segerdahl's legitimate and protectable business interests and goodwill.

312.    It would be inequitable and unjust for the Individual Defendants to retain compensation and other benefits paid to them by American Litho for their unfair competition and other misconduct.  Likewise, it would be inequitable and unjust for American Litho to retain the profits, revenues and other payments received as a result of their and the Individual Defendants' unfair competition and other misconduct.

313.    As a direct and proximate result of the Individual Defendants' and American Litho's unjust enrichment, Segerdahl has suffered and will continue to suffer severe, immediate and irreparable harm, damage and injury.

WHEREFORE, Segerdahl respectfully requests that the Court enter an Order granting judgment in favor of Segerdahl and against Defendants (except Vince Dante) on Count X and ordering the following relief:

(a)      the imposition of a constructive trust and the disgorgement of salaries and the value of any other benefits (including, but not limited to, any such benefits relating to stock appreciation rights) paid or provided to the Individual Defendants by Segerdahl, American Litho or any other person or entity while the Individual Defendants were in breach of their respective fiduciary duties to Segerdahl;

(b)     the imposition of a constructive trust and the disgorgement of salaries and the value of any other benefits (including, but not limited to, any such benefits relating to stock appreciation rights) paid or provided to the Individual Defendants by Segerdahl, American Litho or any other person or entity following the termination of the Individual Defendants' employment with Segerdahl, to the extent that the salary and benefits are related to and naturally flow from their prior breaches of fiduciary duty;

(c)     the imposition of a constructive trust and the disgorgement of any payments or profits received by the Individual Defendants and/or American Litho as a result of the Individual Defendants' respective breaches of fiduciary duty;

(d)     the award of compensatory damages in an amount to be determined at trial; and

(e)     such other relief as the Court deems just and proper.

## COUNT XI
## NEGLIGENT SPOLIATION OF EVIDENCE
### (Against All Defendants)

314.    Segerdahl incorporates its allegations in Paragraphs 1 through 246 as if fully set forth in this Paragraph.

### —*Spoliation of Evidence after February 20, 2017*—

315.    Segerdahl's counsel served written evidence preservation directives on American Litho, Anthony and Michael Ferruzza, Christopher and Erica Knoll, and Daniella Tucci on February 20, 2017. American Litho's general corporate counsel, Kevin Krantz, acknowledged the receipt of all of these letters in a February 23, 2017 letter. These Defendants therefore were under a duty to preserve evidence no later than February 20, 2017, which included a duty to exercise ordinary care and caution to preserve the integrity of evidence material to a potential civil action arising from their misconduct. Vince Dante also was under a duty to preserve evidence no later than February 20, 2017, given his continuing employment with Segerdahl and his knowledge of the other Defendants' and his own misconduct.

118

316.    Anthony Ferruzza breached his duty to preserve evidence by deleting data from his email account (including the emails that Vince Dante had sent to Anthony Ferruzza containing information Vince Dante had copied from the email accounts of Segerdahl's CEO and former CEO) and deactivating that account within hours of his receiving Segerdahl's demand/preservation letter via email at 6:14 PM on Monday, February, 2017 (*See* Ex. X). Anthony Ferruzza logged in to his AT&T email account (the content of which is controlled by Yahoo!) *fourteen* separate times between 7:02 PM and 9:37 PM from two separate IP addresses. At 10:41 PM that same night, Anthony Ferruzza called AT&T, and the customer account notes for that call state, "Problem: customer calling about their uverse services, just got att email reactivate email att email customer accidentally deleted email."

317.    Defendants American Litho, Michael Ferruzza, Eugene Czech and Chris Knoll have breached their duty to preserve evidence by failing to turn over multiple USB storage devices for forensic analysis under the Protocol Agreement, which devices were connected to these individual Defendants' American Litho computers:

(a)    The USB-analysis protocol report for Eugene Czech' s American Litho computer indicates that he connected a USB storage device (serial number 0701591D91048156) to his American Litho computer, which device has not been turned over in connection with the Protocol Agreement or otherwise during discovery. Based on the available data, this missing USB device appears to be a Kingston device 5500 (a generic term for a variety of devices), also known as a " Patriot Memory USB Device," which comes in a variety of capacities ranging from approximately 8GB to 64GB. The available data indicates that this missing USB device was first connected to Eugene Czech's American Litho computer on March 27, 2017, and that the last connection occurred on May 13, 2017, *two days before the computer was imaged in connection with the Protocol Agreement*. It is possible that the missing USB device was also connected to this computer at other times that are not reflected in the USB analysis report, either because the report does not identify other such connections or because the data pertaining to other such connections has been overwritten.

(b)     The USB-analysis protocol report for Chris Knoll's American Litho computer indicates that he connected three different USB storage devices to his American Litho computer, one of which has not been turned over in connection with the Protocol Agreement or otherwise during discovery (serial number 53705AEA).  Based on the available data, the missing USB device appears to be an Alcor Micro Corp. device.  The available data indicates that this missing USB device was first connected to Chris Knoll's American Litho computer on March 9, 2017, and that the last connection occurred on May 15, 2017 at 9:27 a.m. Central time, *which is several hours before the computer was imaged in connection with the Protocol Agreement*.  It is possible that the missing USB device was also connected to this computer at other times that are not reflected in the USB analysis report, either because the report does not identify other such connections or because the data pertaining to other such connections has been overwritten.

(c)     The USB-analysis protocol report for Michael Ferruzza' s American Litho MacBook Pro computer indicates that he connected at least one USB device that has not been turned over for analysis in connection with the Protocol Agreement or otherwise during discovery.  The USB-analysis protocol report for Michael Ferruzza' s American Litho iMac computer indicates that he connected at least two USB devices that have not been turned over for analysis in connection with the Protocol Agreement or otherwise during discovery.

318.    The failure to turn over these USB devices is directly at odds with American Litho's and these individual Defendants' representation and warranty in the Protocol Agreement that they do "not have in their possession, custody or control any other Computer Storage Media that has been connected by or on behalf of the Individual Defendants to any American Litho computer or Computer Network, or that is otherwise responsive to Segerdahl's discovery requests or relates in any way to the Action."  (Ex. JJ § I(C)(2).)

319.    Defendants American Litho, Chris Knoll, Erica Knoll, Daniella Tucci and Eugene Czech have breached their duty to preserve evidence by running the Disk Defragmenter executable file, "defrag.exe," on certain American Litho PC computers long after they were under a duty to preserve evidence.   The data-deletion analysis OS artifacts protocol reports for the American Litho PC computers used by American Litho's President, Michael Fontana, and by

Chris Knoll, Erica Knoll, Daniella Tucci and Eugene Czech show that the executable file "defrag.exe" was run on these computers immediately prior to the imaging of the computers. The suspicious timeframe of this defragging activity is summarized in the chart below:

| Custodian (Device) | Application Run Count | Last Date/Time Defragged | Date/Time Imaged |
|---|---|---|---|
| **Michael Fontana** (Dell Inspiron 580s) | 3 | Monday—5.15.2017 5:44:13 p.m. (Central) | Tuesday—5.16.2017 9:02 p.m. (Central) |
| **Michael Fontana** (Dell XPS 13 9350) | 1 | Thursday—5.11.2017 10:43:53 p.m. (Central) | Tuesday—5.16.2017 4:45 p.m. (Central) |
|  | 1 | Friday—5.12.2017 6:36:41 p.m. (Central) |  |
| **Chris Knoll** (HP Prodesk 400 G3) | 4 | Monday—5.15.2017 12:05:55 p.m. (Central) | Monday—5.15.2017 7:31 p.m. (Central) |
| **Erica Knoll** (HP Prodesk 400 G3) | 1 | Monday—5.15.2017 8:47:36 a.m. (Central) | Monday—5.15.2017 5:15 p.m. (Central) |
| **Daniella Tucci** (HP Prodesk 400 G3) | 1 | Friday—5.12.2017 1:50:08 p.m. (Central) | Monday—5.15.2017 3:14 p.m. (Central) |
| **Eugene Czech** (HP Prodesk 400 G3) | 1 | Friday—5.12.2017 12:22:23 p.m. (Central) | Monday—5.15.2017 9:10 p.m. (Central) |

320.    Defragging a computer can render deleted computer files impossible to recover, and thus it is inconsistent with an intent to preserve evidence on a computer. A fragmented file is one in which the pieces of data that comprise the file are not stored in consecutive blocks of memory on a drive. The act of defragging that file entails copying those pieces of data to a new location on the drive into consecutive blocks of memory, and thereby overwriting whatever otherwise recoverable data had been in that location.

321.    Defendants Michael Ferruzza and/or Vince Dante breached their duty to preserve evidence contained on a Segerdahl-issued MacBook Pro computer. According to Vince Dante, Michael Ferruzza turned over his Segerdahl-issued MacBook Pro to Vince Dante (while Dante

was still an employee of Segerdahl) on the weekend of February 25–26, 2017, just over two weeks after Michael Ferruzza left Segerdahl on February 10, 2017; at least five days after Segerdahl's February 20, 2017 letter to Michael Ferruzza demanding the return of Segerdahl's business information; and at least two days after American Litho's general counsel, Kevin Krantz, wrote Segerdahl's counsel denying that any of the Individual Defendants had anything to return to Segerdahl. Vince Dante allegedly put this device into a drawer in his Segerdahl office, where it remained until May 11, 2017, when he claims to have recalled the existence of this Device No. 6 and Segerdahl turned it over for forensic analysis. The forensic analysis of this device shows *at least five instances* when this device logged onto a WiFi network called "ALITHOGUEST"—i.e., Defendant American Litho' s guest WiFi network—during the workweek of February 20-24, 2017. The forensic analysis also shows that this device contained Segerdahl business information that was deleted before this computer could be forensically imaged and examined by BRG. The Segerdahl files (and any other items located in these same directories) were deleted from this computer prior to February 25, 2017 at 11:46 a.m.—i.e., they were placed in the Trash and then the Trash was emptied by a user with physical custody of the Michael Ferruzza MacBook Pro at that time, either by Michael Ferruzza and/or by Vince Dante.

322.    Defendant Anthony Ferruzza breached his duty to preserve evidence by installing and running the software, Dr. Fone Toolkit for IOS, on his personal MacBook Pro computer, which has significant data-deletion capabilities. The data-deletion protocol report for Anthony Ferruzza's personal MacBook Pro computer shows that, on March 16, 2017—nearly one month *after* receiving a demand letter and preservation notice from Segerdahl's counsel—Anthony Ferruzza, or someone at his direction, installed the software on Anthony Ferruzza's personal computer. The " Dr. Fone Toolkit for IOS" software is from the developer "Wondershare." The

software includes a function called the IOS Private Data Eraser, which enables the user to *permanently* erase data from any IOS device (e.g., iPhones, iPads), including photos, messages and attachments, contacts, call history, notes, calendars, reminders and Safari bookmarks. Data erased using this IOS Private Data Eraser can never be recovered.

323.     On Monday, May 8, 2017 at 7:53 p.m. and at 8:02 p.m. Central time, Anthony Ferruzza ran the Dr. Fone Toolkit for IOS software. Just three days earlier, on Friday, May 5, 2017, Defendant Vince Dante—who at that time was Segerdahl's Director, Infrastructure and Networking—confessed to Segerdahl's CEO, Mary Lee Schneider, that he had been using his position (and his access to Segerdahl employee passwords) to illegally and surreptitiously (a) use a personal iPad to hack the Segerdahl email accounts of Segerdahl's CEO, Mary Lee Schneider, and its Chairman of the Board and former CEO, Rick Joutras; (b) copy confidential information from those Segerdahl email accounts pertaining to Segerdahl's business and the sale thereof; and (c) paste the purloined information into emails directed from Vince Dante's personal email account, Vdante1@me.com, to Anthony Ferruzza' s personal email account, Aferruzza@att.net.[6] Vince Dante allegedly deleted from his personal email account each of the emails that he sent to Anthony Ferruzza's personal email account. Through counsel, Anthony Ferruzza claims to have deactivated his Aferruzza@att.net email account on February 17, 2017, and he further claims that, by doing so, he deleted all data associated with that email account. Anthony Ferruzza never notified anyone at Segerdahl about the fact that Vince Dante was illegally and surreptitiously sending hacked emails to Anthony Ferruzza containing confidential information mined from the Segerdahl email accounts of Segerdahl's CEO and its Chairman of the Board.

324.     On the day that Anthony Ferruzza ran the Dr. Fone Toolkit for IOS software (i.e., on May 8), Segerdahl' s counsel was scheduled to take Vince Dante' s sworn statement on May

9. That sworn statement proceeded on the morning of May 9, and in it, Mr. Dante confirmed his confession to Segerdahl's CEO and the details of his illegal and surreptitious hacking and sharing of highly sensitive Segerdahl business information with Anthony Ferruzza. Following Anthony Ferruzza's use of the Dr. Fone Toolkit for IOS on May 8, 2017 (and Vince Dante's sworn statement on May 9, 2017), Anthony Ferruzza turned over his two iPhones for forensic analysis in connection with the Protocol Agreement on May 12, 2017. The mobile-device analysis protocol reports for Anthony Ferruzza's two iPhones shows that each of his iPhones contains *virtually no data*. For example, Anthony Ferruzza's Apple iPhone SE contains *only six text messages* predating the May 8 running of the Dr. Fone Toolkit for IOS software on his personal MacBook Pro computer (and only 42 total text messages). Likewise, Anthony Ferruzza's Apple iPhone 7 Plus contains only 27 total text messages, all but one of which were sent on either May 4 or 5, 2017 (the other text message was sent on April 17, 2012). By contrast, the mobile-device analysis protocol reports for the other individual Defendants' mobile devices contain significantly larger amounts of data. For example, the protocol reports list the following number of text messages on the individual Defendants' mobile devices: Chris Knoll's iPhone (1,790), Michael Ferruzza's iPhone (367), Erica Knoll's iPhone (473), Daniella Tucci's iPhone (1,828), Eugene Czech's iPhone (487) and Eugene Czech's iPad (216).

325. Defendants American Litho and Michael Ferruzza breached their duty to preserve evidence by causing data to be deleted from Michael Ferruzza's American Litho iMac computer. On August 31, 2017, more than two weeks after the parties executed the Protocol Agreement, American Litho's counsel notified Segerdahl's counsel for the first time that "Michael Ferruzza initially had access to a computer other than the Mac Pro for the first month of his employment at American Litho [i.e., from February 20, 2017 to March 20, 2017]." The failure of American

Litho to identify and turn over this device for forensic analysis is directly at odds with its representation and warranty in the Protocol Agreement that it "does not have in its possession, custody or control any other computers used by the Individual Defendants . . . in connection with their employment with American Litho." (Ex. JJ § I(B)(1).)  On September 1, 2017, American Litho turned over the iMac computer for forensic analysis under the Protocol Agreement.

326.    From at least March 20, 2017 to August 28, 2017, American Litho failed to adequately preserve Michael Ferruzza's American Litho iMac computer, including by reassigning the computer for shared use by two other American Litho employees using Michael Ferruzza's user profile.   The data-deletion protocol report for this iMac indicates that, on *Saturday*, August 26, 2017 at 10:09:54 a.m. Central time (i.e., just *two days* before the iMac was forensically imaged), the .Trash folder for the mferruzza user profile was emptied and its contents were permanently erased.  Additionally, the protocol report shows that the File System Event logs for this iMac were missing, and that the system folder that would normally contain them was accessed and modified on August 28, 2017 at 1:23:01 p.m. Central time, *which is only several minutes before the device began to be forensically imaged* at 1:29 p.m. Central time.

### —Spoliation of Evidence Before February 20, 2017—

327.    While employees of Segerdahl, the Individual Defendants each owed Segerdahl fiduciary duties, including, but not limited to, a duty to act at all times with the utmost good faith, loyalty, honesty and fair dealing towards Segerdahl, to avoid self-dealing, conflicts of interest and acting for his or her personal benefit to the exclusion of Segerdahl's interest, and to act in the best interests of Segerdahl in all matters relating to its business.   The Individual Defendants' duties owed to Segerdahl during their employment included a duty not to take, delete or destroy Segerdahl's data, and a duty not to spoliate evidence of their taking, deleting or

destroying Segerdahl's data. Segerdahl placed trust and confidence in the Individual Defendants that they would abide by these duties.

328. In addition, following their respective departures from Segerdahl (and prior to their receipt of Segerdahl's written evidence preservation directives on February 20, 2017), the Individual Defendants continued to be under a duty to preserve evidence of their egregious misconduct, which they undoubtedly knew could give rise to litigation and legal liability.

329. While still employed by Segerdahl, Defendant Vince Dante breached his duty to preserve evidence by deleting emails from his Vdante1@me.com account, which contained confidential information he stole from the Segerdahl email accounts of Segerdahl's CEO and Chairman of the Board. Vince Dante has admitted that he (most probably at Anthony Ferruzza's direction and in conspiracy with the other Defendants) was using his position (and his access to Segerdahl employee passwords) to illegally and surreptitiously (a) use a personal computing device/iPad to access the Segerdahl email accounts of Segerdahl's CEO, Mary Lee Schneider, and its Chairman of the Board and former CEO, Rick Joutras; (b) copy confidential information from those Segerdahl email accounts pertaining to Segerdahl's business and the sale thereof; and (c) paste the purloined information into emails directed from Vince Dante's personal email account, Vdante1@me.com, to Anthony Ferruzza's personal email account, Aferruzza@att.net. Vince Dante allegedly deleted from his personal email account each of the emails that he sent to Anthony Ferruzza's email account.

330. While still employed by Segerdahl, Defendant Anthony Ferruzza breached his duty to preserve evidence by deleting data from his Segerdahl computer and by stealing from Segerdahl the external "clone" drive backup of his Segerdahl computer. On his last day of employment with Segerdahl, January 31, 2017, Anthony Ferruzza deleted all user-created

documents associated with his user profile on his Segerdahl iMac computer, and he emptied all files in the "Trash" folder, which effectively deleted all file-system metadata for the corresponding files. Moreover, ever since Anthony Ferruzza's abrupt departure from Segerdahl, Segerdahl has been unable to locate the external "clone" drive backup of Anthony Ferruzza's Segerdahl computer. Segerdahl believes that the missing "clone" drive contains, at a minimum, a complete duplicate of the files on his computer as of November 29, 2016, including but not limited to misappropriated confidential and proprietary Segerdahl business information and files previously entrusted to Anthony Ferruzza. On information and belief, Anthony Ferruzza stole the external "clone" drive from Segerdahl, and he has failed to turn it over to Segerdahl during discovery in this case or otherwise.

331. While, still employed by Segerdahl, Defendant Michael Ferruzza breached his duty to preserve evidence by deleting data from his Segerdahl computer. Prior to leaving Segerdahl, Michael Ferruzza deleted all user-created documents associated with his user profile on his Segerdahl MacPro Tower. In addition, Michael Ferruzza accessed and modified his computer's "Trash" folder on February 8, 2017, emptying all files contained therein, which effectively deleted all file-system metadata for the corresponding files.

332. Defendants Anthony Ferruzza and Vince Dante breached their duty to preserve evidence by destroying a hard drive of Anthony Ferruzza's Segerdahl Apple MacBook Pro. On Sunday, February 5, 2017, while Vince Dante was helping to set up a Super Bowl party being hosted by Anthony Ferruzza, Anthony Ferruzza brought Vince Dante a Segerdahl Apple MacBook Pro. Anthony Ferruzza asked Vince Dante about getting rid of Segerdahl information on the MacBook. Vince Dante, still a Segerdahl employee at the time, told Anthony Ferruzza, who was no longer a Segerdahl employee, that replacing the internal hard drive would be the

best way to get rid of all information on the MacBook. Vince Dante then removed the internal hard drive, handed it to Anthony Ferruzza and watched as Anthony Ferruzza snapped the hard drive in two with his hands and threw the pieces in the trash. Mr. Dante did not admit doing all of this to Segerdahl until more than three months later, and after confessing to his hacking and secret information sharing with Anthony Ferruzza.

333.     Defendant Anthony Ferruzza breached his duty to preserve evidence by allegedly deactivating his AT&T email account, aferruzza@att.net. Anthony Ferruzza allegedly deactivated his Aferruzza@att.net email account on February 17, 2017 and, by doing so, he claims that he deleted all data associated with that email account. To avoid a motion to compel (and at the direction of the Special Master), Anthony Ferruzza's counsel issued a subpoena to AT&T, which seeks certain information regarding this allegedly deactivated email account. This email account is the account to which Vince Dante sent the information pertaining to Segerdahl's business and the sale thereof that he stole from the Segerdahl email accounts of Segerdahl's CEO and its Chairman of the Board.

334.     As a direct and proximate result of Defendants' breaches of their respective duties to preserve evidence, Segerdahl may be unable to prove certain claims against Defendants.

335.     Such wrongful conduct and negligent spoliation of evidence, in disregard of Defendants' duties to preserve evidence, has been deliberate, willful and malicious, and of such an aggravated character as to warrant imposition of punitive damages, attorneys' fees and costs in addition to compensatory damages and injunctive relief.

WHEREFORE, Segerdahl respectfully requests that the Court enter an Order granting judgment in favor of Segerdahl and against Defendants on Count XI and ordering the following relief:

(a)     an order or jury instruction allowing that negative inferences be drawn against the Defendants based on the Defendants' destruction of evidence;

(b)     an award of compensatory damages in an amount to be determined at trial;

(c)     an award of punitive damages in an amount to be determined at trial;

(d)     the award of compensatory damages in an amount to be determined at trial; and

(e)     such other relief as the Court deems just and proper.

### JURY DEMAND
**(All Claims)**

Segerdahl demands trial by jury on all the claims for damages.


Respectfully submitted,

THE SEGERDAHL CORP.


By:     */s/ Nicholas Anaclerio*
              One of Its Attorneys

Nicholas Anaclerio, Bar No. 6187889
John W. Whittlesey, Bar No. 6297943
Josh J. Orewiler, Bar No. 6309835
Jonathon P. Reinisch, Bar No.  6317528
Vedder Price P.C.
222 North LaSalle Street
Chicago, Illinois 60601
T:  +1 312 609 7500

Dated:  February 26, 2018

129

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing *SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES* with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Keith A. Vogt
1033 South Blvd
Suite 200
Oak Park, IL 60302
keith@vogtip.com

Adrian M. Vuckovich
Collins Bargione & Vuckovich
One North LaSalle Street
Suite 300
Chicago, IL 60602
av@cb-law.com

Konrad Sherinian
The Law Offices of Konrad Sherinian, LLC
1755 Park St., Ste 200
Naperville, IL 60563
ksherinian@sherinianlaw.net

Steven S. Kaufman
Christopher Kip Schwartz
Christiane McKnight
Ashtyn Saltz
Kaufman & Company
180 North LaSalle Street
Suite 3700
Chicago, IL 60602

on February 26, 2018.

*/s/ Nicholas Anaclerio*
Nicholas Anaclerio